## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF ARKANSAS
### THE PINE BLUFF DIVISION

RICELAND FOODS, INC.,

     PLAINTIFF,

VS.

GRAY, RITTER & GRAHAM, P.C.; DON
M. DOWNING; GRANT & EISENHOFER
P.A.; ADAM J. LEVITT; WOLF
HALDENSTEIN ADLER FREEMAN &
HERZ LLC; WOLF HALDENSTEIN
ADLER FREEMAN & HERZ LLP;
NEBLETT BEARD & ARSENAULT, LLP;
RICHARD J. ARSENAULT; LOOPER
REED & MCGRAW, P.C.; WILLIAM
CHANEY; DAVIS, BETHUNE & JONES,
L.L.C.; GRANT L. DAVIS; EMERSON
POYNTER LLP; SCOTT E. POYNTER;
SEEGER WEISS LLP; STEPHEN A.
WEISS; WHATLEY, DRAKE & KALLAS,
LLC; JOE R. WHATLEY, JR.; CHAP-
MAN, LEWIS & SWAN, PLLC; RALPH
E. CHAPMAN; HARE, WYNN,
NEWELL & NEWTON, LLP; and SCOTT
A. POWELL,

     DEFENDANTS

Case No._____
Removed from the Circuit Court of
Arkansas County, Arkansas
Northern District Civil Division
Case No. CV-2013-040ND


**CLASS ACTION**

# NOTICE OF REMOVAL EXHIBIT A
# STATE COURT FILE

IN THE CIRCUIT COURT OF ARKANSAS COUNTY, ARKANSAS
NORTHERN DISTRICT
CIVIL DIVISION

RICELAND FOODS, INC.                                                      PLAINTIFF

     VS.             CASE NO. _CV-2013-040nD_

**GRAY, RITTER & GRAHAM, P.C., DON M. DOWNING,
GRANT & EISENHOFER P.A., ADAM J. LEVITT,
WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC,
WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP,
NEBLETT BEARD & ARSENAULT, LLP, RICHARD J. ARSENAULT,
LOOPER REED & MCGRAW, P.C., WILLIAM CHANEY,
DAVIS, BETHUNE & JONES, L.L.C., GRANT L. DAVIS,
EMERSON POYNTER LLP, SCOTT E. POYNTER,
SEEGER WEISS LLP, STEPHEN A. WEISS,
WHATLEY, DRAKE & KALLAS, LLC, JOE R. WHATLEY, JR.,
CHAPMAN, LEWIS & SWAN, PLLC, RALPH E. CHAPMAN,
HARE, WYNN, NEWELL & NEWTON, LLP,
and SCOTT A. POWELL**                                              **DEFENDANTS**

FILED
APR 19 2013
TIME: 2:49
SARAH MERCHANT, CIRCUIT CLERK
ARKANSAS COUNTY, ARKANSAS
NORTHERN DISTRICT

## COMPLAINT

    COMES NOW Plaintiff, Riceland Foods, Inc. ("Riceland"), and for its Complaint against

Defendants Gray, Ritter & Graham, P.C., Don M. Downing, Grant & Eisenhofer P.A., Adam J.

Levitt, Wolf Haldenstein Adler Freeman & Herz LLC, Wolf Haldenstein Adler Freeman & Herz

LLP, Neblett Beard & Arsenault, LLP, Richard J. Arsenault, Looper Reed & McGraw, P.C.,

William Chaney, Davis, Bethune & Jones, L.L.C., Grant L. Davis, Emerson Poynter LLP, Scott

E. Poynter, Seeger Weiss LLP, Stephen A. Weiss, Whatley, Drake & Kallas, LLC, Joe R.

Whatley, Jr., Chapman, Lewis & Swan, PLLC, Ralph E. Chapman, Hare, Wynn, Newell &

Newton, LLP, and Scott A. Powell (hereinafter collectively "Defendants") states as follows:

    1.     Riceland, Foods, Inc. ("Riceland") is a farmer-owned agricultural cooperative

organized under the laws of the State of Arkansas with its principal place of business in Stuttgart,

Arkansas. Riceland is a citizen of the State of Arkansas.

2.      Gray, Ritter & Graham, P.C. ("Gray Ritter") is a professional corporation engaged in the practice of law with its principal place of business at 701 Market Street, St. Louis, Missouri 63101.  Gray Ritter was incorporated in the State of Missouri and is a citizen of the State of Missouri.  On February 19, 1992, Gray Ritter registered to do business in the State of Arkansas with the Arkansas Secretary of State, designated an agent for service of process in Arkansas, and identified its principal address in Arkansas as 1920 Main St., STE 800, North Little Rock, AR 72114.  By qualifying to do business in Arkansas and appointing an agent for service of process in Arkansas, Gray Ritter consented to general personal jurisdiction in Arkansas.  Further, Gray Ritter continues to transact business in Arkansas on an active, continuous, and systematic basis.  Gray Ritter states on its website that it represents clients "in cities throughout ... Arkansas."  Among its Arkansas clients, are scores of Arkansas long-grain rice farmers who, together with Gray Ritter, executed the Liberty Link Rice ("LLRICE") Release of All Claims form, upon which this action is based.  Principals of Gray Ritter have actively participated in court sessions and other meetings in Arkansas, and have directed telephone calls, e-mails, and other correspondence into Arkansas pertaining to the subject matter of this litigation.  In addition, principals and other attorneys from Gray Ritter have attended one or more of the Arkansas state court LLRICE trials, depositions and/or hearings and have obtained information, transcripts and exhibits from same.  Don M. Downing of Gray Ritter participated in the May 8, 2009 deposition of Carl Brothers in Little Rock, Arkansas and Jason Sapp of Gray Ritter participated in the July 27, 2009 deposition of Ronnie Helms in Little Rock, Arkansas. Gray Ritter has purposely availed itself of Arkansas law and the Arkansas judicial system.  Gray Ritter has appeared as a party or moved to intervene on its own behalf in multiple LLRICE cases pending in Arkansas state courts, including *Meins, et al. v. Bayer, et al.*, Arkansas County Circuit

2

Court Case No. CV-2008-108 ("*Meins*"), *Sims, et al. v. Bayer, et al.*, Desha County Circuit Court Case No. CV-2009-118 ("*Sims*"), and *Kyle, et al. v. Bayer, et al.*, Woodruff County Circuit Court Case No. CV-2008-107 ("*Kyle*"). Gray Ritter pursued its claim in the *Kyle* case all the way to the Arkansas Supreme Court. *Kyle, et al. v. Gray, Ritter & Graham, P.C., et al.*, 2012 Ark. 268 (remanded for lack of a final order and subsequently non-suited by the Plaintiff Leadership Group).

      3.     Don M. Downing ("Downing") is an attorney member, principal, and Vice President of Gray Ritter. He is a citizen of the State of Missouri. Downing was appointed Co-Lead Counsel of the *In re Genetically Modified Rice Litigation*, which multi-district litigation is pending before the U.S. District Court for the Eastern District of Missouri, Eastern Division, Case No. 4:06-MD-1811-CDP ("MDL"). Downing is part of the MDL Leadership Group. Downing is a signatory to the "MDL Settlement Agreement." Downing represents numerous Arkansas clients, including many Arkansas farmers. Downing has appeared and filed pleadings in multiple Arkansas state court cases, including *Kyle*, *Sims*, and *Meins*. Downing sought and obtained *pro hac vice* admission from this Court in the *Meins* case. In *Meins*, Downing sought to intervene to assert a claim on behalf of himself, Gray Ritter, and others who are part of the MDL Leadership Group. Downing has attended LLRICE hearings and trials conducted in Arkansas state courts. Downing has attended the deposition of Carl Brothers in Arkansas related to LLRICE. Downing has directed numerous telephone calls, emails, letters and other correspondence into the State of Arkansas pertaining to the subject matter of this litigation.

      4.     Grant & Eisenhofer P.A. ("Grant & Eisenhofer") is a professional association incorporated under the laws of the State of Delaware with its principal place of business at 123 Justison Street, Wilmington, Delaware, 19801. Grant & Eisenhofer is a citizen of the State of

Delaware. Upon information and belief, Grant & Eisenhofer is engaged in the practice of law and represents multiple Arkansas clients and transacts business in Arkansas on an active, continuous, and systematic basis. Principal Adam J. Levitt of Grant & Eisenhofer has actively participated in meetings in Arkansas, and has directed telephone calls, e-mails, and other correspondence into Arkansas pertaining to the subject matter of this litigation. In addition, Adam J. Levitt of Grant & Eisenhofer has attended one or more of the Arkansas state court LLRICE trials, hearings, or depositions and has obtained information, transcripts and exhibits from those proceedings.

5.      Wolf Haldenstein Adler Freeman & Herz LLP ("Wolf LLP") is a New York limited liability partnership engaged in the practice of law with its principal place of business at 270 Madison Avenue, 10th Floor, New York, New York 10016. Upon information and belief, the various partners in Wolf LLP are citizens of the States of New York, California and Illinois; therefore, Wolf LLC is a citizen of the States of New York, California, and Illinois.

6.      Wolf Haldenstein Adler Freeman & Herz LLC ("Wolf LLC") is a limited liability company engaged in the practice of law with its principal place of business at 55 West Monroe Street, Suite 1111, Chicago, Illinois 60603. Upon information and belief, the various members of Wolf LLC are citizens of the States of New York, California and Illinois, respectively; therefore, Wolf LLC is a citizen of States of New York, California, and Illinois.

7.      At all times relevant to this action there has existed, and presently exists, a unity of interest in ownership between Wolf LLP and Wolf LLC. These defendants are the alter-egos of one another and, in the case of the parent company, exercised decision-making and control over its subsidiary with respect to the conduct giving rise to Riceland's claims. Alternatively, they have constituted a single business enterprise sharing assets, employees and management.

Both entities hold themselves out to the public as Wolf LLP and use the same website under the Wolf LLP name. The members of Wolf LLC are listed as partners in Wolf LLP on the firm's website. Wolf LLP and Wolf LLC are hereinafter collectively referred to as "Wolf Haldenstein" unless otherwise specified.

8.    Wolf Haldenstein transacts business in Arkansas on an active, continuous, and systematic basis and represents or has represented numerous Arkansas clients. Upon information and belief, among its Arkansas clients, are many Arkansas long-grain rice farmers who, together with Wolf Haldenstein, executed the LLRICE Release of All Claims form. Principals of Wolf Haldenstein have actively participated in meetings in Arkansas, and have directed telephone calls, e-mails, and other correspondence into Arkansas pertaining to the subject matter of this litigation. In addition, principals and other attorneys from Wolf Haldenstein have attended and/or participated in one or more of the Arkansas state court LLRICE trials, hearings, or depositions and have obtained information, transcripts and exhibits from those proceedings. Wolf Haldenstein has purposely availed itself of Arkansas law and the Arkansas judicial system. Wolf Haldenstein has appeared as a party or moved to intervene on its own behalf in multiple LLRICE cases pending in Arkansas state courts, including *Meins, Sims,* and *Kyle.* Wolf Haldenstein pursued its claim in the *Kyle* case all the way to the Arkansas Supreme Court. *Kyle, et al. v. Gray, Ritter & Graham, P.C., et al.,* 2012 Ark. 268.

9.    Adam J. Levitt ("Levitt") is citizen of the State of Illinois. Levitt is an attorney member and Director of Grant & Eisenhofer. Before joining Grant & Eisenhofer, Levitt was a member of Wolf LLP and Wolf LLC. Levitt remains listed as a member of Wolf LLC by the Illinois Secretary of State. Levitt was appointed Co-Lead Counsel of the LLRICE MDL in St. Louis. Levitt is part of the MDL Leadership Group. Levitt is a signatory to the "MDL

5

Settlement Agreement." Levitt represents numerous Arkansas clients, including many Arkansas farmers. Levitt has appeared and filed pleadings in multiple Arkansas state court cases, including *Kyle*, *Sims*, and *Meins*. Levitt sought and obtained *pro hac vice* admission from this Court in the *Meins* case. In *Meins*, Levitt attempted to intervene to assert a claim on behalf of himself and others who are part of the MDL Leadership Group. Furthermore, Levitt appeared and orally argued the motion to intervene before this Court in Stuttgart, Arkansas. Levitt and Downing were also granted *pro hac vice* admission in the *Kyle* case. Levitt has attended one or more LLRICE trials conducted in Arkansas state court and participated in multiple LLRICE hearings conducted in Arkansas state courts. Levitt has directed numerous telephone calls, emails, letters and other correspondence into the State of Arkansas pertaining to the subject matter of this litigation. Levitt has purposely and repeatedly availed himself of Arkansas law and the Arkansas judicial system, including invoking the jurisdiction of this very Court related to a claim against Riceland.

10.      Neblett Beard & Arsenault, LLP ("Neblett Beard") is a limited liability partnership engaged in the practice of law with its principal place of business at 2220 Bonaventure Court, Alexandria, Louisiana 71301. Upon information and belief, all of the partners in Neblett Beard are citizens of the State of Louisiana; therefore, Neblett Beard is a citizen of the State of Louisiana. Neblett Beard transacts business in Arkansas on an active, continuous, and systematic basis. Upon information and belief, Neblett Beard represents Arkansas long-grain rice farmers who, together with Neblett Beard, executed the LLRICE Release of All Claims. Principals of Neblett Beard have directed telephone calls, e-mails, and other correspondence into Arkansas pertaining to the subject matter of this litigation. Neblett Beard has purposely availed itself of Arkansas law and the Arkansas judicial system. Neblett

Beard has appeared as a party or moved to intervene on its own behalf in multiple LLRICE cases pending in Arkansas state courts, including *Meins, Sims,* and *Kyle*. Neblett Beard pursued its claim in the *Kyle* case all the way to the Arkansas Supreme Court. *Kyle, et al. v. Gray, Ritter & Graham, P.C., et al.,* 2012 Ark. 268.

11. Richard J. Arsenault ("Arsenault") is an attorney and a partner in Neblett Beard. Arsenault is a citizen of the State of Louisiana. Arsenault is part of the MDL Leadership Group. Arsenault is a signatory to the "MDL Settlement Agreement." Upon information and belief, Arsenault represents Arkansas long-grain rice farmers. Arsenault has appeared and filed pleadings in multiple Arkansas state court cases, including *Kyle, Sims,* and *Meins*. In *Meins,* Arsenault attempted to intervene to assert a claim on behalf of himself, Neblett Beard, and others who are part of the MDL Leadership Group. Arsenault has directed numerous telephone calls, emails, and other correspondence into the State of Arkansas pertaining to the subject matter of this litigation.

12. Looper Reed & McGraw, P.C. ("Looper Reed") is a professional corporation engaged in the practice of law with offices in Houston and Dallas, Texas, with a principal place of business at 1300 Post Oak Blvd, Suite 2000, Houston, Texas 77056. Looper Reed is a citizen of Texas. Looper Reed transacts business in Arkansas on an active, continuous, and systematic basis. Upon information and belief, Looper Reed represents Arkansas long-grain rice farmers who, together with Looper Reed, executed the LLRICE Release of All Claims. Principals of Looper Reed have actively participated in meetings in Arkansas, and have directed telephone calls, e-mails, and other correspondence into Arkansas pertaining to the subject matter of this litigation. In addition, principals and other attorneys from Looper Reed have attended one or more of the Arkansas state court LLRICE trials, hearings, or depositions and have obtained

information, transcripts and exhibits from those proceedings. William Chaney and Drew York

of Looper Reed participated in the November 2, 2009 deposition of Keith Glover, CEO of

Producers Rice Mill, Inc., in Little Rock, Arkansas. William Chaney and Drew York attended

portions of the *Meins* trial before this Court. Looper Reed has purposely availed itself of

Arkansas law and the Arkansas judicial system. Looper Reed has appeared as a party or moved

to intervene on its own behalf in multiple LLRICE cases pending in Arkansas state courts,

including *Meins, Sims,* and *Kyle.* Looper Reed pursued its claim in the *Kyle* case all the way to

the Arkansas Supreme Court. *Kyle, et al. v. Gray, Ritter & Graham, P.C., et al.,* 2012 Ark. 268.

13.   William Chaney ("Chaney") is an attorney shareholder of Looper Reed &

McGraw, P.C. and a citizen of the State of Texas. Chaney is part of the MDL Leadership Group.

Chaney is a signatory to the "MDL Settlement Agreement." Upon information and belief,

Chaney represents certain Arkansas long-grain rice farmers. Chaney has appeared and filed

pleadings in multiple Arkansas state court cases, including *Kyle, Sims,* and *Meins.* In *Meins,*

Chaney attempted to intervene to assert a claim on behalf of himself, Looper Reed, and others

who are part of the MDL Leadership Group. Chaney has attended one or more LLRICE trials or

hearings conducted in Arkansas state courts. Chaney participated in the November 2, 2009

deposition of Keith Glover, CEO of Producers Rice Mill, Inc., in Little Rock, Arkansas. Chaney

has directed numerous telephone calls, emails, and other correspondence into the State of

Arkansas pertaining to the subject matter of this litigation.

14.   Davis, Bethune & Jones, L.L.C. ("Davis Bethune") is a limited liability company

engaged in the practice of law with a principal place of business at 1100 Main Street, Suite 2930,

Kansas City, Missouri 64105. Upon information and belief, the various members of Davis

Bethune are citizens of the States of Kansas and Missouri, respectively; therefore, Davis Bethune

is a citizen of States of Kansas and Missouri. Davis Bethune transacts business in Arkansas on

an active, continuous, and systematic basis. Davis Bethune has represented numerous Arkansas

clients in Arkansas state courts. *See, e.g., ProAssurance Indem. Co. v. Metheny*, 2012 Ark. 461.

Among its Arkansas clients are Arkansas long-grain rice farmers who, together with Davis

Bethune, executed the LLRICE Release of All Claims. Davis Bethune has filed three lawsuits

against Bayer and Riceland in Arkansas state courts related to LLRICE. One such case is

pending before this Court; the other two are pending before the Circuit Court of Ashley County,

Arkansas. Davis Bethune and Grant L. Davis appeared and represented the farmer plaintiffs in

the case of *Schafer, et al. v. Bayer, et al.*, Lonoke County Circuit Court Case No. CV-2006-413

("*Schafer*"). Principals of Davis Bethune have actively participated in trials, hearings,

depositions and/or other meetings in Arkansas, and have directed telephone calls, e-mails, and

other correspondence into Arkansas pertaining to the subject matter of this litigation. In

addition, principals and other attorneys from Davis Bethune have attended one or more of the

Arkansas state court LLRICE trials and have obtained information, transcripts and exhibits from

those trials. Davis Bethune has purposely and repeatedly availed itself of Arkansas law and the

Arkansas judicial system. Davis Bethune has appeared as a party or moved to intervene on its

own behalf in multiple LLRICE cases pending in Arkansas state courts, including *Meins, Sims,*

and *Kyle*. Davis Bethune pursued its claim in the *Kyle* case all the way to the Arkansas Supreme

Court. *Kyle, et al. v. Gray, Ritter & Graham, P.C., et al.*, 2012 Ark. 268.

15.     Grant L. Davis ("Davis") is an attorney member of Davis, Bethune & Jones,

L.L.C. Davis is a citizen of the State of Kansas. Davis is part of the MDL Leadership Group.

Davis represents numerous Arkansas clients, including many Arkansas farmers and business

entities. Davis has appeared and filed pleadings in multiple Arkansas state court cases, including

*Kyle*, *Sims*, and *Meins*.  In *Meins*, Davis attempted to intervene to assert a claim on behalf of himself, Davis Bethune, and others who are part of the MDL Leadership Group.  Upon information and belief, Davis has attended several trials or hearings conducted in Arkansas state courts, and upon information and belief, he continues to actively participate in litigation in Arkansas presently.  Davis has directed numerous telephone calls, emails, and other correspondence into the State of Arkansas pertaining to the subject matter of this litigation.

16.     Emerson Poynter LLP ("Emerson Poynter") is a limited liability partnership engaged in the practice of law, with its principal place of business at 500 President Clinton Avenue, Little Rock, Arkansas 72201.  Further, Scott E. Poynter, one of the partners of Emerson Poynter, is a citizen of the State of Arkansas.  Thus, Emerson Poynter is a citizen of Arkansas.  As a citizen of Arkansas, Emerson Poynter is subject to personal jurisdiction in this State.  Among its Arkansas clients are numerous Arkansas long-grain rice farmers who, together with Emerson Poynter, executed the LLRICE Release of All Claims form.

17.     Scott E. Poynter ("Poynter") is an attorney and a partner of Emerson Poynter and a citizen of the State of Arkansas.  Poynter is domiciled in Arkansas.  Upon information and belief, Poynter resides and works in Little Rock, Arkansas.  As a citizen of Arkansas, Poynter is subject to personal jurisdiction in this State.  Poynter is part of the MDL Leadership Group.

18.     Seeger Weiss LLP ("Seeger Weiss") is a limited liability partnership engaged in the practice of law with its principal place of business at 77 Water Street, New York, New York 10005.  Upon information and belief, the various partners of Seeger Weiss are citizens of the States of New York, New Jersey and Pennsylvania; therefore, Seeger Weiss is a citizen of the States of New York, New Jersey, and Pennsylvania.  Seeger Weiss transacts business in Arkansas on an active, continuous, and systematic basis.  Upon information and belief, Seeger

10

Weiss represents certain Arkansas long-grain rice farmers who, together with Seeger Weiss, executed the LLRICE Release of All Claims. Principals of Seeger Weiss have directed telephone calls, e-mails, and other correspondence into Arkansas pertaining to the subject matter of this litigation. Seeger Weiss has purposely availed itself of Arkansas law and the Arkansas judicial system. Seeger Weiss has appeared as a party or moved to intervene on its own behalf in multiple LLRICE cases pending in Arkansas state courts, including *Meins, Sims,* and *Kyle*. Seeger Weiss pursued its claim in the *Kyle* case all the way to the Arkansas Supreme Court. *Kyle, et al. v. Gray, Ritter & Graham, P.C., et al.*, 2012 Ark. 268.

19.    Stephen A. Weiss ("Weiss") is an attorney with Seeger Weiss LLP and a citizen of the State of New York. Weiss is part of the MDL Leadership Group. Upon information and belief, Weiss represents certain Arkansas long-grain rice farmers. Weiss has appeared and filed pleadings in multiple Arkansas state court cases, including *Kyle, Sims,* and *Meins*. In *Meins*, Weiss attempted to intervene to assert a claim on behalf of himself, Seeger Weiss, and others who are part of the MDL Leadership Group. Weiss has directed numerous telephone calls, emails, and other correspondence into the State of Arkansas pertaining to the subject matter of this litigation.

20.    Whatley, Drake & Kallas, LLC ("Whatley Drake") is a limited liability company engaged in the practice of law with its principal place of business at 2001 Park Place North, Birmingham, Alabama 35203. Upon information and belief, the various members of Whatley Drake are citizens of the States of Alabama and New York; therefore, Whatley Drake is a citizen of the States of Alabama and New York. Whatley Drake transacts business in Arkansas on an active, continuous, and systematic basis. Upon information and belief, Whatley Drake represents certain Arkansas long-grain rice farmers who, together with Whatley Drake, executed the

LLRICE Release of All Claims form.  Principals of Whatley Drake have directed telephone calls,

e-mails, and other correspondence into Arkansas pertaining to the subject matter of this

litigation.  In addition, principals and other attorneys from Whatley Drake have attended one or

more of the Arkansas state court LLRICE trials, hearings, or depositions and have obtained

information, transcripts and exhibits from those proceedings.  Adam Plant, an attorney with

Whatley Drake, traveled to Arkansas and participated in the July 27, 2009 deposition of Ronnie

Helms, a rice farmer, in Little Rock, Arkansas.  Whatley Drake has purposely availed itself of

Arkansas law and the Arkansas judicial system.  Whatley Drake has appeared as a party or

moved to intervene on its own behalf in multiple LLRICE cases pending in Arkansas state

courts, including *Meins, Sims,* and *Kyle*.  Whatley Drake pursued its claim in the *Kyle* case all

the way to the Arkansas Supreme Court.  *Kyle, et al. v. Gray, Ritter & Graham, P.C., et al.*, 2012

Ark. 268.

21.    Joe R. Whatley, Jr. ("Whatley") is an attorney with, and a member of, Whatley

Drake and a citizen of the State of Alabama.  Whatley is part of the MDL Leadership Group.

Upon information and belief, Whatley represents certain Arkansas long-grain rice farmers.

Whatley has appeared and filed pleadings in multiple Arkansas state court cases, including *Kyle,*

*Sims,* and *Meins*.  In *Meins*, Whatley attempted to intervene to assert a claim on behalf of

himself, Whatley Drake, and others who are part of the MDL Leadership Group.  Whatley has

directed numerous telephone calls, emails, and other correspondence into the State of Arkansas

pertaining to the subject matter of this litigation.

22.    Chapman, Lewis & Swan, PLLC ("Chapman Lewis") is a professional limited

liability company engaged in the practice of law with its principal place of business at 501 First

Street, Clarksdale, Mississippi, 38614.  Upon information and belief, all of the members of

Chapman Lewis are citizens of the State of Mississippi; therefore, Chapman Lewis is a citizen of the State of Mississippi. Chapman Lewis transacts business in Arkansas on an active, continuous, and systematic basis. Upon information and belief, Chapman Lewis represents certain Arkansas long-grain rice farmers who, together with Chapman Lewis, executed the LLRICE Release of All Claims. Principals of Chapman Lewis have directed telephone calls, e-mails, and other correspondence into Arkansas pertaining to the subject matter of this litigation. Chapman Lewis has purposely availed itself of Arkansas law and the Arkansas judicial system. Chapman Lewis has appeared as a party or moved to intervene on its own behalf in multiple LLRICE cases pending in Arkansas state courts, including *Meins, Sims,* and *Kyle.* Chapman Lewis pursued its claim in the *Kyle* case all the way to the Arkansas Supreme Court. *Kyle, et al. v. Gray, Ritter & Graham, P.C., et al.,* 2012 Ark. 268.

23. Ralph E. Chapman ("Chapman") is an attorney with Chapman, Lewis & Swan, PLLC and a citizen of the State of Mississippi. Chapman is part of the MDL Leadership Group. Upon information and belief, Chapman represents certain Arkansas long-grain rice farmers. Chapman has appeared and filed pleadings in multiple Arkansas state court cases, including *Kyle, Sims,* and *Meins.* In *Meins,* Chapman attempted to intervene to assert a claim on behalf of himself, Chapman Lewis, and others who are part of the MDL Leadership Group. Chapman has directed numerous telephone calls, emails, and other correspondence into the State of Arkansas pertaining to the subject matter of this litigation.

24. Hare, Wynn, Newell & Newton, LLP ("Hare Wynn") is a limited liability partnership engaged in the practice of law with offices in Birmingham, Alabama, Little Rock, Arkansas, and Lexington, Kentucky. The partners of Hare Wynn are citizens of the States of Arkansas and Alabama; therefore, Hare Wynn is a citizen of the States of Arkansas and

Alabama. Attorney, Shawn B. Daniels, managing partner of Hare Wynn's Little Rock Office,

permanently resides and works in Arkansas and is a citizen of the State of Arkansas. Hare Wynn

is registered with the Arkansas Secretary of State to conduct business in Arkansas and has

designated an agent for service of process in this state. Hare Wynn maintains an office in Little

Rock, Arkansas, has employees in this state, owns property in this state, has substantial business

operations in Arkansas, and regularly transacts business in the State of Arkansas. By qualifying

to do business in Arkansas and appointing an agent for service of process in Arkansas, Hare

Wynn has consented to general personal jurisdiction in Arkansas. Additionally, Hare Wynn and

Scott Powell represent numerous Arkansas clients, including hundreds of Arkansas long-grain

rice farmers and others, and have filed and pursued many lawsuits in Arkansas state courts. *See,*

*e.g., Bayer CropScience LP, et al. v. Schafer, et al.*, 2011 Ark. 518; *Webb, et al. v. Riceland*

*Foods, Inc.*, Lonoke County Circuit Court Case No. CV-2008-459; *John Alter, et al. v. Pfizer,*

*Inc., et al.*, Arkansas County Circuit Court Case No. CV-2012-67. Hare Wynn represents

numerous Arkansas long-grain rice farmers who, together with Hare Wynn, executed the

LLRICE Release of All Claims. Principals of Hare Wynn have actively participated in LLRICE

litigation in Arkansas state courts, have conducted or participated in multiple LLRICE-related

meetings in Arkansas, and have directed telephone calls, e-mails, and other correspondence into

Arkansas pertaining to the subject matter of this litigation. The attorneys of Hare Wynn have

participated in numerous depositions in Arkansas. For instance, Scott A. Powell attended the

November 12-13, 2008 deposition of Carl Brothers of Riceland in Jonesboro, Arkansas; Scott A.

Powell and Paul Byrd attended the January 8, 2009 deposition of Carl Brothers of Riceland in

Little Rock, Arkansas; Don McKenna attended the May 8, 2009 deposition of Keith Glover,

CEO of Producers Rice Mills, Inc., in Jonesboro, Arkansas; Paul Byrd and Don McKenna

attended the November 6-7, 2008 deposition of Terry Richardson in Jonesboro, Arkansas; and Hare Wynn attorneys have attended certain farmer depositions. Hare Wynn attorneys orally argued the *Schafer* case before the Arkansas Supreme Court.

25.     Scott A. Powell ("Powell") is an attorney, partner, and agent of Hare Wynn and a citizen of the State of Alabama. Powell represents scores of Arkansas clients, including many Arkansas long-grain rice farmers. Powell has appeared and participated at hearings and trial as counsel of record in multiple Arkansas state court cases, including the *Schafer* case referenced above, which was filed in the Circuit Court of Lonoke County, Arkansas. Powell is also currently appearing before this Court in the *Alter* lawsuit. Powell has directed numerous telephone calls, emails, and other correspondence into the State of Arkansas pertaining to the subject matter of this litigation. Powell is a signatory to the "MDL Settlement Agreement."

26.     Each of the Defendant law firms is liable for the acts and omissions of its attorney agents, including the Defendant attorneys named in this Complaint. Defendants' acts and omissions set forth in this Complaint were intended to cause harm and injury, and did in fact cause harm and injury, in Arkansas.

27.     This Court has subject matter jurisdiction pursuant to applicable Arkansas law, including Ark. Code Ann. 16-13-201(a).

28.     This Court has general and specific personal jurisdiction over all of the Defendants due to their continuous and systematic business activities in Arkansas and pursuant to their doing business in Arkansas related to the claims made herein. Each of the Defendants actively conducts or has conducted business in Arkansas. This business includes representing clients and attending, intervening, and participating in court sessions, hearings, trials, and/or depositions in the LLRICE litigation and/or other litigation in Arkansas state courts, advertising

15

or soliciting clients in Arkansas, and directing numerous telephone calls, emails, letters, and other correspondence into this State pertaining to the subject matter of this litigation. Defendants have derived substantial revenues as a result of their activities in Arkansas. In addition to the foregoing, each of the Defendants has sufficient minimum contacts in Arkansas by virtue of its involvement in the LLRICE litigation pending in this state — including voluntarily appearing before this Court, the Circuit Court of Woodruff County, Arkansas, the Circuit Court of Desha County, Arkansas, the Circuit Court of Lonoke County, Arkansas, and the Arkansas Supreme Court (among other Arkansas state courts) — to render the exercise of jurisdiction by this Court over them proper under the Arkansas Long-Arm Statute, Ark. Code Ann. 16-4-101(B), and the Due Process Clause of the United States Constitution. The Defendants have purposely and repeatedly availed themselves of the right to do business in the State of Arkansas as set forth in this Complaint; these contacts are sufficient to create personal jurisdiction over the Defendants.

29.    Venue is proper in this county pursuant to Ark. Code Ann. 16-55-213(a), because Riceland has its principal office in Stuttgart, Arkansas County, Arkansas and a substantial part of the events or omissions giving rise to the claim occurred in Arkansas County.

## FACTS

30.    Riceland is a miller and wholesaler of long-grain rice and rice related products. Riceland purchases long grain rice from farmers who transport their rice to Riceland to be stored, dried, milled, and packaged for sale or sold in bulk. Because Riceland is a cooperative, a large portion of this rice is purchased from cooperative members, but Riceland also buys rice from non-member farmers.

31.    When used in this Complaint, "Bayer" is defined as Bayer CropScience LP, Bayer CropScience Holding, Inc., Bayer CropScience Inc., Bayer CropScience LLC, Stoneville

Pedigreed Seed Company, Bayer Corporation, Bayer AG, Bayer CropScience AG, Bayer BioScience NV, Bayer CropScience Holding SA, Bayer CropScience SA, and StarLink Logistics Inc.  Bayer created, produced, patented and trademarked the genetically modified rice seeds intended to promote glufosinate herbicide tolerance referred to herein as LLRICE.

32.    On August 18, 2006, the United States Department of Agriculture ("USDA") announced that Bayer's LLRICE event 601 had been detected in the U.S. commercial rice supply.  Later testing in 2007 by the USDA and the Arkansas State Plant Board resulted in an announcement of the discovery that Bayer's LLRICE 604 strain had also infiltrated the commercial rice supply.  Bayer developed these genetically modified LLRICE traits in an effort to create a strain of genetically modified rice that could tolerate Bayer's Liberty® herbicide.  At the time the USDA statements were issued, LLRICE 601 and LLRICE 604 had not been authorized for commercial production or human consumption in the United States.

33.    Following the announcement that LLRICE had been detected in the commercial rice supply, hundreds (if not thousands) of lawsuits were filed by long-grain rice farmers as well as domestic and foreign rice mills against Bayer in federal and state courts (the "LLRICE Litigation").  Most of these cases were filed in the southern long-grain rice growing regions of the United States, including Arkansas, Louisiana, Mississippi, Missouri and Texas.

34.    On December 19, 2006, the Judicial Panel on Multidistrict Litigation created a multi-district litigation to consolidate all of the many LLRICE cases filed in federal court.  This federal MDL was consolidated before the U.S. District Court for the Eastern District of Missouri, Case No. 4:06-md-1811-CDP.

35.    In April of 2007, the Honorable Catherine Perry, United States District Court Judge, entered an order titling the MDL action the *In Re Genetically Modified Rice Litigation.*

Judge Perry also appointed Downing and Levitt as Co-Lead Counsel for the MDL plaintiffs and Poynter, Arsenault, Chaney, Chapman, Whatley and Weiss as members of the MDL Executive Committee for the MDL plaintiffs.  When used in this Complaint, the term "MDL Leadership Group" includes Downing, Levitt, Poynter, Arsenault, Chaney, Chapman, Whatley, Weiss and each of their respective law firms, all of which are Defendants in this action.

36.     Bayer was not the only defendant made a party to the LLRICE Litigation.  Other individuals and entities were joined as defendants with Bayer in various suits including, by way of example, Louisiana State University and Jacko Garrett, among others.

37.     Riceland was named as a defendant with Bayer in more than two hundred LLRICE cases.  The vast majority of these cases involving Riceland were filed in Arkansas state court.  Many of the LLRICE cases which were brought against Riceland in Arkansas state court were filed by the attorneys and law firms who are Defendants to this present action.  For instance, Davis and Davis Bethune filed before this Court the case of *Holly Ridge Rice & Grain Terminal v. Bayer CropScience, LP, et al.*, Arkansas County Circuit Court, Northern District, Case No. CV-2010-68.  Poynter and Emerson Poynter filed before this Court the case of *Makovec v. Bayer CropScience, LP, et al.*, Arkansas County Circuit Court, Northern District, Case No. CV-2009-93.  Powell and Hare Wynn filed in Lonoke County, Arkansas the case of *Schafer, et al. v. Riceland Foods, Inc., et al.*, Lonoke County Circuit Court, Case No. CV-2006-413.  These Defendants filed many other lawsuits against Riceland in Arkansas state courts.  Riceland also filed its own affirmative claim for damages against Bayer in the *Meins* case.

38.     In 2009 and 2010 several cases filed by long-grain rice farmers proceeded to trial against Bayer.  Three cases were tried to conclusion in the federal MDL; three more were tried in Arkansas state court.  Bayer was defeated in each of these trials.  In every instance, the jury

18

concluded that Bayer was negligent in its handling of LLRICE and awarded compensatory damages to the farmer-plaintiffs. Punitive damages were imposed upon Bayer by Arkansas juries in both the *Kyle* and *Schafer* cases.

39.     Riceland was also a defendant in two of the trials referenced above, both of which were in Arkansas state court. *Kyle, et al. v. Bayer, et al.*, Woodruff County Circuit Court Case No. CV-2008-107 and *Sims, et al. v. Bayer, et al.*, Desha County Circuit Court Case No. CV-2009-118. Riceland prevailed at trial in each instance. Riceland obtained a jury verdict in *Kyle* and a directed verdict in *Sims*. In both cases, Riceland vigorously defended itself and all claims against Riceland were dismissed with prejudice.

40.     Meanwhile, in the MDL Action, the MDL Leadership Group requested that Judge Perry create a common benefit fund to compensate them for work they allegedly performed on behalf of participants in the MDL, including their own farmer-clients. In sum, the MDL Leadership Group asked that a portion of each farmer's recovery – whether represented by the MDL Leadership Group attorneys or not – be taken from the farmer and paid to the MDL Leadership Group; this was in addition to the contingency fee the MDL Leadership Group attorneys and their firms were already charging their clients. The MDL Leadership Group requested that parties to state court litigation also be required to participate in the fund. Several parties objected to MDL Leadership Group's proposal on multiple grounds, including the ground that the federal MDL court did not have jurisdiction over and could not require a common benefit hold back from state court claimants.

41.     On February 24, 2010, Judge Perry created a common benefit fund, the purpose of which was "to pay fees and expenses of attorneys who perform work benefitting all the plaintiffs." However, Judge Perry ruled that the common benefit order "cannot be as broad as

requested," and that the Court "will not require defendants to hold back and contribute amounts from settlements and judgments related to cases pending in state courts." *In re Genetically Modified Rice Litig.*, 4:06 MD 1811 CDP, 2010 WL 716190 (E.D. Mo. Feb. 24, 2010).

42.    In February 2011, Riceland proceeded to trial against Bayer on its own affirmative claims for relief. *Meins, et al. v. Bayer, et al.*, Arkansas County Circuit Court Case No. CV-2008-108. After a month long trial, the Arkansas County jury returned a verdict in favor of Riceland. The jury awarded Riceland $11.83 million in compensatory damages and $125 million in punitive damages. The jury also found in favor of Riceland on Bayer's cross-claim for contribution and indemnity. In its cross-claim against Riceland in *Meins*, Bayer contended that Riceland was liable to Bayer in contribution or indemnity for payments Bayer made to the *Meins* farmer-plaintiffs to settle the farmer-plaintiffs' claims against Bayer and Riceland. Bayer contended that Riceland's negligence proximately caused the loss of the European Union market and any resulting damages to the *Meins* plaintiffs. The *Meins* jury rejected Bayer's cross-claim and found that Bayer was 100% responsible for the loss of the European Union market and any resulting damages.

43.    On the eve of the *Meins* trial, the MDL Leadership Group filed a motion requesting the MDL Court to compel Riceland to contribute a portion of any recovery it received in the *Meins* case to the common benefit fund. Riceland responded. On February 11, 2011, Judge Perry issued an Order wherein she again stated that "[t]he common benefit order in this MDL is limited to federal cases." Judge Perry further stated: "I have no jurisdiction over the state cases" and "[t]he leadership group has provided no new authority to the contrary." The Court then denied the MDL Leadership Group's motion to enforce the common benefit order against Riceland.

44.    After having been rejected twice by Judge Perry, on February 14, 2011 (the first day of the *Meins* trial), the MDL Leadership Group filed a motion to intervene in the *Meins* state court action and asked this Court to require Riceland to compensate the MDL Leadership Group for work they claim to have performed in the federal MDL which they contended benefitted Riceland. That motion was orally argued to this Court in Stuttgart, Arkansas by Mr. Levitt who appeared and represented the MDL Leadership Group. On May 13, 2011, this Court denied the MDL Leadership Group's motion to intervene in *Meins*.

45.    On July 1, 2011, shortly after the *Meins* trial concluded, Bayer entered into a global producer settlement. The global producer settlement consisted of two separate settlements, which together, provided $750 million to resolve rice producers' claims arising out of the presence of Bayer LLRICE rice in the U.S. rice supply. The two separate settlements were the MDL Settlement Agreement, which provided recovery for farmer-plaintiffs in federal court cases and others who agreed to be bound by its terms, and the GMB Settlement Agreement, which provided recovery for farmer-plaintiffs in state court cases.

46.    The MDL Leadership Group negotiated the terms of the MDL Settlement Agreement with Bayer. Downing, Levitt, Arsenault, Chaney, and Powell all signed the MDL Settlement Agreement with Bayer. A true and correct copy of the executed MDL Settlement Agreement is attached hereto as Exhibit A.

47.    The MDL Settlement Agreement states: "This Agreement shall be governed by and construed in accordance with the law of the State of Arkansas without regard to any choice-of-law rules that would require the application of the law of another jurisdiction." Exhibit A, ¶ 14.3.

48.    As part of the MDL Settlement Agreement, farmers who desired to settle their

21

claims and receive compensation from Bayer were required to submit a claims package to the LLRICE Claims Administrator. Pursuant to the MDL Settlement Agreement contract, before any recovery under the MDL Settlement Agreement was permitted, the farmers were required to execute a General Release of All Claims form ("the Release"). The MDL Settlement Agreement contract also required the farmer's attorney to sign the Release form to trigger payment. If both the farmer and the farmer's attorney did not execute the Release, Bayer did not have any obligation to pay the farmer any money under the MDL Settlement Agreement bargain. The MDL Leadership Group was fully aware of this term of the MDL Settlement Agreement and they agreed to it.

49.    The Release was attached and expressly incorporated into the MDL Settlement Agreement as Exhibit D. *See* Exhibit A.

50.    A true and correct copy of the Release form is attached hereto as Exhibit B.

51.    Every farmer who participated in the MDL Settlement Agreement and his attorney signed a Release identical to that attached hereto as Exhibit B.

52.    As part of the Release, each farmer (referred to in the Release as the "Settling Claimant") *and his attorneys* released their claims against Bayer. Exhibit B, p. 2-4. The farmer's attorney was expressly included in the Release as a "Settling Claimant Releasing Party." Exhibit B, p. 2-4. The farmer's attorney expressly agreed that it was a "Settling Claimant Releasing Party" under the terms of the Release by signing the Release. Exhibit B, p. 2-4, 12-13.

53.    As part of the Release, each farmer *and his attorneys* also expressly released any claims that the farmer or attorneys had or could have against Riceland. Riceland was expressly included as an "Additional Released Party" in the Release. Exhibit B, p. 2-4.

54.     The Release states, in pertinent part, as follows:

Settling Claimant, to the full extent permitted by law, (i) if a natural person: for himself and his assigns, and for his and their current and former heirs, executors, administrators, attorneys and representatives and (ii) if other than a natural person: for itself and its current and former parents, subsidiaries and affiliates, the current and former agents (actual or apparent), servants, employees, officers, directors, members, managers, partners, owners, attorneys, and representatives of any such Person and their respective heirs, executors, administrators, predecessors, successors and assigns (each a "Settling Claimant Releasing Party" and, collectively, the "Settling Claimant Releasing Parties"), . . . hereby releases, acquits and forever discharges . . (ii) each of Riceland Foods, Inc. . . . as well as the current and former parents, subsidiaries and affiliates of each of them; the current and former agents (actual or apparent), servants, employees, officers, directors, members, managers, partners, owners, attorneys, and representatives of any such Person; and their respective heirs, executors, administrators, predecessors, successors and assigns . . . ("Additional Released Parties") of and from any and all claims, demands, causes of action, liabilities, sums of money, damages (including, but not limited to, punitive damages), loss of service, expenses, compensation, costs and losses, of any type, kind, nature, description or character whatsoever, whether based on tort, contract or other theory of recovery and including claims for contribution and indemnity, whether known or unknown, suspected or unsuspected, whether liquidated or unliquidated, which the Settling Claimant Releasing Parties, or any of them, now has or which may hereafter accrue on account of or in any way growing or arising out of the presence in the United States rice supply of Bayer GM Rice Seed, against any Bayer Released Party or any Additional Released Party (collectively, the "Settling Claimants Released Claims.")

Exhibit B, p. 2-4.     The Release extinguishes all claims against Riceland by all farmers who participated in the MDL Settlement Agreement, and it also extinguishes all claims against Riceland by any attorneys who represented those farmers.

55.     In addition to the foregoing, on the issue of attorneys' liens, fees, and costs, the Release states as follows:

Settling Claimant represents and warrants that all legal expenses, bills, costs, or contingency fee agreements resulting from or arising out of representation of Settling Claimant by Settling Claimant's retained attorney in relation to Settling Claimant's claims have been paid or will be paid out of the proceeds of the settlement and are Settling Claimant's responsibility to pay, and that any liens based on any legal expenses, bills, costs, or contingency fee agreements incurred by Settling Claimant's retained attorney as a result of Settling Claimant's alleged

23

injuries will be satisfied by Settling Claimant.

Exhibit B, p. 7.

56.     In accordance with the foregoing and the MDL Settlement Agreement, common benefit withholdings equal to 11% of the total settlement proceeds awarded to each MDL farmer-claimant were automatically deducted and paid into the common benefit trust fund.

57.     The Release further states, "This Release was entered into in good faith based upon arms-length negotiation between Settling Claimant, Bayer and their respective counsel." Exhibit B, p. 8.

58.     At the bottom of the Release, the signature block reads as follows:   "IN WITNESS WHEREOF, Claimant, Claimant's Representative (if any) and Claimant's Counsel (if any) have each executed this Release, as of the dates set forth below." Exhibit B, p. 12.   The Release then provides separate spaces for signatures by the Settling Claimant and Settling Claimant's attorney. Exhibit B, p. 12-13.

59.     By signing the Release, the farmer agreed to, consented, and ratified the terms of the Release, including the release of all claims against Riceland by both the farmers and their attorneys.

60.     By signing the Release, the farmer's attorney agreed to, consented to, and ratified the Release and all of its terms, including the release of all claims the attorneys had against Riceland.

61.     The MDL Settlement Agreement, which is incorporated into the Release, states at paragraph 14.14:

> It is understood and agreed by the parties that money damages would not be a sufficient remedy for any breach of this Agreement by any party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach in addition to any other remedy

available at law or in equity, without the necessity of demonstrating the inadequacy of money damages.

Exhibit A, ¶ 14.14.

62.   Moreover, the Release further provides that Riceland, as an "Additional Released Party may plead this Release as a complete defense and bar to any Settling Claimant Released Claim brought in contravention hereof and, in the event any Settling Claimant Releasing Party brings a Settling Claimant Released Claim, the Settling Claimant shall indemnify, defend and hold . . . [Riceland] harmless from and against any and all costs, fees, liabilities, expenses, damages, judgments, interests, debts, or losses suffered or incurred in connection therewith[.]"

Exhibit B, p. 5.

63.   Riceland was intentionally included as an Additional Released Party in the Release for the purpose of providing finality and certainty as to the universe of claims against Bayer. Specifically, Riceland had sued Bayer for contribution and indemnity related to certain farmer claims against Riceland; therefore, Bayer wanted all claims against Riceland released. Moreover, upon information and belief, Bayer also demanded this provision because it wanted to get a release of all claims against Riceland so that Bayer could pursue a contribution claim against Riceland and seek to recover some or all of the settlement proceeds Bayer paid to farmers and their attorneys under the MDL Settlement Agreement. The MDL Settlement Agreement specifically states that "Bayer may seek contribution from any Additional Released Party." Exhibit A, ¶ 14.15. Defendants negotiated this term of the MDL Settlement Agreement and Release with Bayer and intentionally gave up any rights to pursue any action against Riceland as part of their compromise with Bayer. Regardless of the reason, Bayer included a term in the MDL Settlement Agreement requiring that the farmer and his attorney release all claims against Riceland. The MDL Leadership Group (as well as Powell and Hare Wynn), the farmers who

25

participated in the MDL Settlement, and the attorneys of those farmers agreed to this term. The release of Riceland by the farmers and their attorneys is an unambiguous term in the MDL Settlement Agreement and incorporated Release.

64.     Bayer did, in fact, pursue a claim for contribution against Riceland for all settlement proceeds paid out under the global settlement agreement in the case of *BASF Corporation, et al. v. Bayer AG, et al.*, Arkansas County Circuit Court Case No. CV-2008-107. Bayer alleged that Riceland's negligence caused the loss of the European Union market and any damages sustained by the farmers. Bayer's contribution claim against Riceland has since been dismissed with prejudice.

65.     Each of the Defendants has represented farmers who have participated in the MDL Settlement Agreement.

66.     Upon information and belief, all or nearly all of Defendants' farmer clients have executed a Release and have thereby released all claims against Riceland. In each such instance, Defendant counsel for the farmer client also executed the Release.

67.     Upon information and belief, each of the Defendants has executed a Release and has thereby released all claims against Riceland. Defendants, and each of them, thus constitute "Settling Claimant Releasing Parties" under the terms of the Release.

68.     Nevertheless, on February 20, 2013, Downing and Levitt "individually and on behalf of all persons and entities that provided or paid for common benefit services, materials, and/or related expense items" filed a Class Action Complaint against Riceland in the U.S. District Court for the Eastern District of Missouri. *Downing, et al. v. Riceland Foods, Inc.*, U.S.D.C. E.D. Mo., Eastern District, Case No. 4:13-cv-321-CDP (the "Class Action Complaint").

69. The Class Action Complaint was drafted, prepared, authorized, approved, initiated, ratified, and filed by and on behalf of all of the Defendants, including the entire MDL Leadership Group.

70. The Class Action Complaint was executed by Downing, Gray Ritter, Levitt, Grant & Eisenhofer, Wolf Haldenstein, Arsenault, Neblett Beard, Chaney, Looper Reed, Powell, Hare Wynn, Davis, and Davis Bethune on behalf all of the Defendants, including the entire MDL Leadership Group.

71. The "class" defined in the Class Action Complaint against Riceland includes all members of the MDL Leadership Group, as well as Powell and Hare Wynn.[1] Moreover, filings in the class action lawsuit confirm that all the Defendants have agreed to, consented, and requested to be part of the class. Upon information and belief, the Defendants have worked together to draft and file the Class Action Complaint against Riceland and/or agreed to, consented to, and otherwise knowingly and consciously conspired with each other to cause it to be drafted, prepared, and filed. This common plan and conspiracy of the Defendants with each other to draft and file this lawsuit despite knowing these claims are released and forever barred was improper, tortious, and done with the specific intent to cause harm to Riceland in Arkansas.

72. In the Class Action Complaint, Defendants assert claims against Riceland for unjust enrichment and quantum meruit for services they allege to have rendered and costs they allege to have incurred in the federal *In re Genetically Modified Rice Litigation* MDL.

73. The claims asserted against Riceland by Defendants in the Class Action Complaint unambiguously constitute "Settling Claimant Released Claims" within the meaning of

---

[1] Riceland denies that the Defendants provided a common benefit or any common benefit services to Riceland, denies that Defendants are entitled to recovery against Riceland for quantum meruit or unjust enrichment, and denies that it has any liability whatsoever to the named class members or any putative class members.

the Release and MDL Settlement Agreement.

## RICELAND'S CLAIMS AGAINST THE DEFENDANTS

### Count 1 – Breach of Contract

74. Riceland incorporates by reference paragraphs 1-73 above.

75. Defendants entered into the MDL Settlement Agreement with Bayer.

76. Defendants enrolled their farmer clients as Settling Claimants under the MDL Settlement Agreement.

77. Defendants and their farmer clients each executed the Release contained within the MDL Settlement Agreement.

78. The Release released Defendants' and their farmer clients' claims against Bayer and Riceland, including those which Defendants assert in the Class Action Complaint.

79. By settling their claims and releasing Bayer and Riceland from any further liability, Defendants and their farmer clients agreed to dismiss all legal actions against Bayer and Riceland and not to pursue litigation against Bayer and/or Riceland related to the released claims.

80. By drafting, filing, and pursuing the Class Action Complaint against Riceland and suing Riceland for unjust enrichment and quantum meruit for services they allege to have rendered and costs they allege to have incurred in the federal *In re Genetically Modified Rice Litigation* MDL, Defendants have breached the Release and the MDL Settlement Agreement and have caused all members of the putative class that executed a Release to do likewise.

81. Bayer has made all payments and fulfilled all obligations to the Defendants and their farmer clients required of Bayer pursuant to the terms of both the Release and MDL Settlement Agreement.

82.   Defendants did not do what the Release and MDL Settlement Agreement required of them because they filed suit against Riceland after having released all claims against Riceland.

83.   The parties to the Release and MDL Settlement Agreement—including Bayer, Defendants, and their farmer clients—clearly intended to benefit Riceland under the contract. Riceland is expressly named in the Release and MDL Settlement Agreement as an "Additional Released Party." The covenants in the Release and MDL Settlement Agreement are "for the sole and exclusive benefit of the Bayer Released Parties, the Additional Released Parties and their respective successors and permitted assigns." Exhibit B, p. 9. The language of the MDL Settlement Agreement and Release contract unambiguously make Riceland an express third party beneficiary of the Release and MDL Settlement Agreement and expressly grants Riceland the power to enforce the Release against the Defendants.

84.   As result of Defendants' breach of contract, Riceland has sustained, and continues to sustain, damages in excess of $75,000 including but not limited to attorneys' fees, expenses and costs incurred in defending against the Class Action Complaint. These damages would not have been sustained but for the Defendants' breach of contract.

85.   Riceland has sustained and seeks compensatory damages, including consequential damages, in an amount in excess of $75,000.00 related to the actions and omissions of the Defendants and for the aforementioned elements of damage, and others, as determined by the trier of fact.

86.   In accordance with the Release and paragraph 14.14 of the MDL Settlement Agreement, Riceland seeks specific performance of the contract. Defendants have agreed in paragraph 14.14 that Riceland need not prove that money damages are insufficient in order to obtain injunctive relief. Regardless of paragraph 14.14, Riceland would nevertheless be entitled

to injunctive relief because money damages are insufficient to place Riceland in the same position it would have been in had Defendants fulfilled their bargain. Riceland asks this Court to order specific performance and to issue a preliminary and permanent injunction enjoining Defendants from breaching the Release and MDL Settlement Agreement.

### Count 2 – Tortious Interference with Contract and/or Business Expectancy

87.     Riceland incorporates by reference paragraphs 1-86 above.

88.     In addition to the farmer-clients represented by Defendants, many other farmers who were not represented by any of the Defendants participated in the MDL Settlement Agreement (the "Other Farmers"). These Other Farmers (and their attorneys) also executed Releases in favor of Bayer and Riceland pursuant to the MDL Settlement Agreement.

89.     As stated above, all farmer participants in the MDL Settlement Agreement — including these Other Farmers — had a portion (11%) of their settlement proceeds withheld and paid into the MDL common benefit fund.

90.     In their Class Action Complaint, Defendants defined the class to include "all persons and entities that . . . paid for common benefit services, materials, and/or related expense items[.]"

91.     Consequently, these Other Farmers are part of the putative class as defined by the Defendants in the Class Action Complaint they filed.[2]

92.     The Other Farmers executed valid and binding contractual Releases in accordance with the terms of the MDL Settlement Agreement. By executing these Releases, the Other Farmers released all claims against Bayer and Riceland.

---

[2] Riceland denies the putative class is properly defined, denies that class certification or treatment is appropriate, and denies that it has any liability whatsoever to the named class members or any putative class members.

93.    Riceland is expressly named as an "Additional Released Party" in each of those Releases.

94.    As a third-party beneficiary of the Other Farmers' Releases, Riceland had a valid contractual relationship and/or business expectancy that it would not be sued or subjected to suit by the Other Farmers, any attorneys of the Other Farmers, or any person purporting to make claims on behalf of either of the aforementioned for claims released by the Other Farmers and their attorneys in their Releases.  Riceland had a valid contractual relationship and/or business expectancy that it would not be sued by the Other Farmers, either individually or as a class, for the claims asserted in the Class Action Complaint.

95.    Defendants had knowledge that these Other Farmers and their attorneys had executed Releases in favor of Riceland and were fully aware and had complete knowledge of Riceland's contractual relationship and/or business expectancy with respect to the Other Farmers.

96.    Defendants have acted in concert to draft and file a Class Complaint on behalf of persons, including the Other Farmers, whom Defendants knew had previously and fully released their claims against Riceland.  Defendants have all agreed to, consented to, ratified, and/or actively taken steps that proximately caused the Class Action Complaint to be drafted and filed. By acting in concert with one another, Defendants intentionally and improperly induced or caused disruption of, substantial interference with, or termination of the contractual relationship or business expectancy via this Class Action Complaint against Riceland which asserts against Riceland claims previously released by these Other Farmers.

97.    Defendants' conduct was improper on many levels.  Defendants have taken actions that directly breach the contractual promises of the Other Farmers without any good faith

basis and without probable cause. Also, upon information and belief, Defendants knew multiple Other Farmers objected to the filing of this Class Action Complaint because it directly conflicts with the Other Farmers' pecuniary interests. Yet, Defendants have improperly filed the Class Complaint subjecting the Other Farmers to potential liability for breach of contract and pecuniary injury caused by the Class Action Complaint. Defendants appear to have been motived solely by greed and an attempt to line their pockets rather than any thought about how their actions would affect the Other Farmers. Upon information and belief, Defendants will not distribute the recovery – if any – made on behalf of the Other Farmers in the Class Action Complaint back to the Other Farmers, but Defendants instead plan to retain any potential recovery wholly for themselves. Defendants have no attorney-client relationship with the Other Farmers and have no duty or authority to act on behalf of the Other Farmers. To the extent that Defendants claim to have any duty to act on behalf of the Other Farmers, which Riceland denies, the Defendants' filing of the Class Action Complaint is a breach of that fiduciary duty to the Other Farmers and a direct conflict of interest because the Defendants are taking a position directly adverse to the interests of the Other Farmers. Defendants' actions are in bad faith, oppressive, and improperly interfere with Riceland's contractual and/or business expectancy.

98.    Defendants have knowingly, intentionally, and purposely caused the Other Farmers to breach their Release agreements. Defendants' tortious interference was specifically designed to harm, injure, and damage Riceland. Defendants knew that harm to Riceland was substantially certain to be produced as a result of their conduct. Defendants' tortious interference with Riceland's reasonable and legitimate contractual and/or business expectancy was done with malice, in bad faith, and with an improper motive or purpose.

99.    As a direct and proximate result of Defendants' tortious conduct, Riceland has sustained and will continue to sustain actual damages.  Riceland's damages include but are not limited to the following:   attorneys' fees, expenses, and costs incurred in defending against the Class Action Complaint, lost business opportunity, time, labor, and other consequential damages, and any other element of damages awarded by the jury.

100.    These damages would not have been sustained but for Defendants' intentional and wrongful conduct in causing the Other Farmers to breach their Release agreements.

101.    Defendants' intentional and purposeful disruption and termination of Riceland's business expectancy was the proximate cause of the Riceland's damages.

102.    Riceland has sustained actual damages in an amount in excess of $75,000.00 as a result of the aforementioned circumstances that would not have occurred but for the Defendants' tortious conduct. ,

103.    Riceland sustained and seeks compensatory damages in an amount in excess of $75,000.00 related to the actions and omissions of the Defendants and for the aforementioned elements of damage, and others, as determined by the trier of fact.

### Count 3 – Punitive Damages

104.    Riceland incorporates by reference paragraphs 1-103 above.

105.    In addition to compensatory damages, Riceland seeks an award of punitive damages in an amount to be assessed by the trier of fact sufficient to punish the Defendants for the aforementioned acts, omissions and conduct, and to deter similar future conduct.  Riceland is entitled to punitive damages because the Defendants intentionally pursued a course of conduct for the purpose of causing injury to Riceland.  Additionally, Defendants knew or ought to have known that their actions would naturally and probably result in damage to Riceland; however,

they continued such conduct in reckless disregard of the consequences to Riceland, from which malice is inferred.

## Count 4 – Declaratory Judgment

106.   Riceland incorporates by reference paragraphs 1-105 above.

107.   In addition to the foregoing, and in accordance with Ark. Code Ann. 16-111-101, *et seq.* and Ark. R. Civ. P. 57, this Court has the authority to issue a declaratory judgment and to declare the rights, status, and other legal relations of Riceland and each of the Defendants under the MDL Settlement Agreement and Release. Ark. Code Ann. 16-111-104 states: "Any person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder."

108.   Pursuant to Arkansas law, including Ark. Code Ann. 16-111-101, *et seq.*, there presently exists a justiciable controversy between Riceland and each of the Defendants. This justiciable controversy concerns the rights and status of the parties under the MDL Settlement Agreement and Release. If declaratory relief is not issued by this Court, Riceland will be materially prejudiced. Under the terms of the MDL Settlement Agreement and Release, Riceland is an "Additional Released Party" and has been released by Defendants, each of whom has signed the Release and is a "Settling Claimant Releasing Party," from all "Settling Claimant Released Claims." Defendants are bound by the terms of the Release they executed and cannot pursue any "Settling Claimant Released Claims" against Riceland. The above-described controversy exists between persons whose interests are adverse; specifically, the interests of

Riceland and Defendants are adverse. As an "Additional Released Party" under the terms of the MDL Settlement Agreement and Release, Riceland has a legally protected interest not to be subjected to litigation by Defendants for claims Defendants released in the MDL Settlement Agreement and Release. This legally protected interest of Riceland should be declared, adjudicated, interpreted, and upheld by this Court. The issues involved in the above-described controversy between Riceland and Defendants are ripe for judicial determination by this Court.

109. Riceland and Defendants dispute the construction and effect of the release contained in the MDL Settlement Agreement and Release contract. Therefore, in accordance with applicable law and Ark. Code Ann. 16-111-101, *et seq.*, Riceland asks this Court to declare the rights and status of Riceland and each of the Defendants under the MDL Settlement Agreement and the Release including the scope and effect of the Release, and further to declare that Defendants are bound by the MDL Settlement Agreement and Release.

110. Riceland demands a trial by jury.

THEREFORE, Riceland Foods, Inc. requests as follows:

a) That the Court enter judgment in favor of Riceland and against Defendants, jointly and severally, for compensatory damages sustained by Riceland and for punitive damages in a sum to be determined by the trier of fact;

b) That the Court enter a declaratory judgment in accordance with Ark. Code Ann. 16-111-101, *et seq.*, declaring the rights of Riceland and each of the Defendants under the MDL Settlement Agreement and Release and that Defendants are bound by the MDL Settlement Agreement and Release as set forth hereinabove;

c) That the Court order specific performance of Defendants' contractual obligations and issue a preliminary and permanent injunction enjoining Defendants from

breaching the Release and MDL Settlement Agreement;

d)  For its attorneys' fees pursuant to Ark. Code Ann. 16-22-308 and for its costs and

expenses in bringing this action;

e)  For prejudgment and post-judgment interest at the maximum rate allowed by law;

and,

f)  For all other just and proper relief.

Respectfully submitted,

John R. Musgrave
Christopher M. Hohn
THOMPSON COBURN LLP
One US Bank Plaza
St. Louis, Missouri  63101
Telephone:  (314) 552-6000

and

Barry Deacon (75030)
Andrew H. Dallas (2003161)
Jason M. Milne (2005239)
DEACON LAW FIRM, P.A.
P.O. Box 3000
Jonesboro, Arkansas  72403
Telephone:  (870) 336-9300

By: _____
Attorneys for Plaintiff, Riceland Foods, Inc.

36

## MDL SETTLEMENT AGREEMENT

This Agreement, dated as of the Execution Date, is entered into by and among (i) Bayer, (ii) the counsel listed in the signature pages hereto under the heading "Negotiating Claimants' Counsel" (collectively, the "NCC"), and (iii) each Enrolled Claimant and Eligible Claimant who is bound by this Agreement according to its terms.  This Agreement establishes a program to resolve the Claims that Eligible Claimants have asserted, or could have asserted, arising out of the presence of Bayer GM Rice Seed in the supply of rice in the United States and to settle any and all such Claims.  All capitalized terms herein shall have the meanings ascribed to them, respectively, either where they are first used or in Article 1 below.

### RECITALS

WHEREAS, the NCC and Bayer have agreed to establish a structured private settlement program, as set forth herein, to resolve Claims against Bayer (the "Program").

WHEREAS, the Program is intended to resolve, in lieu of litigation (or further litigation), the Claims of all Eligible Claimants who participate in the Program.

WHEREAS, each Eligible Claimant is advised to consult an attorney of his choice regarding the Program.

WHEREAS, a key objective of the Program is that all Eligible Claimants shall be entitled to enroll in the Program.

WHEREAS, an essential element of the Program is that the Program. combined with the settlement documented in the GMB Program, is part of a comprehensive effort to resolve claims arising from Bayer GM Rice Seed with an aggregate limit on total payments.

1



EXHIBIT

A

NOW, THEREFORE, in consideration of the mutual promises, agreements and covenants contained herein, and in exchange for the payment or exchange of good and valuable consideration as set forth below, the receipt and sufficiency of which hereby are acknowledged by the parties, the parties agree as follows:

## Article 1 – Definitions

"Additional Released Parties" has the meaning set forth in the Release attached hereto as Exhibit D.

"Administrative Expenses" has the meaning set forth in Section 5.1.1.

"Affiliated Claimant" has the meaning set forth in Section 2.3.2.3.

"Aggregate Payments" has the meaning set forth in Section 5.2.4.1.

"Agreement" and "Settlement Agreement" means this Settlement Agreement, including any and all Exhibits and Schedules attached hereto, as the same may be amended or modified from time to time in accordance with the terms hereof.

"Amount Over the Cap" has the meaning set forth in Section 5.5.2.

"Arbitrator" has the meaning set forth in Section 6.1.3.

"Average Aggregate Applicable Acreage" has the meaning set forth in Section 3.1.1.1.

"Average Claimed Acreage" has the meaning set forth in Section 3.1.1.1.

"Award" has the meaning set forth in Section 4.3.5.

"Award Information" has the meaning set forth in Section 12.1.

"Bayer" means, collectively, Bayer CropScience LP, Bayer CropScience Holding Inc., Bayer CropScience Inc., Bayer CropScience LLC, Stoneville Pedigreed Seed Company, Bayer Corporation, Bayer AG, Bayer CropScience AG, Bayer BioScience NV, Bayer CropScience Holding SA and Bayer CropScience SA.

"Bayer GM Rice Seed" means rice genetically engineered to be resistant to glufosinate ammonium developed by Bayer or its predecessors containing the following Bayer events: LLRice 06, LLRice 62, LLRice 601, or LLRice 604.

"Bayer Released Party" and "Bayer Released Parties" have the meanings set forth in the Release attached hereto as Exhibit D.

"Business Day" means any day other than a Saturday, a Sunday, or a day on which banking institutions in New York City, New York, are authorized or obligated by law or executive order to remain closed.

"Cap" means the Cheniere/CL-131 Losses Cap, the Other Losses Cap and/or the Overall Cap, as the context may require.

"Cheniere" means long-grain rice seed that has been certified, or is derived from seed that has been certified, by a state certifying agency as either certified, registered, or foundation seed of the Cheniere variety.

"Cheniere/CL-131 Claims Form" means a claim form containing the substance of Exhibit A-2.

"Cheniere/CL-131 Claims Package" means (i) a claims form containing (y) the substance of Exhibit A-2, which shall contain information in support of an Eligible Claimant's claims for Cheniere/CL-131 Losses and (z) Wire Instructions for use by the QSF Administrator in connection with any Settlement Payment to be made to such Eligible Claimant subject to and in accordance with the terms of this Agreement and the Qualified Settlement Fund Agreement and (ii) all requisite supporting documentation as further described in Exhibit Y attached hereto.

"Cheniere/CL-131 Claims Package Cure Deadline Date" means the sixtieth (60th) day following receipt of notice that the corresponding Claims Package was Materially Delinquent or Deficient.

"Cheniere/CL-131 Claims Package Deadline Date" means the later of the one-hundred-twentieth (120th) day following the Execution Date or the thirtieth (30th) day following the Effective Date unless extended by written agreement of the parties, but, in any event, no earlier than the Cheniere/CL-131 Claims Package Deadline Date as such term is defined in the GMB Settlement Agreement.

"Cheniere/CL-131 Formula" or "Formula" has the meaning set forth in Section 5.3.2.

"Cheniere/CL-131 Fund" has the meaning set forth in Section 5.3.8.

"Cheniere/CL-131 Losses" has the meaning set forth in Section 5.3.

"Cheniere/CL-131 Losses Cap" has the meaning set forth in Section 5.3.3.

"Cheniere/CL-131 Losses Payment" has the meaning set forth in Section 5.3.

"CL-131" means long-grain rice seed that has been certified by a state certifying agency as either certified, registered, or foundation seed of the Clearfield 131 variety.

"Claimed Acreage" has the meaning set forth in Section 3.1.1.1.

"Claims" means any (i) unfiled claims, actions or proceedings, (ii) claims that constitute part of the MDL Litigation and (iii) claims, actions or proceedings filed in state or federal court,

in each case arising out of the presence of Bayer GM Rice Seed in the supply of rice in the United States, but excluding any claims, actions, or proceedings that were or could have been filed by (y) any of the Excluded Trial Claimants and (z) any Person who is an Eligible Claimant under the GMB Settlement Agreement.

"Claims Administrator" means the Person appointed by Bayer and the NCC, initially BrownGreer PLC, to fulfill the functions of the "Claims Administrator" set forth in this Agreement (for so long as such Person or Persons continues to serve in such capacity). Any successor to the initial Claims Administrator shall fulfill the same functions from and after the date of his succession and shall be bound by the determinations made by his predecessor(s) to date. The Person who serves as the Claims Administrator under this Agreement shall be the same Person who serves in such capacity under the GMB Settlement Agreement.

"Claims Package" means, as the context requires, an Enrollment and Claims Package, a Cheniere/CL-131 Claims Package or a Other Losses Claims Package.

"Completed Claims Package" means, as the context requires, a Completed Enrollment and Claims Package, a Completed Cheniere/CL-131 Claims Package, or a Completed Supplemental Claims Package.

"Completed Enrollment and Claims Package" means a package containing a completed Enrollment and Claims Form, all requisite Releases, all requisite Stipulations of Dismissal (if and as applicable), together with such other information or materials as may have been required by the Claims Administrator that has been timely submitted and accepted, or that has not been timely rejected, by the Claims Administrator and that is not then the subject of any appeal or suspended in accordance with the terms hereof.

"Completed Cheniere/CL-131 Claims Package" means a package containing a Cheniere/CL-131 Claims Form together with such other information or materials as may have been required by the Claims Administrator that has been timely submitted and accepted, or that has not been timely rejected, by the Claims Administrator and that is not then the subject of any appeal or suspended in accordance with the terms hereof.

"Completed Other Losses Claims Package" means a package containing an Other Losses Claims Form together with the documentation required to substantiate an Other Losses Claim that has been timely submitted and that is not then the subject of any appeal or suspended in accordance with the terms hereof.

"Counsel" means, with respect to any particular Person, a lawyer or law firm who represents such Person, provided that, for all purposes of this Agreement, the "Counsel" of any particular Eligible Claimant shall be the lawyer or law firm named as such in such Eligible Claimant's Enrollment and Claims Package, except to the extent that Counsel for Duplicative Claims is determined by Section 2.17.

"Court" has the meaning set forth in Section 6.4.1.

4

"Duplicative Claim" means a claim for Market Losses, Cheniere/CL-131 Losses and/or Other Losses with respect to the same Interest, in whole or in part, as to which more than one Claims Package has been submitted, whether under this Agreement or the GMB Agreement.

"Effective Date" has the meaning set forth in Section 3.2.3.

"Eligible Claim" means a claim for Market Losses, Cheniere/CL-131 Losses and/or Other Losses with respect to which an Eligible Claimant timely has submitted a Completed Claims Package.

"Eligible Claimant" means any Person (i) who has an Interest in a crop of long-grain rice as reflected in FSA Form 578 alleged to have been affected by the presence of Bayer GM Rice Seed in the supply of rice in the United States, and (ii) who, as of the Enrollment and Claims Form Deadline Date, is not an Excluded Trial Claimant or an Eligible Claimant under the GMB Agreement. If a Claimant has made a Duplicative Claim under this Agreement and the GMB Agreement, any such Claimant shall be deemed to be an Eligible Claimant under this Agreement.

"Enrolled Claimant" or "Claimant" means (y) an Eligible Claimant who timely has submitted (or on whose behalf timely has been submitted) to the Claims Administrator a Completed Enrollment and Claims Package on or prior to the applicable deadline; and (z) any Affiliated Claimant identified in any such Completed Enrollment and Claims Package. For the avoidance of doubt, a Counsel to an Enrolled Claimant or to an Affiliated Claimant is not (in such capacity) an "Enrolled Claimant."

"Enrolling Counsel" means any lawyer or law firm who files an Enrollment and Claims Package on behalf of an Eligible Claimant.

"Enrolling Counsel Declaration" means a declaration in the form attached hereto as Exhibit B.

"Enrollment and Claims Form" means a claim form containing the substance of Exhibit A-1, which shall (i) reflect the Eligible Claimant's agreement to enroll in the Program and be bound by the terms of this Agreement, (ii) contain information in support of an Eligible Claimant's claims for Market Losses, including the number of acres farmed from January 1, 2006 through and including December 31, 2010, (iii) be accompanied by supporting FSA 578 forms and (iv) if the Eligible Claimant seeks to receive payments other than Market Loss Payments, state whether the Eligible Claimant intends to make a claim on the Cheniere/CL-131 Fund, or, instead intends to submit a Supplemental Claim Form in respect of Other Losses, provided that the Claimants shall have the time until the Cheniere/CL-131 Claims Package Deadline Date or the Other Losses Claims Package Deadline Date, as applicable, to make a final determination as to which program, if any, the Claimant will participate in. The parties may agree on a different format of the Enrollment and Claims Form to make it more efficient to complete, review and process claims.

"Enrollment and Claims Package" means the applicable Enrollment and Claims Form, any requisite Release(s), any requisite Landlord Consent and Instruction to Pay Tenant Form, any requisite Stipulation(s) of Dismissal and an Enrolling Counsel Declaration to the extent required, as they appear in the Exhibits to this Agreement unless otherwise approved by Bayer.

5

"Enrollment and Claims Package Cure Deadline Date" means the sixtieth (60th) day following receipt of notice that the corresponding Claims Package was Materially Delinquent or Deficient unless extended by written agreement of the parties or as otherwise set forth in Section 3.2.2.1 of the Agreement.

"Enrollment and Claims Package Deadline Date" means the ninetieth (90th) day after the Execution Date unless extended by written agreement of the parties or as otherwise set forth in Section 2.10 of the Agreement, but, in any event, no earlier than the Enrollment and Claims Package Deadline Date as such term is defined in the GMB Settlement Agreement.

"Excluded Trial Claimants" means those Persons who have obtained a verdict or settlement prior to the Execution Date of this Agreement and are excluded from the determination of the Overall Cap and Average Claimed Acreage under this Agreement. Excluded Trial Claimants are identified in Exhibit H.

"Execution Date" means the last date on which this Settlement Agreement is executed by the parties, as stated within the signature blocks below, but, in any event, no earlier than (y) the last date on which the GMB Settlement Agreement is executed by any of the parties thereto, as stated within the signature blocks to that agreement and (z) the date that notice is received from the Claims Administrator indicating that a website capable of full data entry and form generation for Market Losses and Cheniere/CL-131 Losses is operational.

"Expenses Report" has the meaning set forth in Section 5.1.2.

"Final Cheniere/CL-131 Payment List" has the meaning set forth in Section 5.3.6.

"Final Enrolled Claimant Payment List" has the meaning set forth in Section 5.2.4.

"Final Summary Report" has the meaning set forth in Section 5.2.2.

"FSA Form 578" means FSA Form(s) 578 Reports of Acreage or Reports of Commodities that provide information sufficient to identify the Interests on a field-by-field level of an Enrolled Claimant and any Affiliated Claimant.

"Funding Payment" has the meaning set forth in Article 5.

"GMB" means the signatories to the GMB Settlement Agreement.

"GMB Amount Over the Cap" has the meaning set forth in Section 5.5.2.

"GMB Program" has the meaning set forth in Section 3.1.1.1.

"GMB Settlement Agreement" means that certain settlement agreement entered into by and among Bayer, on the one hand, and each of Goldman, Pennebaker and Phipps, Mikal C. Watts, P.C. Chuck Banks and Steve Murray, on the other hand, pertaining to the presence of Bayer GM Rice Seed in the United States rice supply.

"Included Trial Claimants" means those Persons, other than Excluded Trial Claimants, who have obtained a verdict or settlement prior to the Execution Date of this Agreement whose acres are included in the determination of the Overall Cap and the Average Claimed Acres under this Agreement. Included Trial Claimants are identified in Exhibit I.

"Initial Market Losses Payment List" has the meaning set forth in Section 5.2.3.

"Interest," when used in connection with acreage, means a financial interest in the revenue from planting a crop, as reflected on an existing FSA 578 form, including, without limitation, rent based on a share of the crop. Landlords who receive only a fixed cash amount for renting the land that does not vary with the size of, or pricing for, the crop do not have Interests in a crop. Creditors who are not reflected on an existing FSA 578 form do not have Interests in a crop.

"Landlord Consent and Instruction to Pay Tenant Form" means a document in the form attached hereto as part of Exhibit A-1.

"Liabilities" means any and all debts, liabilities, covenants, promises, contracts, agreements and/or obligations of whatever kind, nature, description or basis, whether fixed, contingent or otherwise, whether presently known or unknown, developed or undeveloped, discovered or undiscovered, foreseen or unforeseen, matured or unmatured, or accrued or not accrued.

"Lien" means any lien, claim, mortgage, hypothecation, encumbrance, assignment, subrogation right, third-party interest or adverse claim of any nature whatsoever, pledge, security interests or charges of any kind, in each case whether statutory or otherwise.

"Market Losses" has the meaning set forth in Exhibit X attached hereto.

"Market Losses Payment List" means, as the context requires, any of the Initial Market Losses Payment List and/or any Supplemental Market Losses Payment List.

"Market Losses Payments" has the meaning set forth in Exhibit X attached hereto.

"Material Delinquency or Deficiency" means (a) the absence of any information necessary to determine (i) whether or not a Person is entitled to any benefits, directly or indirectly, under this Agreement and/or (ii) the amount of any benefits that any Person is entitled to, directly or indirectly, under this Agreement; (b) the absence of a proper signature by any Eligible Claimant, Affiliated Claimant, or Witness on any Release or Enrollment and Claims Form; (c) the absence of any required signature on any required Stipulation of Dismissal, (d) the absence of any required signature on, or accompanying information with respect to, any required Enrolling Counsel Declaration; (e) the absence of any required document or (f) any alteration, deletion, or addition to the terms set forth in Exhibit A-1, Exhibit B, or Exhibit D, as applicable. A Claims Package that is "Materially Delinquent or Deficient" has a Material Delinquency or Deficiency.

"MDL Litigation" means, collectively, those cases pertaining to Bayer GM Rice Seed that (i) are pending in federal court, (ii) have been removed to federal court and not remanded, or

7

(iii) have been consolidated by the Multi-District Litigation Panel before Hon. Catherine Perry, United States District Court for the Eastern District of Missouri, Eastern Division. MDL 06-1811.

"Minimum Amount Due" has the meaning set forth in Exhibit X attached hereto.

"NCC" has the meaning set forth in the Preamble.

"NCC Amount Over the Cap" has the meaning set forth in Section 5.5.2.

"NCC Pre-Cap Amount" has the meaning set forth in Section 5.5.2.

"Negotiating Claimants' Counsel" has the meaning set forth in the Preamble.

"Non-Appealable" means not subject to (i) any further right of appeal to any Arbitrator or otherwise within the Program or (ii) any right of appeal to any court.

"Notice of Appeal" has the meaning set forth in Section 2.9.4.1.

"Notice of Preliminary Award" has the meaning set forth in Section 4.3.5.

"Order" has the meaning set forth in Section 6.4.1.

"Other Losses" has the meaning set forth in Exhibit Z.

"Other Losses Cap" means $50 million, unless reduced in accordance with Section 3.2.2.3.

"Other Losses Fund" has the meaning set forth in Section 5.4.1.

"Overall Awards" has the meaning set forth in Section 5.5.2.

"Overall Cap" has the meaning set forth in Section 5.5.2.

"Penn Trial Entities" has the meaning set forth in Section 2.1.

"Person" means a natural person, corporation, limited liability company, other company, trust, joint venture, association, partnership, or other enterprise or entity, or the legal representative of any of the foregoing.

"Pre-Cap Total" has the meaning set forth in Section 5.5.2.

"Preliminary Cheniere/CL-131 Payment List" has the meaning set forth in Section 5.3.2.

"Prevailing Party" means, with respect to a determination that is appealed to the Arbitrator in accordance with the terms of this Agreement, the Person whose position prior to the appeal was closest to the Arbitrator's ruling.  For illustration, if an Enrolled Claimant files a Notice of Appeal under Section 4.2.1.9 because the Claims Administrator rejected a Claims Package in part, the Enrolled Claimant will be the Prevailing Party if the Arbitrator finds that

8

more of the Claims Package should not have been rejected than should have been rejected. If the Arbitrator finds that most of the Claims Package should have been rejected, Bayer will be the Prevailing Party. For further illustration, under the Other Losses Fund, if the Enrolled Claimant makes a claim for Other Losses of $100,000, Bayer states it is willing to pay $50,000, and the Arbitrator rules that the Enrolled Claimant is entitled to $74,999, then Bayer will be the Prevailing Party. If the Arbitrator finds that the Enrolled Claimant is entitled to $75,001, then the Enrolled Claimant will be the Prevailing Party. In any event where the Arbitrator's Award is exactly between the parties' positions, then the parties to the arbitration share equally in the costs incurred and there is no Prevailing Party.

"Producer" means an owner, operator, landlord, waterlord, tenant, or sharecropper, who shares in the risk of producing a long-grain rice crop and who is entitled to share in the long-grain rice crop available for marketing from the farm, as reflected in FSA Form 578. A landlord who receives only a fixed cash amount for renting the land that does not vary with the size of, or pricing for, the crop is not a Producer.

"Program" has the meaning set forth in the Preamble.

"Program Claim" means any claim as to which a Completed Claims Package timely has been submitted in accordance with the terms of this Agreement.

"Qualified Settlement Fund" means the qualified settlement fund established in accordance with the terms of Section 6.4.1 and Exhibit F attached hereto.

"Qualified Settlement Fund Agreement" means the agreement governing distributions of monies deposited into the Qualified Settlement Fund attached hereto as Exhibit F.

"QSF Administrator" refers to the Person who will function as the QSF Administrator (as such term is defined in the Qualified Settlement Fund Agreement attached hereto as Exhibit F).

"Release" means a release in the form attached hereto as Exhibit D.

"Resolved Other Losses List" has the meaning set forth in Section 5.4.10.

"Review Period" has the meaning set forth in Section 2.9.1.

"Settlement Payment" means any payment made into the Qualified Settlement Fund for the benefit of a Claimant under this Agreement, whether for Market Losses, Cheniere/CL-131 Losses or Other Losses or any payment made into the common benefit fund pursuant to Section 8.1.1.

"Settlement Threshold" has the meaning set forth in Section 3.1.1.

"Settling Claimant" has the meaning set forth in the Release attached hereto as Exhibit D.

"Settling Claimant Released Claims" has the meaning set forth in the Release attached hereto as Exhibit D.

9

"Settling Claimant Releasing Party" and "Settling Claimant Releasing Parties" has the meaning set forth in the Release attached hereto as Exhibit D.

"Stipulation of Dismissal" means a "Stipulation of Dismissal, " "Proposed Order" or such other document required by the local practice of the court in which a case is pending consistent with the form of Exhibit E or in such other form as is mandated by the Enrollment and Claims Form that serves the purpose of dismissing with prejudice any and all claims brought by or on behalf of the settling party or parties."Summary Report" has the meaning set forth in Section 5.2.1.

"Other Losses Claims Form" means that additional claim form, in the form of Exhibit A-3 attached hereto, that must be filed to make a claim from the Other Losses Fund, pursuant to the criteria outlined in Exhibit Z attached hereto.

"Other Losses Claims Package" has the meaning set forth in Section 4.2.2.1.

"Other Losses Claims Package Deadline Date" means the later of the one hundred fiftieth (150th) day following the Execution Date or the sixtieth (60th) day following the Effective Date, unless extended by written agreement of the parties, but, in any event, no earlier than the Other Losses Claims Package Deadline Date as such term is defined in the GMB Settlement Agreement.

"Other Losses Claims Package Negotiation Deadline Date" means as to any applicable Other Losses Claims Package, the sixtieth (60th) day following receipt by an Enrolled Claimant of notice from Bayer that it disagrees with the Claim reflected in such Claimant's Other Losses Claims Package.

"Supplemental Market Losses Payment List" has the meaning set forth in Section 5.2.3.

"Third Party Payer/Provider" has the meaning set forth in Section 10.7.1.

"Total Other Losses" has the meaning set forth in Section 5.4.7.

"Walk Away Deadline" has the meaning set forth in Section 3.1.

"Walk Away Period" has the meaning set forth in Section 3.1.

"Walk Away Right" has the meaning set forth in Section 3.1.

"Wire Instructions" means preliminary wire or other payment instructions, subject to revision by the Enrolled Claimant prior to transfer of funds.

"Witness" means the person witnessing the signature of the Release and providing a proper signature and information regarding such signature.

## Article 2 – Enrollment and Market Losses Claims

2.1    Only Eligible Claimants may enroll in the Program. Included Trial Claimants may not participate in the Program unless the terms of any prior settlement agreement and/or the balance of this Section 2.1 specifically permits such enrollment. Bayer expressly recognizes that Penn Brothers Partnership, Penn Brothers Landleveling, Inc. and Denton Farms, Inc. (the "Penn Trial Entities") neither sought nor recovered any market loss damages at trial related to rice crops attributable to crop share landlords or to any tenant renting land from any Penn Trial Entities. As such, Bayer expressly recognizes that no landlord who rents land to or previously rented land to the Penn Trial Entities under a crop share lease, or any other Person reflected as a Producer on a FSA Form 578 listing one or more Penn Trial Entities as a Producer, shall be precluded from participating as an Eligible Claimant or from recovering for that parties' proportional interest on such land shared with one or more Penn Trial Entities. Bayer further recognizes that the Penn Trial Entities specifically do not include other Persons related to the families of Jim Penn and/or Joe Penn which did not participate in the first MDL Arkansas trial including, but not limited to, Portia Farms, Inc., Christopher Penn, Matt Hibbard, Lindsey Penn and Susan Penn and that such related Persons shall not be barred from participating as Eligible Claimants. Bayer further expressly recognizes that Jerry Catt and Donna Catt rent certain land from Ronald Catt and/or Judy Catt, individuals who also directly participate in rice farming. Bayer agrees that Ronald Catt and/or Judy Catt will not be excluded from participation as Eligible Claimants provided, however, that Ronald Catt and Judy Catt shall not be eligible to submit a claim related to any specific acreage leased on a share rent basis to Jerry Catt and/or Donna Catt.

2.2    Bayer will not conduct a public relations campaign for the purpose of encouraging unrepresented claimants to participate in the Program without counsel. Bayer may, in any communications directed toward Eligible Claimants, provide notice that the Program has been established. Bayer shall make reasonable efforts to ensure that any such communications shall state that Eligible Claimants who are not represented by counsel are encouraged to consult with an attorney regarding the Program and may, at any time, obtain legal counsel in connection with this Agreement. Such Persons promptly shall notify Bayer and the Claims Administrator in the event counsel is engaged and provide the name and contact information for such counsel. An Eligible Claimant who is represented by counsel shall identify such counsel in his Enrollment and Claims Package.

2.3    In order for an Eligible Claimant to participate in the Program, on or before the Enrollment and Claims Package Deadline Date or Enrollment and Claims Package Cure Deadline Date, such Eligible Claimant must deliver to the Claims Administrator as to any and all of such Eligible Claimant's Interests (only if controlled directly or indirectly, including through delegation or assignment of control by other owners) (i) an Enrollment and Claims Form and any requisite supporting documentation (including the applicable FSA Form 578s), (ii) any and all requisite Releases (i.e., a Release executed by the Eligible Claimant, or, if not

11

a natural person, or if deceased or incompetent, by a duly authorized person as well as a Release executed by any Affiliated Claimant, or, if not a natural person, or if deceased or incompetent, by a duly authorized person), (iii) if a claim has been filed by the Eligible Claimant or any Affiliated Claimant in a court of law, a Stipulation of Dismissal, all properly and fully completed, and properly and fully executed by the various Persons specified therein, not later than the Enrollment and Claims Package Deadline Date or Enrollment and Claims Package Cure Deadline Date and (iv) any requisite supporting documentation called for in Exhibit X attached hereto. With the sole exception of a landlord participating directly for Market Losses and as an Affiliated Claimant for Cheniere/CL-131 Loss Claims or Other Loss Claims, an Eligible Claimant must enroll all of its Interests in the Program and by enrolling is releasing all of its Interests, whether enrolled or not. By way of example only, if an Eligible Claimant is a natural person with Interests but also controls a company that has Interests, both the natural person and the company must submit Claims Packages and if the company does not submit a Claims Package, any effort to bring a lawsuit by the company will be barred by the Eligible Claimant's Release.

2.3.1   The Enrollment and Claims Form for an Eligible Claimant who is represented by counsel must be submitted on his behalf by his Enrolling Counsel and be accompanied by an Enrolling Counsel Declaration. (For the avoidance of doubt, references herein to Enrollment and Claims Forms submitted "by" an Eligible Claimant shall be deemed to include Enrollment and Claims Forms so submitted on behalf of such Eligible Claimant.)

2.3.2   The Enrollment and Claims Form shall:

2.3.2.1   indicate the long-grain rice crop acreage for which the Eligible Claimant is seeking Settlement Payments;

2.3.2.2   attach all FSA Forms 578 reflecting the Eligible Claimant's Interest in that same crop;

2.3.2.3   identify any additional Person having an Interest in the acreage reflected in the submitted FSA Forms 578 and who has permitted Settlement Payments to be made on his or her behalf to the Eligible Claimant as supported by a Release and a Landlord Consent and Instructions to Pay Tenant Form executed by such Person (each an "<u>Affiliated Claimant</u>");

2.3.2.4   include a representation by the Eligible Claimant that the Eligible Claimant is not aware of any other Person, not listed on each such FSA Form 578, who has an Interest in the crop;

2.3.2.5   include an agreement that in the event more than one Claims Package is filed for the same acreage (whether under this

12

Program or the GMB Program) (i) any disputes as to which Claims Package shall be the prevailing Claims Package and/or under which program the Eligible Claimant's claims should be considered shall be resolved according to Section 2.17 below, and (ii) the Claims Administrator shall suspend further consideration of such Duplicative Claims under either this Agreement or the GMB Settlement Agreement (except for determining the Interest in acres in order to determine whether the Settlement Threshold has been met) until the matter has been resolved in accordance with Section 2.17 below;

2.3.2.6   include Wire Instructions for use by the QSF Administrator in connection with any Settlement Payment to be made to such Eligible Claimant in respect of Market Losses, subject to and in accordance with the terms of this Agreement and the Qualified Settlement Fund Agreement; and

2.3.2.7   include a statement as to whether the Claimant intends to seek additional compensation for Cheniere/CL-131 Losses or Other Losses and, if so, which one the Claimant intends to seek, provided that the Claimants shall have the time until the Cheniere/CL-131 Claims Package Deadline Date or the Other Losses Claims Package Deadline Date, as applicable, to make a final determination as to which program, if any, the Claimant will participate in.

2.3.3   Each long-grain rice acre for which an Eligible Claimant intends to submit an Enrollment and Claim Form must be reflected in a FSA Form 578 that accompanies an Enrollment and Claims Package. An Eligible Claimant may only seek recovery for (y) its share, as reflected on the FSA Form(s) 578, of any long-grain rice acre and (z) the share of such acreage, as reflected on the FSA Form(s) 578, of any Affiliated Claimant. In the event that the long-grain rice acreage reflected on any FSA Form(s) 578 for any relevant time is adjusted or revised due to the Eligible Claimant or Affiliated Claimant not providing true and accurate information, the lowest figure from the original or any revised FSA Form(s) 578 shall be used to calculate any recovery. For avoidance of doubt, a landlord may be an Enrolled Claimant for Market Losses, so long as that landlord complies with all requirements, as well as an Affiliated Claimant for Cheniere/CL-131 Losses or Other Losses, so long as the Enrolled Claimant and Affiliated Claimant comply with all requirements. Under no circumstances may the same Interest in a crop participate both in the Cheniere/CL-131 Losses Fund and the Other Losses Fund. To avoid double counting of claims, the Settlement Threshold shall be calculated by examining the Interest claimed in a long-grain rice crop by acres for Market Losses only.

13

2.3.4   Enrollment and Claims Forms and all Releases must be properly and fully executed by the Eligible Claimants themselves or, if not a natural person or if deceased or incompetent, by a duly authorized representative (in addition to being executed by Enrolling Counsel, if the Eligible Claimant is represented by counsel, as specified therein). As to Affiliated Claimants, all Releases and all Directions of Payment must be properly and fully executed by the Affiliated Claimants themselves or, if not a natural person or if deceased or incompetent, by a duly authorized representative. Stipulations of Dismissal shall be executed by Enrolling Counsel for the Eligible Claimants and for the Affiliated Claimants, or by the Eligible Claimant or the Affiliated Claimant himself (or, if such Eligible Claimant or Affiliated Claimant is not a natural person or is deceased or incompetent, by a duly authorized representative), if not represented by counsel (other than Eligible Claimants or Affiliated Claimants who do not have a lawsuit pending against Bayer related to the presence of Bayer GM Rice Seed in the U.S. rice supply). Enrolling Counsel Declarations shall be executed by Enrolling Counsel.

2.3.5   All or any portion of any Enrollment and Claims Package may be filed electronically in accordance with such instructions as may be provided by the Claims Administrator from time to time, provided, however, that original Releases must be submitted in hard-copy and not electronically.

2.4   Submission of an Enrollment and Claims Package is irrevocable. No Eligible Claimant may under any circumstances or for any reason withdraw an Enrollment and Claims Package, request the return of any Release or Stipulation of Dismissal, or otherwise unilaterally exit the Program, unless Bayer exercises its rights under Article 3 below (Walk Away Rights) or a court of competent jurisdiction has finally determined Bayer to be in material breach of its obligations under this Agreement. If a court of competent jurisdiction determines Bayer to be in material breach of its obligations under this Agreement, then any Claimant who filed a Stipulation of Dismissal shall have one (1) year from such determination to refile any lawsuit that was dismissed pursuant to a Stipulation of Dismissal. Bayer retains all other defenses to those lawsuits, including any statute of limitations defense based on the original date of filing.

2.5   Each party to this Agreement and, by submitting an Enrollment and Claims Package, Enrolling Counsel and each Eligible Claimant and any Affiliated Claimant covered by such Enrollment and Claims Package, and, by signing the Qualified Settlement Fund Agreement, the QSF Administrator, agrees to be bound by all of the terms and conditions of this Agreement and agrees that authority over the process contemplated by the Program, including any claims for a Settlement Payment submitted under the Program and any return to Bayer of any portion of a Funding Payment required pursuant to this Agreement, resides with those Persons appointed pursuant to this Agreement to exercise that authority, as such authority is specified in this Agreement. Subject to the mandatory procedures for

14

arbitration in this Agreement, any signatory to this Agreement may enforce this Agreement in a court of law.

2.6     On or prior to the Enrollment and Claims Package Deadline Date, Enrolling Counsel shall submit an Enrolling Counsel Declaration listing, with specificity, all Persons whom such Enrolling Counsel represents (x) who are Eligible Claimants and who have filed a claim or proceeding against Bayer in any court of law (including any such Eligible Claims who have not filed a claim under the Program), (y) on whose behalf such Enrolling Counsel has filed a claim under the Program, such list to be organized alphabetically by name and listing, as to each such Person, the number of long-grain rice acres in which such Person had an Interest in each of calendar years 2006, 2007, 2008, 2009 and 2010 and (z) who are Eligible Claimants that are landlords and through that same Enrolling Counsel are seeking to be both Enrolled Claimants for Market Losses and, for the same Interest, Affiliated Claimants for Cheniere/CL-131 Losses or Other Losses.

2.7     Enrolling Counsel shall update any form in which there may be a change in the information required by the form before the Enrollment and Claims Package Deadline Date, or if an Enrollment and Claims Package has been deemed Materially Delinquent or Deficient, by the Enrollment and Claims Package Cure Deadline Date. Only updates regarding contact information and payment instructions may be updated after that date. When an Enrollment and Claims Package has been submitted, it is presumptively complete. After submission, changes that relate to the amount of the claim or the identity of the Eligible Claimant or Affiliated Claimants may only be made prior to the applicable deadlines as set forth above in this Section 2.7 and only with good cause shown. A request for any such change must be made to the Claims Administrator with a copy to Bayer with a statement for the reason for the requested change and the timing of the requested change. Any decision by the Claims Administrator disallowing the change is subject to appeal through the procedures set forth in Section 2.9.4.1.

2.8     Enrolling Counsel may submit on behalf of Eligible Claimants, and Eligible Claimants who are not represented by counsel may submit on their own behalf, Enrollment and Claims Packages, as well as any updates or corrections to previously submitted Enrollment and Claims Packages, on a rolling basis at any time prior to (y) the Enrollment and Claims Package Deadline Date and the Enrollment and Claims Package Cure Deadline Date, as applicable, or (z) if earlier, the Claims Administrator's determination that an Enrollment and Claims Package is a Completed Enrollment and Claims Package.

2.9     On a rolling basis but within forty-five (45) days of the Enrollment and Claims Package Deadline Date the Claims Administrator shall notify the Eligible Claimant either personally, or if represented by counsel, through his Enrolling Counsel, either (i) that the Enrollment and Claims Package constitutes a Completed Claims Package in accordance with the form attached hereto as Exhibit J-1, or (ii) that the Enrollment and Claims Package is Materially

15

Delinquent or Deficient and has been rejected in whole or in part. The Claims Administrator shall specifically identify all reasons for the determination that the Enrollment and Claims Package is Materially Delinquent or Deficient. The Claims Administrator must process claims quickly; however, if 50% or more of the total Enrollment and Claims Packages (determined by number of packages, not by number of acres represented by those packages) under both agreements are received within fifteen (15) days of the Enrollment and Claims Package Deadline Date, this forty-five (45) day deadline in this Section 2.9 may be extended no more than necessary to complete review of Enrollment and Claims Packages and under no circumstances more than an additional fifteen (15) days. Any Enrollment and Claims Package as to which no such notice timely has been delivered shall be deemed accepted.

2.9.1   An Eligible Claimant who has received a notice that his Enrollment and Claims Package has been rejected shall have sixty (60) days from receipt of such notice to submit a corrected Enrollment and Claims Package. Any corrected Enrollment and Claims Package that has not been rejected on or prior to the twentieth (20th) day after the applicable Enrollment and Claims Package Cure Deadline Date (the "Review Period") shall be deemed accepted as of the end of the corresponding Review Period.

2.9.2   If the Eligible Claimant fails to submit within the sixty (60) day period a corrected Enrollment and Claims Package without Material Delinquency or Deficiency (as determined by the Claims Administrator), such Eligible Claimant may be removed from the Program and rendered ineligible for any Settlement Payments under this Agreement. However, any and all Releases and Stipulations of Dismissal, as applicable, submitted in connection with a Materially Delinquent or Deficient Enrollment and Claims Package shall nonetheless remain in full force and effect and promptly shall be delivered by the Claims Administrator to Bayer (and, without limitation, Bayer shall be free to file or cause to be filed such Stipulation of Dismissal and/or Release in any relevant action or proceeding). A Material Delinquency or Deficiency in an Enrollment and Claims Package due to the omission of, or deficiency in, a Release of an Affiliated Claimant shall not serve as the basis for rejection of the entire Enrollment and Claims Package, but, under Section 2.9.3 below, the portion of the claim for which adequate information has been submitted shall be accepted if otherwise not Materially Delinquent or Deficient.

2.9.3   If the Claims Administrator has determined that an Eligible Claimant has submitted adequate information for some portion of the claim, the Claims Administrator shall accept an Enrollment and Claims Package solely as to that portion of the claims for which adequate information has been submitted so long as there are no Material Delinquencies or Deficiencies related to the portion of the claim adequately submitted.

16

2.9.4    The Claims Administrator shall process Enrollment and Claims Packages on a rolling basis and shall approve or reject any Enrollment and Claims Package or corrected Enrollment and Claims Package, or any part thereof, as they are submitted.

2.9.4.1    An Eligible Claimant may appeal the Claims Administrator's decision to reject a corrected Enrollment and Claims Package, in whole or in part solely by notifying the Claims Administrator of its intent to appeal (each a "Notice of Appeal") within ten (10) days of receipt of notice of such rejection.

2.9.4.1.1    Within thirty (30) days of the date that the Notice of Appeal is sent to the Claims Administrator or within ten (10) days of receipt of any request from the Arbitrator, whichever is later, the Eligible Claimant shall submit to the Arbitrator and to the Claims Administrator any additional materials in support of his claim as the Eligible Claimant may desire to submit or as may be requested by the Arbitrator.

2.9.4.1.2    The Claims Administrator shall have twenty (20) days following the receipt by both the Claims Administrator and the Arbitrator of materials submitted in accordance with 2.9.4.1.1 above to respond to the appeal and submit relevant documentation.

2.9.4.1.3    The Arbitrator shall rule on each appeal within thirty (30) days of the deadline established pursuant to Section 2.9.4.1.2 above and, in the event no response is filed, the Arbitrator shall rule on each appeal within thirty (30) days of his receipt of the appeal or, if later, the deadline established pursuant to Section 2.9.4.1.1 above. The ruling of the Arbitrator shall be final, binding and Non-Appealable.

2.9.4.1.4    If an Eligible Claimant fails to meet the Notice of Appeal deadline in Section 2.9.4.1, its right to appeal shall be extinguished and the Claims Administrator's decision shall be final, binding and Non-Appealable. The Claims Administrator shall consider only those materials that have been timely filed by any party.

2.9.4.1.5    If an Eligible Claimant files a Notice of Appeal and the Eligible Claimant is not the Prevailing Party in

17

respect of such appeal as determined by the Arbitrator, the Eligible Claimant shall be liable for the fees and costs of the Arbitrator related to such appeal, which such fees and costs may be deducted from any Settlement Payment to be made with respect to the Eligible Claimant hereunder. Likewise, if an Eligible Claimant files a Notice of Appeal and the Eligible Claimant is the Prevailing Party in respect of such appeal as determined by the Arbitrator, the Eligible Claimant shall not be liable for the fees and costs of the Arbitrator related to such appeal (subject to the balance of the terms of this Section 2.9.4.1.5), rather Bayer shall be so responsible. In any event where the Arbitrator's Award is exactly between the parties' positions, the parties to the arbitration shall share equally in the fees and costs incurred and there is no Prevailing Party. Even if the Enrolled Claimant would otherwise be the Prevailing Party, if the Claimant submits additional material under Section 2.9.4.1.1 then the Arbitrator shall determine (1) whether those submissions materially changed the submission of the Claimant and (2) if so, then the Claimant shall bear all costs and expenses of the arbitration.

2.9.4.2   Upon the completion of all appeals in accordance with the terms of Section 2.9.4.1 above, the Claims Administrator shall make any necessary adjustments in respect of the degree to which the Eligible Claimant's Enrollment and Claims Package will be considered accepted or rejected in accordance with the rulings by the Arbitrator.

2.10   Bayer, in its sole and absolute discretion, may extend the Enrollment and Claims Package Deadline Date, or the Enrollment and Claims Package Cure Deadline Date, upon written notice to the NCC (which such extension also may be communicated in accordance with the terms of Section 2.2 above), but is under no obligation to do so.

2.11   Upon acceptance of an Enrollment and Claims Package (i.e., upon a determination that an Enrollment and Claims Package is a Completed Enrollment and Claims Package), the Eligible Claimant shall become an Enrolled Claimant. An Enrolled Claimant who does not file a Cheniere/CL-131 Claims Package by the Cheniere/CL-131 Claims Package Deadline Date shall have the right, instead, to make a claim on the Other Losses Fund, subject to the timely submission of a Other Losses Claims Form on or before the Other Losses Claims Form Deadline.

18

2.12   Each Enrollment and Claims Package, including each element thereof, must be submitted on behalf of the Eligible Claimant by his Enrolling Counsel or, if unrepresented, by the Eligible Claimant.

2.13   All or any portion of any Enrollment and Claims Package may be filed electronically in accordance with such instructions as may be provided by the Claims Administrator from time to time, provided, however, that original Releases must be submitted in hard-copy and not electronically.

2.14   Bayer and the Claims Administrator (together with its and their respective representatives and others deemed necessary by either Bayer or the Claims Administrator to assist them and/or their representatives) and the NCC, will have unlimited access to all Enrollment and Claims Packages, including any related supporting documentation. If any Cap is reached, then the signatories to the GMB Settlement Agreement shall also have access to Enrollment and Claims Packages, including any related supporting documentation, provided, however, that the party requesting information shall pay for all costs, including administrative costs, to obtain such information. All parties with such access agree not to disclose any information contained in the Enrollment and Claims Packages, including any related supporting documentation. To the extent any such information is shared with others deemed necessary as permitted above, the person sharing such information shall be required to agree in writing not to disclose such information to anyone not expressly allowed to have access to it under this Agreement.

2.15   Nothing in this Article 2 limits any party's rights or remedies in the event of fraud or other intentional misconduct.

2.16   Enrolled Claimants consent to the disclosure of the communications between themselves and their Enrolling Counsel set forth in the Enrolling Counsel's declaration. Such disclosure does not operate as a waiver of any attorney-client privilege. Bayer agrees not to use such disclosure to argue or claim that any attorney-client privilege has been waived or such protections otherwise weakened.

2.17   In the event more than one Claims Package is submitted as to the same Interest in the same acreage (whether under this Agreement or the GMB Settlement Agreement), the single Claims Package to be considered, and the program under which it shall be considered, shall be determined as follows:

2.17.1   Duplicative Claims Involving Two or More Lawyers or Law Firms

2.17.1.1   As to any Duplicative Claims where two or more lawyers or law firms are named as Enrolling Counsel (whether submitted pursuant to this Program or the GMB Program), the Claims Administrator shall promptly notify each such lawyer or law firm of the Duplicative Claims. Within seven (7) days thereafter, the notified firms shall produce a true and correct copy of that firm's

19

representation agreement signed by the Eligible Claimant(s), Affiliated Claimant(s), or an owner of the Eligible or Affiliated Claimant(s) at issue to the other identified firm. A law firm failing to timely produce its representation agreement signed by the Eligible Claimant(s), Affiliated Claimant(s), or an owner of the Eligible or Affiliated Claimant(s) at issue shall be entitled to no fees for that particular claim filed on behalf of an Eligible Claimant, Affiliated Claimant(s), or an owner of the Eligible or Affiliated Claimant(s), the Claims Package filed by that law firm shall be disregarded, and only the Claims Package filed by the law firm who did timely produce its representation agreement shall be considered by the Claims Administrator.

2.17.1.2   If more than one lawyer or law firm timely produces a representation agreement with the Eligible Claimant(s), Affiliated Claimant(s), or an owner of the Eligible or Affiliated Claimant(s) at issue, the lawyers or law firms shall attempt to resolve the dispute. If within twenty (20) days of the Claims Administrator's Duplicative Claim notice all such lawyers or law firms have not agreed on which lawyers or law firms shall be deemed to be the Enrolling Counsel for such Eligible Claimant and which of the Duplicative Claims is to be the prevailing Claims Package and so notified the Claims Administrator, the Claims Administrator shall promptly refer the dispute between the lawyers or law firms to the Arbitrator.

2.17.1.2.1   Within ten (10) days of the date that the dispute is referred to the Arbitrator, the disputing lawyers or law firms shall submit to the Arbitrator and to the Claims Administrator any additional materials in support of their claims that they may desire or as may be required by the Arbitrator.

2.17.1.2.2   In resolving disputes between lawyers or law firms over Duplicative Claims, the Arbitrator first shall determine whether each lawyer or law firm has a signed agreement with the Eligible Claimant, Affiliated Claimant(s), or an owner of the Eligible or Affiliated Claimant(s). If there is more than one signed representation agreement with the Eligible Claimant, Affiliated Claimant(s), or an owner of the Eligible or Affiliated Claimant(s), the Arbitrator shall resolve disputes between lawyers and law firms based upon all the facts and circumstances timely presented to the Arbitrator.

20

2.17.1.2.3   The Arbitrator shall rule on each such dispute within thirty (30) days of the deadline established pursuant to Section 2.17.1.2.1 above. The ruling of the Arbitrator as to which of the Duplicative Claims is to be considered by the Claims Administrator shall be final, binding and Non-Appealable.

2.17.1.3   The fees and costs of the Arbitrator shall be borne by the lawyer or law firm that is not the Prevailing Party. Bayer shall not be responsible for any fees or expenses incurred in resolving disputes between the lawyers and law firms, including fees and expenses charged or incurred by the Arbitrator in doing so. Nor shall any work by the Arbitrator resolving these disputes delay or take priority over work related to resolving disputes regarding benefits due Enrolled Claimants who have not submitted Duplicative Claims under this Agreement or the GMB Settlement Agreement.

2.17.2   <u>All Other Duplicative Claims</u>

2.17.2.1   As to any and all Duplicative Claims involving either one or no lawyers or law firms (whether submitted under this Program or the GMB Program), the Claims Administrator promptly shall notify the NCC and Bayer as well as each such Claimant's respective Counsel (and when one or more Duplicated Claims are filed by Eligible or Enrolled Claimants who are not represented, the Eligible or Enrolled Claimant) of the existence of Duplicative Claims.

2.17.2.2   The various parties who have made Duplicative Claims shall attempt to resolve the dispute. If within ten (10) days of the Claims Administrator's Duplicative Claim notice all such parties have not agreed as to which Claims Package shall be the prevailing Claims Package as well as the identity of the Enrolling Counsel (if any) and so notified the Claims Administrator, the Claims Administrator shall promptly refer the dispute to the Arbitrator.

2.17.2.3   Within ten (10) days of the date that the dispute is referred to the Arbitrator, any implicated Eligible Claimant through Enrolling Counsel (if any, and when one or more Duplicated Claims are filed by Eligible or Enrolled Claimants who are not represented, the Eligible or Enrolled Claimant) shall submit to the Arbitrator and to the Claims Administrator any additional materials in support of their claims that they may desire or as may be required by the Arbitrator.

21

2.17.2.4   The Arbitrator shall rule on each such dispute within thirty (30) days of the deadline established pursuant to Section 2.17.2.3 above.  The ruling of the Arbitrator as to which of the Duplicative Claims is to be considered by the Claims Administrator shall be final, binding and Non-Appealable.

2.17.2.5   The fees and costs of the Arbitrator presumptively shall be borne by the Person whose Claims Package is the prevailing Claims Package, in which case, such fees and costs may be deducted from any Settlement Payment to be made in respect of that Claims Package.  However, the Arbitrator shall be the ultimate arbiter of who is to bear the Arbitrator's fees and costs, provided that, in no event shall Bayer be responsible for any fees or expenses incurred in resolving disputes regarding Duplicative Claims, including fees and expenses charged or incurred by the Arbitrator in doing so.  Nor shall any work by the Arbitrator resolving these disputes delay or take priority over work related to resolving disputes regarding benefits due Enrolled Claimants who have not submitted Duplicative Claims under this Agreement or the GMB Settlement Agreement.

2.17.3   If any Settlement Payment has already been made to a Enrolled Claimant in respect of a Claims Package that is later determined to be a Duplicative Claim, all Enrolled Claimants and their Counsel agree (1) to be bound by any determination under the above Sections 2.17.1 and 2.17.2; (2) if necessary to comply with such determination, to return monies received to the Qualified Settlement Fund for subsequent disposition in accordance with such determination (however, Counsel's obligation to return monies is limited to the amount of such monies remaining in Counsel's possession); and (3) to hold Bayer, the Claims Administrator and the QSF Administrator harmless in any attempt to collect monies already paid to an Enrolled Claimant because such payments were later determined to have been in respect of one or more Duplicative Claims.  Enrolled Claimants and their Counsel expressly agree that when payments are made to one Enrolled Claimant  and, if applicable, their Counsel (Claimant A), that later are determined, under Sections 2.17.1 or 2.17.2, to be due a different Enrolled Claimant and, if applicable, their Counsel, (Claimant B) that Claimant B will only be paid for that portion that was a Duplicative Claim when Claimant A returns the applicable funds to the Qualified Settlement Fund.

2.17.4   If any Funding Payment, or part thereof, has been made to the Qualified Settlement Fund in respect of a Claims Package that is later determined to be a Duplicative Claim, if and to the extent that such Funding Payment has not been distributed to the Enrolled Claimant, all Enrolled Claimants and their Counsel as well as the QSF Administrator agree to be bound by any determination under the above Sections 2.17.1 and

22

2.17.2; and , if necessary to comply with such determination, the QSF Administrator shall transfer to the Qualified Settlement Fund established under the GMB Settlement Agreement said Funding Payment provided further that the GMB QSF Administrator certifies it has not received a Funding Payment for such Claims Package , Enrolled Claimants and their Counsel expressly agree that when payments are transferred to the Qualified Settlement Fund established under the GMB Settlement Agreement that later are determined, under Sections 2.17.1 or 2.17.2, to be due an Enrolled Claimant under this Agreement such Claimant will only be paid in respect of its Claims Package when the GMB QSF Administrator transfers the applicable funds to the Qualified Settlement Fund established under this Agreement.  To the extent the QSF Administrator has distributed the Funding Payment to the Enrolled Claimant before receipt of any determination that the Claims Package is a Duplicative Claim, the QSF Administrator shall have no further obligation or duty with regard to such Funding Payment.  This Section 2.17.4, nor any other portion of this Agreement, shall not in any circumstance permit a transfer of funds otherwise precluded by 26 U.S.C. Sec. 468B(d)(1)(A).

2.18   Upon receipt of payment by any Enrolled Claimant under this Agreement, subject to its receipt of a Release executed by such Enrolled Claimant and, as applicable, a Release duly executed by any Affiliated Claimant to such Enrolled Claimant, Bayer releases such Enrolled Claimant and any such Affiliated Claimant from any claim related to the presence of Bayer GM Rice Seed in the United States rice supply.  The foregoing release specifically excludes, and Bayer is not prohibited or limited in any way by such release from bringing, the following claims:

- Any claim arising out of any commercial transaction between such Enrolled Claimant or Affiliated Claimant and Bayer or any Person that sells or distributes any Bayer product.

- Any claim against any other Person that may affect anticipated payments from any Additional Released Party or may affect the ownership or property interest of the released Enrolled Claimant or Affiliated Claimant, directly or indirectly, in any Additional Released Party.  The foregoing release only covers claims made directly against the Enrolled Claimant or Affiliated Claimant.

- Any claim against any Enrolled Claimant or Affiliated Claimant related to fraudulent or deceptive information submitted to the Claims Administrator under this Agreement or to enforce an obligation of an Enrolled Claimant or Affiliated Claimant under this Agreement.

23

## Article 3 – Walk Away Rights and Termination of Agreement

3.1 **Walk Away Rights and Termination of Agreement**

If a Summary Report or the Final Summary Report indicates that the Settlement Threshold has been met, Bayer has no Walk Away Right. If no such Report has been received, then during the period beginning upon Bayer's receipt of the Final Summary Report and ending at midnight Central Time on the tenth (10th) day thereafter (such period being referred to as the "Walk Away Period" and the last day of such period being referred to herein as the "Walk Away Deadline") Bayer shall have the option, in its sole discretion, to terminate the Program and this Agreement (such option being referred to herein as, the "Walk Away Right") if:

3.1.1 The Average Claimed Acreage constitutes less than 85% of the Average Aggregate Applicable Acreage (such number of acres being referred to herein as "Settlement Threshold").

3.1.1.1 "Average Claimed Acreage" shall be determined by taking a simple average of the Claimed Acreage for calendar years 2006, 2007, 2008 and 2009. "Claimed Acreage" means, as to any applicable calendar year, the aggregate size of the crop in acres in which Enrolled Claimants have an Interest (including the Interests of any Affiliated Claimants) as represented by Completed Enrollment and Claims Packages for Market Losses together with the aggregate size of the crop in which Enrolled Claimants have an Interest (including the Interests of any Affiliated Claimants) as represented by Completed Enrollment and Claims Packages for Market Losses in the GMB Settlement Agreement (the "GMB Program"). Notwithstanding the foregoing, solely for purposes of determining whether the Settlement Threshold has been met, Claimed Acreage will include the acreage reflected in any Enrollment and Claims Package for Market Losses that otherwise would be a Completed Enrollment and Claims Package but for its having been determined to be a Duplicate Claim, the Claimed Acreage shall include the acreage in the Enrollment and Claims Package with the highest number of properly documented acres, provided that such acreage is counted only once. Claimed Acreage specifically excludes the Interests of all Excluded Trial Claimants and specifically includes the Interests of all Included Trial Claimants. The "Average Aggregate Applicable Acreage" is 2,229,500, which is the simple average long-grain rice acres planted in 2006, 2007, 2008 and 2009 according to the USDA.

3.1.1.2 An Interest in a crop shall be calculated by acre and in accordance with the data reflected on the corresponding Form 578. By way of illustration only, if a Form 578 demonstrates

24

that an Eligible Claimant has a "share rent" arrangement with a landlord in the ratio of 75/25 and a total of 100 acres of long-grain rice is reflected on the form, the Eligible Claimant will be deemed to have an Interest in 100 acres if the landlord is an Affiliated Claimant and has signed a Release and a Landlord Consent and Instruction to Pay Tenant Form and 75 acres if the landlord has not done so.  (Interests in crops shall be calculated without regard to, or reduction for, landlord portions of any cash rent arrangements.)

**3.2    Time to Exercise Walk Away Right**

3.2.1   Bayer may exercise its Walk Away Right during the Walk Away Period upon written notice to such effect delivered to the Persons set forth in Section 3.2.4 below.

3.2.2   If Bayer has a Walk Away Right, alternatively, Bayer may, in its sole and absolute discretion, do any of the following at any time during the Walk Away Period upon written notice to such effect delivered to the NCC:

3.2.2.1   extend the cure period for correcting Materially Delinquent or Deficient Enrollment and Claims Packages and extend the date for the exercise of its Walk Away Right by a period of fifteen (15) days thereafter;

3.2.2.2   irrevocably waive its Walk Away Right; or

3.2.2.3   waive its Walk Away Right but reduce the Overall Cap as well as the (y) Cheniere/CL-131 Cap and (z) the Other Losses Cap and the Other Losses Fund pro rata based on a fraction, the numerator of which shall be the Average Claimed Acreage and the denominator of which shall be the Settlement Threshold.

3.2.3   If Bayer has the right to exercise the Walk Away Right but fails to do so on or before the Walk Away Deadline, the Walk Away Right shall have expired as of such date.  The date on which the Walk Away Right expires or is waived, or, if earlier, the date on which Bayer has received a Summary Report or the Final Summary Report that indicates that the Settlement Threshold has been met, is referred to herein as the "Effective Date."

3.2.4   Bayer shall exercise its Walk Away Right, or waive the same, or exercise any alternative under Section 3.2.2 by giving written notice to NCC and the date of such notice shall be determined by the date such notice was sent.

25

**3.3     Effects of Termination**

3.3.1     Upon exercising its Walk Away Right, any term of this Agreement to the contrary notwithstanding, this Agreement immediately shall terminate and (without limitation of the foregoing) Bayer immediately shall cease to have any further financial obligations under this Agreement (including Article 5), except only that Bayer shall continue to be responsible to pay the Administrative Expenses specified in Section 5.1 and arbitration expenses with respect to arbitrations in which Bayer is not the Prevailing Party or in which there is no Prevailing Party. All other parties responsible for costs under Section 5.1 or in arbitrations where they are not the Prevailing Party shall continue to be responsible for such costs. Under no circumstances is Bayer responsible for any costs incurred under Section 2.17.

3.3.2.     In the case of any exercise by Bayer of its Walk Away Right, all Releases and Stipulations of Dismissal shall be null and void and returned to the NCC or destroyed.

3.3.3.     In the case of any exercise by Bayer of its Walk Away Right, Bayer agrees that any statute of limitations applicable to any claim by any Enrolled Claimant against Bayer related to the presence of GM Rice Seed in the supply of rice in the United States which had not expired on or before May 1, 2011 shall be tolled from May 2, 2011 until thirty (30) days after Bayer exercises its Walk Away Right. Bayer expressly retains all other defenses, including all statute of limitations defenses that it had as of May 1, 2011, to any such claims.

**Article 4 – Claims Evaluation**

**4.1     General**

4.1.1     Each Enrolled Claimant shall receive a Settlement Payment for Market Losses in accordance with the criteria specified in Exhibit X which shall constitute evidence of loss attributable to Bayer GM Rice Seed. The Settlement Payment for Market Losses shall be made in two phases. First, in the timeframe set forth in Section 5.2.5, the Claims Administrator shall direct Bayer to remit to the Qualified Settlement Fund the Minimum Amount Due as set forth in Exhibit X. Second, after the calculation of any applicable reduction for exceeding the Overall Cap, if applicable, the Claims Administrator shall direct Bayer to remit to the Qualified Settlement Fund the remaining amount owed pursuant to Section 5.2.4 herein. An Enrolled Claimant may also be eligible to receive an additional Settlement Payment for either Cheniere/CL-131 Losses or Other Losses based on having submitted materials that satisfy the criteria specified for

Cheniere/CL-131 Losses as set forth in Exhibit Y, or the criteria specified for Other Losses as set forth in Exhibit Z.

4.1.2   In the event more than one Claims Package is filed for the same Interest in the same acreage (whether under this Program or the GMB Program), the Claims Administrator shall suspend further consideration of any such Person's claims under this Agreement or the GMB Settlement Agreement until such time as the matter has been resolved in accordance with the terms of Section 2.17 above.  Such acreage, however, shall be counted once to determine whether the Settlement Threshold has been met in the manner set forth in Section 3.1.1.1.  The Claims Administrator shall determine whether or not Duplicative Claims exist and, as appropriate, suspend further consideration under this Section before directing Bayer to remit payment under Section 4.1.1.

## 4.2   Cheniere/CL-131 Claims Packages and Other Losses Claims Packages

### 4.2.1   Cheniere/CL-131 Claims Packages

4.2.1.1   Each Enrolled Claimant who wishes to make a claim for Cheniere/CL-131 Losses shall submit a claims package (each a "Cheniere/CL-131 Claims Package") on or before the Cheniere/CL-131 Claims Package Deadline Date.  All or any portion of any Cheniere/CL-131 Claims Package may be filed electronically in accordance with such instructions as may be provided by the Claims Administrator from time to time.  Notwithstanding anything to the contrary set forth herein, only tenants (including farmers who own the land they farmed) may submit claims for Cheniere/CL-131 Losses; landlords are not eligible to submit claims for Cheniere/CL-131 Losses.  However, a tenant may submit claims for Cheniere/CL-131 Losses in respect of their own Interests as well as the Interests of any landlord who has an Interest in the same crop provided that the tenant secures and submits a Release and Landlord Consent and Instruction to Pay Tenant Form executed by the landlord.  For example, if a Form 578 demonstrates that an Enrolled Claimant has a "share rent" arrangement with a landlord in the ratio of 75/25 and a total of 100 acres of long-grain rice is reflected on the form, the Enrolled Claimant will be deemed to have an Interest in the crop of 75 acres if the landlord has not signed a completed Release and Landlord Consent and Instruction to Pay Tenant Form and Interest in the crop of 100 acres if the landlord has signed both completed documents.  By way of further example, assume a Form 578 demonstrates that an Enrolled Claimant has two tracts of land, with a total of 100 acres of long grain rice reflected on the form for each tract, and two different landlords, each of whom has a

27

25% interest in the crop on the respective tracts. The tenant submits a Release and Landlord Consent and Instruction to Pay Tenant Form executed by one landlord, but not the other. The Enrolled Claimant will be deemed to have an 87.5% interest in the crop from the 200 acres for purposes of his Cheniere/CL-131 submission.

4.2.1.2   Each Cheniere/CL-131 Claims Package shall contain the following materials, together with any requisite supporting documentation called for in the corresponding Exhibits, if and to the extent applicable to an Enrolled Claimant:

4.2.1.2.1   A Cheniere/CL-131 Claims Form, in the form attached hereto as Exhibit A-2;

4.2.1.2.2   Wire Instructions for use by the QSF Administrator in connection with any Settlement Payment to be made to such Enrolled Claimant subject to and in accordance with the terms of the Qualified Settlement Fund Agreement; and

4.2.1.2.3   Reasonable documentation of Cheniere/CL-131 Losses as further described in Exhibit Y attached hereto.

4.2.1.3   Enrolling Counsel may submit on behalf of Enrolled Claimants Cheniere/CL-131 Claims Packages, as well as any updates or corrections to previously submitted Cheniere/CL-131 Claims Packages, on a rolling basis at any time prior to the Cheniere/CL-131 Claims Package Deadline Date and the Cheniere/CL-131 Claims Package Cure Deadline Date, as applicable.

4.2.1.4   Within sixty (60) days of the Cheniere/CL-131 Claims Package Deadline Date, the Claims Administrator shall notify the Eligible Claimant (through his Enrolling Counsel) either (i) that the Cheniere/CL-131 Claims Package constitutes a Completed Cheniere/CL-131 Claims Package in accordance with the form attached hereto as Exhibit J-2, or (ii) that the Cheniere/CL-131 Claims Package is Materially Delinquent or Deficient and has been rejected in whole or in part. The Claims Administrator shall specifically identify all reasons for the determination that the Enrollment and Claims Package is Materially Delinquent or Deficient. Any Cheniere/CL-131 Claims Package as to which no such notice timely has been delivered shall be deemed accepted. Bayer may, at its expense and discretion, notify the Claims Administrator, the Enrolling

28

Counsel and the NCC of Cheniere/CL-131 Claims Packages
that it deems Materially Delinquent or Deficient and the basis
for its belief for such Material Delinquency or Deficiency
within thirty (30) days of receipt of the Cheniere/CL-131
Claims Package. Enrolling Counsel or the NCC may provide
whatever information they deem appropriate to the Claims
Administrator regarding Bayer's submission within fifteen (15)
days of any such notification by Bayer. Thereafter, the Claims
Administrator shall determine whether the Cheniere/CL-131
Claims Package is Materially Delinquent or Deficient.

4.2.1.5     An Enrolled Claimant who timely has received a notice from
the Claims Administrator that his Cheniere/CL-131 Claims
Package has Material Delinquencies or Deficiencies shall have
sixty (60) days from receipt of such notice to submit a
corrected Cheniere/CL-131 Claims Package. All or any
portion of any corrected Cheniere/CL-131 Claims Package
may be filed electronically in accordance with such instructions
as may be provided by the Claims Administrator from time to
time. Under no circumstances may an Enrolled Claimant
increase their claim in any manner for Cheniere/CL-131 Losses
in any form in their corrected Cheniere/CL-131 Claims
Package, including but not limited to claiming more acres of
Cheniere/CL-131 grown in 2006 or by seeking to recover for
Affiliated Claimants not identified as an Affiliated Claimant in
their original Claims Package. Any corrected Cheniere/CL-
131 Claims Package that has not been rejected on or prior to
the fortieth (40th) day after the applicable Cheniere/CL-131
Claims Package Cure Deadline Date shall be deemed accepted.
Bayer may, at its expense and discretion, notify the Claims
Administrator, the Enrolling Counsel and the NCC within
twenty (20) days of receipt of any corrected Cheniere/CL-131
Claims Packages that it deems Materially Delinquent or
Deficient and the basis for its belief for such Material
Delinquency or Deficiency. Enrolling Counsel or the NCC
may provide whatever information they deem appropriate to
the Claims Administrator regarding Bayer's submission within
ten (10) days of any such notification by Bayer. Thereafter, the
Claims Administrator shall determine whether the
Cheniere/CL-131 Claims Package is Materially Delinquent or
Deficient.

4.2.1.6     Subject to the terms of Section 4.2.1.7 below, if an Enrolled
Claimant fails timely to submit a corrected Cheniere/CL-131
Claims Package free of any Material Delinquency or
Deficiency, such Enrolled Claimant will be rendered ineligible
for any Settlement Payments for Cheniere/CL-131 Losses

29

under this Agreement.  In any event, such Enrolled Claimant's Release and Stipulation of Dismissal, as applicable, nonetheless shall remain in full force and effect and promptly shall be delivered by the Claims Administrator to Bayer (and, without limitation, Bayer shall be free to file or cause to be filed such Stipulation of Dismissal and/or Release in any relevant action or proceeding).

4.2.1.7    If the Claims Administrator has determined that an Eligible Claimant has submitted adequate information for some portion of the claim, the Claims Administrator shall accept the Cheniere/CL-131 Claims Package (or corrected Cheniere/CL-131 Claims Package) solely as to that portion of the claims for which adequate information has been submitted so long as there are no Material Delinquencies or Deficiencies related to the portion of the claim adequately submitted.

4.2.1.8    The Claims Administrator may, in his discretion, approve or reject any Cheniere/CL-131 Claims Package or corrected Cheniere/CL-131 Claims Package, or any part thereof, at a rate faster than is required pursuant to the terms hereof but shall not do so prior to the time permitted for Bayer to provide notice of whether or not it believes a Cheniere/CL-131 Claims Package or corrected Cheniere/CL-131 Claims Package contains Material Delinquencies or Deficiencies.

4.2.1.9    An Enrolled Claimant may appeal the Claims Administrator's decision to reject a corrected Cheniere/CL-131 Claims Package in whole or in part solely by delivering to the Claims Administrator a Notice of Appeal within ten (10) days of receipt of notice of such rejection.

4.2.1.9.1    Within thirty (30) days of the date that the Notice of Appeal is sent to the Claims Administrator, the Enrolled Claimant shall submit to the Arbitrator and to the Claims Administrator any additional materials in support of his claim as he may desire or as may be requested by the Arbitrator.

4.2.1.9.2    Bayer and the Claims Administrator shall have a period of twenty (20) days following the receipt by both the Claims Administrator and the Arbitrator of all materials submitted in accordance with 4.2.1.9.1 above to respond to the appeal and submit relevant documentation.

30

4.2.1.9.3    The Arbitrator shall rule on each appeal within thirty (30) days of the deadline established pursuant to Section 4.2.1.9.2 above and, in the event no response is filed, the Arbitrator shall rule on each appeal within thirty (30) days of his receipt of the appeal or, if later, the deadline established pursuant to Section 4.2.1.9.1 above. The ruling of the Arbitrator shall be final, binding and Non-Appealable.

4.2.1.9.4    If an Enrolled Claimant fails to meet any of the deadlines set forth in this Section 4.2.1.9, its right to appeal shall be extinguished and the Claims Administrator's decision shall be final, binding and Non-Appealable.

4.2.1.9.5    If an Enrolled Claimant files a Notice of Appeal and the Enrolled Claimant is not the Prevailing Party in respect of such appeal as determined by the Arbitrator, the Enrolled Claimant shall be liable for the fees and costs of the Arbitrator related to such appeal, which such fees and costs may be deducted from any Settlement Payment to be made with respect to the Enrolled Claimant hereunder. Likewise, if an Enrolled Claimant files a Notice of Appeal and the Enrolled Claimant is the Prevailing Party in respect of such appeal as determined by the Arbitrator, the Enrolled Claimant shall not be liable for the fees and costs of the Arbitrator related to such appeal (subject to the balance of the terms of this Section 4.2.1.9.5), rather Bayer shall be so responsible. In any event where the Arbitrator's Award is exactly between the parties' positions, then the parties to the arbitration share equally in the costs incurred and there is no Prevailing Party. Even if the Enrolled Claimant would otherwise be the Prevailing Party, if the Claimant submits additional material under Section 4.2.1.9.1 then the Arbitrator shall determine (1) whether those submissions materially changed the submission of the Claimant and (2) if so, then the Claimant shall bear all costs and expenses of the arbitration.

4.2.1.10    Upon the completion of all appeals in accordance with the terms of Section 4.2.1.9 above, the Claims Administrator shall make any necessary adjustments in respect of the degree to

31

which the Enrolled Claimant's Cheniere/CL-131 Claims Package will be considered accepted or rejected in accordance with the rulings by the Arbitrator.

4.2.1.11    Within ten (10) days after the calculation of reductions in payments, if any, called for under Section 5.2.4 for exceeding the Overall Cap, said payments shall be remitted to the Qualified Settlement Fund in the amount called for.

## 4.2.2    Other Losses Claims Packages

4.2.2.1    Each Enrolled Claimant who wishes to make a claim for Other Losses shall submit an Other Losses Claims package (each a "Other Losses Claims Package") on or before the Other Losses Claims Package Deadline Date. All or any portion of any Other Losses Claims Package may be filed electronically in accordance with such instructions as may be provided by the Claims Administrator from time to time.   Notwithstanding anything to the contrary set forth herein, only tenants (including farmers who own the land they farmed) may submit claims for Other Losses; landlords, in their capacity as landlords, are not eligible to submit claims for Other Losses. However, a tenant may submit claims for Other Losses in respect of their own Interests as well as the Interests of any landlord who has an Interest in the same crop provided that the tenant secures and submits a Release executed by the landlord. For example, if a Form 578 demonstrates that an Enrolled Claimant has a "share rent" arrangement with a landlord in the ratio of 75/25 and a total of 100 acres of long-grain rice is reflected on the form, the Enrolled Claimant will have any Other Losses claim reduced by 25% if the landlord has not signed a completed Release and Landlord Consent and Instruction to Pay Tenant Form.  If the landlord has signed both completed documents, no reduction shall occur.  By way of further example, assume a Form 578 demonstrates that an Enrolled Claimant has two tracts of land, with a total of 100 acres of long grain rice reflected on the form for each tract, and two different landlords, each of whom has a 25% interest in the crop on the respective tracts.  The tenant submits a Release and Landlord Consent and Instruction to Pay Tenant Form executed by one landlord, but not the other.  The Enrolled Claimant will be deemed to have an 87.5% interest in the crop from the 200 acres for purposes of his Other Losses submission.  For the avoidance of doubt, any payments from the Other Losses fund when a landlord is not an Affiliated Claimant shall be reduced by that landlord's Interest regardless of whether the claim is for reduced revenue or higher expenses.  Each Other Losses

32

Claims Package shall contain the following materials, together with any requisite supporting documentation called for in the corresponding Exhibits, if and to the extent applicable to an Enrolled Claimant:

4.2.2.1.1   An Other Losses Claims Form, in the form attached hereto as Exhibit A-3;

4.2.2.1.2   Wire Instructions for use by the QSF Administrator in connection with any Settlement Payment to be made to such Enrolled Claimant subject to and in accordance with the terms of the Qualified Settlement Fund Agreement; and

4.2.2.1.3   Reasonable documentation of Other Losses as further described in Exhibit Z attached hereto.

4.2.2.2   Enrolling Counsel may submit on behalf of Enrolled Claimants Other Losses Claims Packages, as well as any updates or corrections to previously submitted Other Losses Claims Packages, on a rolling basis at any time prior to the Other Losses Claims Deadline Date and the Supplemental Package Cure Deadline Date, as applicable.

4.2.3   Each Cheniere/CL-131 Claims Package and each Other Losses Claims Package, including each element thereof, must be submitted on behalf of the Eligible Claimant by his Enrolling Counsel or, if unrepresented, by the Eligible Claimant.

4.2.4   Bayer, the NCC and the Claims Administrator (together with such Person's respective representatives and others deemed necessary by such Person to assist either such Person and/or its representatives), will have unlimited access to all Cheniere/CL-131 Claims Packages and all Other Losses Claims Packages, including any related supporting documentation. If any Cap is reached, then GMB shall also have access to all Cheniere/CL-131 Claims Packages and all Other Losses Claims Packages, including any related supporting documentation, provided, however, that the party requesting information shall pay for all costs, including administrative costs, to obtain such information. Each of Bayer, the NCC, the Claims Administrator and any representative or other Person who gains access to Cheniere/CL-131 Claims Packages and/or Other Losses Claims Packages in accordance with the terms of this Section 4.2.4 shall maintain such materials in strict confidence and use such materials solely as contemplated by the terms of this Agreement. All parties with such access agree not to disclose any information contained in the Cheniere/CL-131 Claims Packages and/or Other Losses Claims Packages, including any related supporting documentation. To the extent any such

33

information is shared with others deemed necessary as permitted above, the person sharing such information shall be required to agree in writing not to disclose such information to anyone not expressly allowed to have access to it under this Agreement.

4.2.5   If no payments have been made under Section 5.3.8, within ten (10) days after the calculation of reductions in payments, if any, called for under Section 5.2.4 for exceeding the Overall Cap, said payments shall be remitted to the Qualified Settlement Fund in the amount called for.

## 4.3   Claim Assessment Process

4.3.1   With respect to each Completed Enrollment and Claims Package, the Claims Administrator, taking into account any revisions in accordance with Sections 2.3.3 or 2.9.3, shall determine the number of planted acres for which the Enrolled Claimant should receive credit pursuant to the criteria specified for Market Losses as set forth in Exhibit X, and thereby eligible for a Settlement Payment in respect of such Market Losses.

4.3.2   With respect to each Completed Cheniere/CL-131 Claims Package, the Claims Administrator shall determine, taking into account any revisions in accordance with Section 4.2.1.7 or 4.2.1.9, whether the Enrolled Claimant is eligible for a Settlement Payment in respect of Cheniere/CL-131 Losses as provided in Exhibit Y.  If the Enrolled Claimant is so eligible, the Claims Administrator shall determine, taking into account any revisions in accordance with Section 4.2.1.7 or 4.2.1.9, the number of acres for which the Enrolled Claimant should receive credit pursuant to the criteria specified for Cheniere/CL-131 Losses in Exhibit Y.

4.3.3   With respect to each Completed Other Losses Claims Package, the Claims Administrator shall determine whether the Enrolled Claimant is eligible to participate in the process to determine eligibility for a Settlement Payment from the Other Losses Fund as set forth in Exhibit Z.

4.3.4   The Claims Administrator shall endeavor to process Claims Packages in the order in which each such package is determined to be a Completed Claims Package. However, the Claims Administrator shall not have any Liability for any failure to do so.

4.3.5   The Claims Administrator shall notify each Enrolled Claimant (through Enrolling Counsel, if represented by counsel), Bayer and the NCC of any and all Settlement Payments (together, the "Award") to be made to an Enrolled Claimant using a form developed for such purpose by the Claims Administrator (each a "Notice of Preliminary Award").  Notwithstanding anything to the contrary set forth herein, any such noticed Award shall be subject to (i) any appeal made in accordance with terms of Sections 2.9, 4.2.1.9, 5.3.5 or 5.4.6, as applicable (the Arbitrator's decision in respect of

34

which shall be final, binding and Non-Appealable), (ii) Bayer's Walk
Away Right under Article 3 above, (iii) any deduction from or reduction
of any such Award made in accordance with the terms of this Agreement
or the Qualified Settlement Fund Agreement or as may mutually be agreed
as between Enrolled Claimants and their Counsel and (iv) any adjustment
made in respect of the application of any applicable Cap, but otherwise
shall be final, binding and Non-Appealable.

### 4.4    Duplicative Claims

In the event any Claims Package for Cheniere/CL-131 Losses or Other Losses is a
Duplicative Claim (whether under this Program or the GMB Program), the Claims Administrator
shall suspend further consideration of any such Person's claims under this Agreement or the
GMB Settlement Agreement until such time as the matter has been resolved in accordance with
the terms of Section 2.17 above, except as provided in Section 4.1.2.

### 4.5    No Punitive Damages

By submitting a Release, each Eligible Claimant and any Affiliated Claimant waives the
right to receive any punitive damages in respect of any Eligible Claim and each Eligible
Claimant and each Affiliated Claimant understands and agrees that no Settlement Payment paid
hereunder is, or shall be deemed to be, attributable to punitive or emotional damages.

### Article 5 – Bayer Funding Obligations

Bayer agrees, subject to the terms and conditions hereof, to make the Settlement
Payments that it is required to make from time to time pursuant to this Article (collectively, the
"Funding Payments"). The parties agree that, absent its inability or failure to timely pay, (y)
Bayer CropScience LP will make such payments, and (z) all references herein to Bayer with
respect to an obligation to pay shall refer to Bayer CropScience LP. If Bayer CropScience LP
does not timely make any payments, the other Bayer entities agree to make such payments
promptly.

### 5.1    Administrative Expenses

5.1.1    Bayer shall be responsible for paying the fees and expenses incurred by
the Claims Administrator in administering the Program (the
"Administrative Expenses"), except that any party seeking information
under Section 2.14 or Section 4.2.4 or Article 9 shall bear the entire cost
of such request, including administrative fees and costs.

5.1.2    Within three (3) Business Days after the end of each full calendar month
following the Execution Date, the Claims Administrator shall submit to
Bayer and the NCC, in such form and in such detail as Bayer reasonably
from time to time may specify, a report (each an "Expenses Report"),
itemizing and certifying a list of all Administrative Expenses incurred

35

during such calendar month and itemizing any costs to be paid by any party other than Bayer by party.

5.1.3 Bayer and all other parties incurring fees and costs shall pay the Administrative Expenses described in each Expenses Report within thirty (30) days of receipt thereof or as otherwise agreed as between that party and the Claims Administrator.

**5.2   Market Losses**

5.2.1   Beginning on the forty-fifth (45) day following the Execution Date, the Claims Administrator shall provide to Bayer and to the NCC a summary report (each a "Summary Report") that (x) includes a list of all Enrolled Claimants who have theretofore submitted Completed Enrollment and Claims Packages, (y) a list summarizing by Enrolling Counsel the total acres of Interest by year submitted on Completed Enrollment and Claims Packages under this Settlement Agreement and (z) indicates what percentage of the Settlement Threshold has been achieved to date under this Settlement Agreement and the GMB Settlement Agreement.

5.2.2   Thereafter, on the last day of each succeeding period of thirty (30) days (ending, at the latest, on the thirtieth (30th) day following the last possible Enrollment and Claims Package Cure Deadline Date), the Claims Administrator shall provide to Bayer and to the NCC an updated Summary Report. The last such Summary Report due hereunder is referred to herein as the "Final Summary Report."

5.2.3   On or after the Effective Date, the Claims Administrator shall calculate the preliminary amount due to each Enrolled Claimant identified therein for Market Losses reflecting the Minimum Amount Due in accordance with the formula described in Exhibit X (the "Initial Market Losses Payment List") and shall provide such Initial Market Losses Payment List by the fifth (5th) day following its delivery of the first Summary Report to be delivered after theEnrollment and Claims Package Deadline Date. Following the delivery of the Initial Market Losses Payment List, on a schedule to coincide with its delivery of each subsequent Summary Report, , the Claims Administrator shall provide to Bayer and to the NCC an updated list setting out the Minimum Amount Due to each additional Claimant who theretofore has submitted a Completed Enrollment and Claims Package (each a "Supplemental Market Losses Payment List").
5.2.4   Within thirty (30) days following the completion of all rulings by the Arbitrator on all appeals allowed under this Agreement, whether with respect to Claims Packages or to any Award, the Claims Administrator shall provide to Bayer and to the NCC a list (the "Final Enrolled Claimant Payment List") setting out the final amount due to each Claimant for Market Losses, Cheniere/CL-131 Losses and Other Losses, as applicable, after the application of the Overall Cap.

5.2.4.1   Such Final Enrolled Claimant Payment List shall include Market Losses reflecting the highest amount payable per acre in accordance with the formula described in Exhibit X attached hereto if the aggregate of Market Losses Payments calculated at such rate, Cheniere/CL-131 Losses Payments and Other Losses Payments (collectively, the "Aggregate Payments") are equal to or less than the Overall Cap.

37

5.2.4.2   If the Aggregate Payments exceed the Overall Cap, the Claims Administrator shall reduce payments by the methodologies set forth in Section 5.5.2 and shall provide to Bayer and to the NCC a Final Enrolled Claimant Payment List, as so adjusted.

5.2.4.3   Within fifteen (15) days of receipt of the Final Enrolled Claimant Payment List, adjusted as necessary to comply with any Caps and to account for payments already made, Bayer shall (i) transfer funds electronically to the Qualified Settlement Fund for the benefit of the Enrolled Claimants entitled to Settlement Payments equal, in the aggregate, to the remaining Settlement Payments to be made to Enrolled Claimants for Market Losses pursuant to this Agreement and in accordance with the instructions accompanying the corresponding list and (ii) cause notice of such transfer to be delivered to the Claims Administrator and the NCC.

5.2.5   Within fifteen (15) days of its receipt of (x) the first Market Losses Payment List delivered after the Enrollment and Claims Package Deadline Date and (y) each subsequent Market Losses Payment List, Bayer shall (i) transfer funds electronically to the Qualified Settlement Fund for the benefit of the Enrolled Claimants entitled to Settlement Payments for Market Losses (as reflected on the corresponding Market Losses Payment List) equal, in the aggregate, to the Settlement Payments to be made to such Enrolled Claimants for the Minimum Amount Due for Market Losses pursuant to this Agreement and in accordance with the instructions accompanying the corresponding Market Losses Payment List; and (ii) cause notice of such transfer to be delivered to the Claims Administrator and the NCC.

Notwithstanding the foregoing, Bayer may take up to twenty five (25) days to make the first transfer of funds under this Section 5.2.5 in the event the Claims Administrator notifies Bayer and the NCC that it has not completed its review of Enrollment and Claims Form Packages, that the time period(s) for reviewing such submissions has (have) not yet expired and that the corresponding Market Losses Payment List may contain errors.  As to any original Initial Market Losses Payment List or Supplemental Market Payment List, should Bayer receive a *revised* Market Losses Payment List from the Claims Administrator prior to the applicable deadline for transferring funds, Bayer shall be obligated to transfer funds only in accordance with the revised Market Losses Payment List.

Settlement Payments in respect of Market Losses shall be made from the Qualified Settlement Fund in accordance with the terms of the Qualified Settlement Fund Agreement.

5.2.6   Within three (3) days of receiving notice of any electronic transfer of funds pursuant to Article 5.2.5 above, the Claims Administrator shall deliver to Bayer the original Release corresponding to each Enrolled Claimant who is eligible for a Settlement Payment from the Qualified Settlement Fund (as reflected on the corresponding Market Losses Payment List) and, if any, the Stipulation of Dismissal for each such Enrolled Claimant (and, without limitation, Bayer shall be free to file or cause to be filed such Stipulation of Dismissal and/or Release in any relevant action or proceeding).

## 5.3   Cheniere/CL-131 Losses

Producers who planted Cheniere and/or CL-131 in 2006 have claimed that they suffered losses as a result ("Cheniere/CL-131 Losses").  For simplicity's sake, Bayer and each Enrolled Claimant who accedes to the terms of this Agreement

39

have agreed that, should such a Producer (but not a landlord) who is an Enrolled Claimant elect to receive a payment for Cheniere/CL-131 Losses and timely submit a Completed Cheniere/CL-131 Claims Package, Bayer will make a one-time payment per acre of Cheniere or CL-131 planted in 2006 by such Producer in accordance with the terms of Exhibit Y attached hereto (each a "Cheniere/CL-131 Losses Payment"). This payment is intended to be a fast-track solution to compensate Producers for Cheniere/CL-131 Losses. A decision to participate in the Cheniere/CL-131 Fund shall constitute a full and final payment by Bayer of any and all such Cheniere/CL-131 Losses that have or could have been claimed by the applicable Enrolled Claimant. Enrolled Claimants may seek to recover Cheniere/CL-131 Losses from the Other Losses Fund instead, but may not participate in the Cheniere/CL-131 Fund and also participate in the Other Losses Fund. Any payments for Cheniere/CL-131 Losses from the Other Losses Fund shall not be based on the Cheniere/CL-131 Formula, may be greater or lesser than any payments for Cheniere/CL-131 Losses from the Cheniere/CL-131 Fund, and shall be excluded from any determination related to the Cheniere/CL-131 Losses Cap (but will be included in any determination related to the Other Losses and Overall Caps).

5.3.1 If the Enrolled Claimant elects not to participate in the Cheniere/CL-131 Fund, the Enrolled Claimant shall not be entitled to any payment from the Cheniere/CL-131 Fund and waives any right under this Agreement, the Program, any law or rule, or otherwise, to seek any recovery for Cheniere/CL-131 Losses from such fund or calculated using the Cheniere/CL-131 Formula.

5.3.2 No later than forty five (45) days after the Cheniere/CL-131 Claims Package Deadline Date, the Claims Administrator shall attempt to make an initial determination of all Cheniere/CL-131 Losses sought by all Enrolled Claimants under this and the GMB Settlement Agreement, including all Claims Packages that contain Material Delinquencies or Deficiencies. If the Claims Administrator is able to make that determination in spite of the Material Delinquencies or Deficiencies and all Cheniere/CL-131 Claims will be less than the Cheniere/CL-131 Losses Cap, then the Claims Administrator shall calculate the amount which each Enrolled Claimant who has submitted a Completed Cheniere/CL-131 Claims Package would receive pursuant to the terms set forth in Exhibit Y (the "Cheniere/CL-131 Formula" or "Formula") and shall provide to Bayer and to NCC a list of all Enrolled Claimants (i) who have submitted Completed Cheniere/CL-131 Claims Packages, (ii) who have satisfied the criteria set forth in Exhibit Y and thereby have become eligible for a Cheniere/CL-131 Losses Payment and (iii) the amount which each Enrolled Claimant would receive in accordance with the Cheniere/CL-131 Formula (the "Preliminary Cheniere/CL-131 Payment List"). If the Claims Administrator is unable to make an initial determination of all Cheniere/CL-131 Claims sought by all Enrolled Claimants due to Material Delinquencies or Deficiencies in Claims Packages, then the Claims

40

Administrator shall determine the Preliminary Cheniere/CL-131 Payment List no later than thirty (30) days after the last ruling of the Arbitrator as to any appeal of the Claims Administrator's rejection (in whole or in part) of a Cheniere/CL-131 Claims Package brought in accordance with Section 4.1.2.9 above. Participation in the Cheniere/CL-131 Losses Fund is limited to those Eligible Claimants who actually farmed the land. In the event that any landlord for the 2007 crop year is not an Affiliated Claimant, any payments to an Eligible Claimant under the Cheniere/CL-131 Formula will be reduced by the percentage of Interest of that landlord's share for that land relative to all long-grain rice acres. If all landlords for the 2007 crop year are Affiliated Claimants then no reduction in payment will occur.

5.3.3   If the preliminary calculation of the total amount that all claimants would receive (whether under this Agreement or the GMB Settlement Agreement) in accordance with the Cheniere/CL-131 Formula (prior to the resolution of any appeals initiated pursuant to Section 5.3.5 below or the applicable terms of the GMB Settlement Agreement) is equal to, or less than, $70,000,000 or such lower amount as may be applicable pursuant to the exercise by Bayer of its rights pursuant to Section 3.2.2.3 above (the "Cheniere/CL-131 Losses Cap"), simultaneously with its delivery of the Preliminary Cheniere/CL-131 Payment List under Section 5.3.2 above, the Claims Administrator (i) shall, pursuant to a Notice of Preliminary Award, notify each Enrolled Claimant of the sum preliminarily calculated to be payable to that Claimant in accordance with the Formula and (ii) shall apprise each Enrolled Claimant that there may be adjustments to said sum in the event, after the resolution of any appeals, the total amount payable in respect of all Cheniere/CL-131 Losses (prior to such adjustment) under this Agreement and the GMB Settlement Agreement were to exceed the Cheniere/CL-131 Losses Cap. In such event, the Claims Administrator shall reduce pro rata the Cheniere/CL-131 Losses Payment to be made to each Eligible Claimant so that the total amount of all payments in respect of Cheniere/CL-131 Losses under this Agreement and the GMB Settlement Agreement will not exceed the Cheniere/CL-131 Losses Cap. As to each such claimant, the Claims Administrator shall multiply the Claimant's Cheniere/CL-131 Losses Payment by a fraction, the numerator of which shall be the Cheniere/CL-131 Losses Cap and the denominator of which shall be the total amount payable in respect of all Cheniere/CL-131 Losses (prior to adjustment) under this Agreement and the GMB Settlement Agreement.

5.3.4   If the preliminary calculation of the total amount that all claimants would receive (whether under this Agreement or the GMB Settlement Agreement) in accordance with the Cheniere/CL-131 Formula (prior to the resolution of any appeals initiated pursuant to Section 5.3.5 below or the applicable terms of the GMB Settlement Agreement) is more than the Cheniere/CL-131 Losses Cap, the Claims Administrator (i) shall reduce

41

pro rata the amount payable to each claimant entitled to a share of the Cheniere/CL-131 Fund so that the total amount of all payments in respect of Cheniere/CL-131 Losses will not exceed the Cheniere/CL-131 Losses Cap, (ii) shall simultaneously with its delivery of the Preliminary Cheniere/CL-131 Payment List under Section 5.3.2 above notify each Enrolled Claimant of its preliminarily adjusted pro rata share pursuant to a Notice of Preliminary Award and (iii) shall apprise each Enrolled Claimant that there may be further adjustments to such sum in the event, after the resolution of any appeals, the total amount payable in respect of all Cheniere/CL-131 Losses (prior to such further adjustment) under this Agreement and the GMB Settlement Agreement were to exceed the Cheniere/CL-131 Losses Cap. In such event, the Claims Administrator shall recalculate the amounts payable to each claimant entitled to a share of the Cheniere/CL-131 Fund, making pro rata reductions as necessary so that the total amount of all payments in respect of Cheniere/CL-131 Losses under this Agreement and the GMB Settlement Agreement will not exceed the Cheniere/CL-131 Losses Cap.

5.3.5   An Enrolled Claimant may appeal the Claims Administrator's decision as to the size of the Award to be made in the form of a Cheniere/CL-131 Losses Payment solely by delivering to the Claims Administrator a Notice of Appeal within ten (10) days of the date of the Notice of Preliminary Award for such Enrolled Claimant delivered by the Claims Administrator in accordance with the terms of Section 4.3.5 above.

   5.3.5.1   The Enrolled Claimant shall submit to the Arbitrator and to the Claims Administrator any additional materials in support of his claim as may be requested by the Arbitrator on or before the tenth (10th) day following receipt of such request.

   5.3.5.2   Bayer and the Claims Administrator shall have a period of twenty (20) days following the receipt by both the Claims Administrator and the Arbitrator of all materials requested by the Arbitrator in accordance with 5.3.5.1 above to respond to the appeal and submit relevant documentation.

   5.3.5.3   The Arbitrator shall rule on each appeal within thirty (30) days of the deadline established pursuant to Section 5.3.5.2 above and, in the event no response is filed, the Arbitrator shall rule on each appeal within thirty (30) days of his receipt of the appeal or, if later, the deadline established pursuant to Section 5.3.5.1 above. The ruling of the Arbitrator shall be final, binding and Non-Appealable.

   5.3.5.4   If an Enrolled Claimant fails to meet any of the deadlines set forth in this Section 5.3.5, its right to appeal shall be

42

extinguished and the Claims Administrator's decision shall be final, binding and Non-Appealable.

5.3.5.5  If an Enrolled Claimant files a Notice of Appeal and the Enrolled Claimant is not the Prevailing Party in respect of such appeal as determined by the Arbitrator, the Enrolled Claimant shall be liable for the fees and costs of the Arbitrator related to such appeal, which such fees and costs may be deducted from any Settlement Payment to be made with respect to the Enrolled Claimant hereunder. Likewise, if an Enrolled Claimant files a Notice of Appeal and the Enrolled Claimant is the Prevailing Party in respect of such appeal as determined by the Arbitrator, the Enrolled Claimant shall not be liable for the fees and costs of the Arbitrator related to such appeal, rather Bayer shall be so responsible. In any event where the Arbitrator's Award is exactly between the parties' positions, then the parties to the arbitration share equally in the costs incurred and there is no Prevailing Party.

5.3.6  Upon the completion of all appeals in accordance with the terms of Section 5.3.5 above, the Claims Administrator shall make any necessary adjustments to the Preliminary Cheniere/CL-131 Payment List in accordance with (i) the rulings by the Arbitrator and (ii) the terms of Sections 5.3.3 and 5.3.4 above, as applicable. Upon the completion of these calculations, the Claims Administrator shall submit to Bayer and the NCC a final Cheniere/CL-131 Payment List (the "Final Cheniere/CL-131 Payment List").

5.3.7  Any term of this Agreement to the contrary notwithstanding, in no event shall the aggregate of all payments in respect of Cheniere/CL-131 Losses (whether under this Agreement or the GMB Settlement Agreement) exceed the Cheniere/CL-131 Losses Cap.

5.3.8  If the Claims Administrator determines that under no circumstances will any payments on the Final Cheniere/CL-131 Payment List under the NCC Program be affected by the operation of the Overall Cap, then within fifteen (15) days of receipt of such determination by the Claims Administrator, Bayer shall (i) transfer funds electronically to the Qualified Settlement Fund for the benefit of the Enrolled Claimants entitled to Settlement Payments for Cheniere/CL-131 Losses on the Final Cheniere/Cl-131 Payment List equal, in the aggregate, to the Settlement Payments to be made to Enrolled Claimants for such payments pursuant to this Agreement and in accordance with the instructions accompanying the corresponding list; and (ii) cause notice of such transfer to be delivered to the Claims Administrator and the NCC. Settlement Payments in respect of Cheniere/CL-131 Losses shall be made from the Qualified Settlement

43

Fund in accordance with the terms of the Qualified Settlement Fund Agreement.

**5.4    Other Losses Fund**

5.4.1    The Other Losses Fund is designed to settle, by way of compromise, claims that applicable Enrolled Claimants have for documented economic losses (other than Market Losses) suffered as a consequence of the presence of Bayer GM Rice Seed in the United States rice supply. Claims for emotional damages of any kind, punitive damages, expenses of counsel and losses occurring after any final determination made by the Arbitrator hereunder are excluded from consideration under the Other Losses Fund process and will not be compensated under this Agreement. Participation in the Other Losses Fund is limited to those Eligible Claimants who actually farmed the land. In the event that a landlord is not an Affiliated Claimant for the relevant time period, any payments to an Eligible Claimant under the Other Losses Fund for lost revenue will be reduced by the percentage of Interest of that landlord's share for that land. If all landlords are Affiliated Claimants for all relevant time periods, then no reduction in payment will occur.

5.4.2    The Other Losses Fund shall be used to pay those Enrolled Claimants who submit an Other Losses Claims Form showing documentable losses (other than Market Losses) and who elect to receive compensation from the Other Losses Fund instead of receiving Cheniere/CL-131 Losses Payments. The types of losses recoverable from the Other Losses Fund and the documentation required to entitle an Enrolled Claimant to recovery from the Other Losses Fund are set forth in Exhibit Z. All claims for Other Losses must be submitted pursuant to an Other Losses Claims Form on or before the Other Losses Claims Form Deadline.

5.4.3    As to any Enrolled Claimant who chooses to submit a Completed Claims Package with respect to Cheniere/CL-131 Losses, such Enrolled Claimant is not entitled to submit a claim for any payment from the Other Losses Fund.

5.4.4    The documentation required to substantiate an Other Losses claim will be provided to Bayer and to the Claims Administrator together with the Other Losses Claims Form on or before the Other Losses Claims Form Deadline. The Other Losses Claims Form shall state, by category, the amount claimed by the Claimant. Within forty-five (45) days of receipt of an Other Losses Claims Package, Bayer will notify Claimant's Enrolling Counsel and the Claims Administrator, in writing, of its agreement or disagreement with respect to the Other Losses claim(s) asserted by that Claimant and for each category of claim set forth the amount, if any, that Bayer is willing to pay for the claim. Such agreement or disagreement shall be recorded by the Claims Administrator.

5.4.5   Intentionally Omitted

5.4.6   Any timely Other Losses claim that Bayer has not disputed, in writing, within forty-five (45) days of receipt of an Other Losses Claims Package will be deemed accepted. As to any Other Losses claim that Bayer has timely disputed, Claimant and Bayer shall attempt, in good faith, to resolve the dispute. If Claimant and Bayer are unable to resolve their dispute concerning the Other Losses claim within sixty (60) days of Bayer's dispute notice (i.e., on or before the Other Losses Claims Package Negotiation Deadline Date), either Claimant or Bayer may inform the other that they intend to declare an impasse. Within ten (10) days of this declaration, Bayer and Claimant may revise their claim or offer by communicating such revision to the other party, however Claimant may not under any circumstances increase their claim. If the parties do not achieve resolution of the impasse within such ten (10) days, then, on or before such 10th day, either Claimant or Bayer may notify the Claims Administrator of the impasse pursuant to written notice. Upon being so informed, the Claims Administrator shall within ten (10) days of the receipt of such notice schedule the disputed claim for binding arbitration, which shall be conducted before the Arbitrator, and inform the Arbitrator of each party's most recent claim and offer by category.

   5.4.6.1   The Claimant and Bayer shall submit to the Arbitrator any additional materials pertaining to the dispute as they may desire to submit or as the Arbitrator may request on or before the deadline for such submission established by the Arbitrator.

   5.4.6.2   The Arbitrator shall rule on any such dispute within thirty (30) days of the deadline established pursuant to Section 5.4.6.1 above.

   5.4.6.3   The Arbitrator's ruling concerning the disputed Other Losses claim – or any compromise agreement reached by the arbitrating parties prior to the outcome of that arbitration – shall be final, binding and Non-Appealable, and shall be promptly communicated to, and recorded by, the Claims Administrator.

   5.4.6.4   All fees and costs payable to the Arbitrator in connection with any arbitration initiated pursuant to the terms of this Section 5.4.6 shall be paid by the party that is not the Prevailing Party, subject to the balance of the terms of this Section 5.4.6.4. In any event where the Arbitrator's Award is exactly between the parties' positions, then the parties to the arbitration share equally in the costs incurred and there is no Prevailing Party. Any such fees and costs owed by a Claimant may be deducted from any

45

Settlement Payment to be made with respect to such Claimant hereunder. Even if the Claimant would otherwise be the Prevailing Party, if the Claimant submits additional material under Section 5.4.6.1 then the Arbitrator shall determine (1) whether those submissions materially changed the submission of the Claimant and (2) if so, then the Claimant shall bear all costs and expenses of the arbitration.

5.4.7   On or before the thirtieth (30th) day after any and all Other Losses claims have been agreed upon or otherwise determined pursuant to binding arbitration, in the manner(s) set forth above, the Claims Administrator shall (y) tally the amount of all such Other Losses claims and (z) promptly notify Bayer and the QSF Administrator of the total amount that is payable in respect of all Other Losses ("Total Other Losses") subject to the Overall Cap.

5.4.8   Intentionally Omitted

5.4.9   If the Total Other Losses exceed the Other Losses Cap, each Claimant eligible for a Settlement Payment will receive a reduced payment. In determining the Other Losses Payment to be made to each eligible Claimant the Other Losses Cap shall be multiplied by a fraction, the numerator of which shall be the Enrolled Claimant's Other Losses (prior to adjustment) and the denominator of which shall be the Total Other Losses.

5.4.10  If by examining the total amount of claims made in the Other Losses Claims Form under this Agreement, the Claims Administrator determines that under no circumstances will any payments under this Agreement for Other Losses be affected by the operation of the Overall Cap or the Other Losses Cap, then beginning thirty (30) days after the Other Losses Claims Package Deadline Date, the Claims Administrator shall compile a report every thirty (30) days that lists those Enrolled Claimants who have had all of their Other Losses claims resolved by agreement under Section 5.4.4 or 5.4.6 and the total amount of the resolved claim, (the "Resolved Other Losses List"). Any Enrolled Claimant that has any portion of its Other Losses Claim declared at an impasse and the Claims Administrator notified of such by either party may not be included on the Resolved Other Losses List. If any Cap may affect the Other Losses payments, then no Resolved Other Losses List shall be created. Within fifteen (15) days of receipt of each Resolved Other Losses List, Bayer shall (i) transfer funds electronically to the Qualified Settlement Fund for the benefit of the Enrolled Claimants entitled to Settlement Payments for Other Losses on the Resolved Other Losses List equal, in the aggregate, to the Settlement Payments to be made to Enrolled Claimants for such payments pursuant to this Agreement and taking account of payments already made and in

46

accordance with the instructions accompanying the corresponding list; and (ii) cause notice of such transfer to be delivered to the Claims Administrator and the NCC. Settlement Payments in respect of Other Losses shall be made from the Qualified Settlement Fund in accordance with the terms of the Qualified Settlement Fund Agreement.

**5.5     Limitations on Bayer Funding Obligations**

5.5.1   Any term of this Agreement to the contrary notwithstanding, Bayer shall have no financial obligations under this Agreement other than its express obligations to make Funding Payments as described in this Article. Bayer shall have no obligation to pay (or to make any Funding Payment on account of), or reimburse any Eligible Claimant, Enrolled Claimant or Enrolling Counsel for, any costs or expenses incurred by such Persons in connection with the Program. Bayer shall have no responsibility for the management of the Qualified Settlement Fund or any Liability to any Enrolled Claimant arising from the handling of Program Claims by the Claims Administrator.

5.5.2   The total of all Settlement Payments under this Agreement and the GMB Settlement Agreement shall be subject to an overall cap of $750 million or such lower aggregate figure as may be determined in accordance with the terms of Section 3.2.2.3 above (the "Overall Cap") and any term of this Agreement to the contrary notwithstanding, in no event shall the aggregate of all Settlement Payments, whether under this Agreement or the GMB Settlement Agreement, exceed the Overall Cap. In the event that the total of all Awards under this Agreement plus all awards under the GMB Settlement Agreement ("Overall Awards") exceed the Overall Cap, the Claims Administrator shall reduce the Awards under this Agreement and the awards under the GMB Settlement Agreement as follows:

5.5.2.1   First, the total amount of claims to be paid, absent the Overall Cap, but accounting for any reductions in payment under the Cheniere/CL-131 Cap or any Other Losses Cap, shall be determined under this Agreement and the GMB Settlement Agreement. This amount is the "Pre-Cap Total."

5.5.2.2   Second, the total reduction in payments required by the Overall Cap under this Agreement and the GMB Settlement Agreement shall be calculated by subtracting the amount constituting the Overall Cap from the Pre-Cap Total to determine the "Amount Over the Cap."

5.5.2.3   Third, the amounts paid for Market Losses Payments for acre planted in each year 2006 through 2010 under this Agreement and the GMB Agreement shall be reduced by an equal percentage applied to each payment in each settlement until

47

reduced to the Minimum Amount Due. That percentage shall be the lowest percentage necessary to cause the total of all reductions to Market Losses Payments to equal the Amount Over the Cap. Under no circumstance shall Market Losses Payments be reduced to less than the Minimum Amount Due.

- For example, if the combined Market Losses Payments under this Agreement and the GMB Agreement equal $600 million and the Amount Over the Cap equals $10 million, each Market Losses Payment would be reduced by 1.6667% (10/600) such than the Market Losses Payments for each acre planted in each year would be as follows: $118 for 2006, $78.67 for 2007, $59 for 2008, $39.33 for 2009 and $9.83 for 2010.

- As an additional example, if the combined Market Losses Payments under this Agreement and the GMB Agreement equal $630 million and the Amount Over the Cap equals $40 million, each Market Losses Payment would be reduced by 3.2258% (10/310) such that the Market Losses Payments would be as follows and the remaining reductions would be determined by the methodology below: $116.13 for 2006, $77.42 for 2007, $58.06 for 2008, $38.71 for 2009 and $9.68 for 2010.

5.5.2.4   Fourth, if and only if the maximum collective reductions in the Market Losses Payments determined in accordance with section 5.5.2.3 are less than the Amount Over the Cap, then the remaining difference shall be allocated to the NCC and GMB Agreements as follows:

5.5.2.4.1   The total amounts of claims to be paid under each agreement, absent the Overall Cap, but accounting for any reductions in payment under the Cheniere/CI-131 Cap, any Other Losses Cap, and the operation of Section 5.5.2.3 shall be calculated. These amounts are the "NCC Cap Amount" and the "GMB Cap Amount" and the sum of the two figures is the "Remaining Cap Total."

5.5.2.4.2   The amount constituting the Overall Cap shall be subtracted from the Remaining Cap Total to determine the "Remaining Amount Over the Cap." The Remaining Amount Over the Cap shall be allocated to this Program and the GMB Program by multiplying the Remaining Amount Over the Cap by a fraction, the denominator being the Remaining Cap Total and the numerator being

48

the NCC Cap Amount, or GMB Cap Amount, respectively.

5.5.2.4.3 Fifth, the NCC Pre-Cap Amount and the GMB Pre-Cap Amount shall be reduced using the following methodology:

- For this Agreement, the portion of the Remaining Amount Over the Cap allocated to the Program established hereunder (the "NCC Amount Over the Cap") shall be used to reduce all Awards for Other Losses proportionately by subtracting the remaining NCC Amount Over the Cap from the Other Losses payments otherwise due and dividing that figure by the Other Losses payments otherwise due and multiplying all Other Losses payments otherwise due by this fraction. If, and only if, these reductions in Market Losses and Other Losses Awards do not eliminate the NCC Amount Over the Cap, any remaining reduction shall be taken out of all Cheniere/CL-131 Losses Awards proportionately.

- For the GMB Settlement Agreement, the Amount Over the Cap allocated to the GMB Program (the "GMB Amount Over the Cap") shall be used to reduce all Awards for Cheniere/CL-131 Losses and Other Losses proportionately by subtracting the remaining GMB Amount Over the Cap from the sum of the Cheniere/CL-131 Losses and Other Losses payments otherwise due and dividing that figure by the sum of the Cheniere/CL-131 Losses and Other Losses payments otherwise due and multiplying all Cheniere/CL-131 Losses and Other Losses payments otherwise due by this fraction.

5.5.2.5 All payments to be made to Included Trial Claimants in accordance with this Agreement are included in determining the payments to be made to Enrolled Claimants under this Agreement and shall be treated as Market Losses Awards for all purposes under this Section; however, such payments to Included Trial Claimants shall not be reduced in any way by operation of any Cap. All payments to be made to Included Trial Claimants in accordance with this Agreement except for the Spain Claimants (as such term is defined in Exhibit I attached hereto) shall be allocated to the Program established under this Agreement and all payments to be made to the Spain Claimants shall be allocated to the GMB Program. Settlements, if any, of

49

additional cases that had a trial setting for a specific date ("Additional Trial Claimants", identified in Exhibit K) will be treated as Included Trial Claimants under this Section 5.5.2.5 for the sole purposes of 1) allocating any payments to the respective GMB or NCC Program based on the definition of Eligible Claimant in these Agreements; 2) calculating any Cap by allocating any payments as Market Loss Awards, Cheniere/CL-131 Losses Payments or Other Losses, as appropriate based on the manner of determination and 3) calculating acres to determine whether the Settlement Threshold has been met. Unless specified to the contrary in the agreements governing settlement of the Additional Trial Claimants, payments made to Additional Trial Claimants are not subject to reduction by any Cap or otherwise, and those payments will be made without regard to whether the Settlement Threshold is satisfied or whether there ever is an Effective Date or whether Bayer ever has a Walk Away Right. Any payments to Excluded Trial Claimants are not included in determining the payments to be made to Enrolled Claimants under this Agreement. Administrative Expenses also are not included in determining the payments to be made to Enrolled Claimants under this Agreement.

5.5.3   Any term of this Agreement, or Exhibit F, to the contrary notwithstanding, in no event shall Bayer have any obligation to make the Funding Payments unless and until (i) the Qualified Settlement Fund shall have been duly approved by the Court pursuant to the Order, (ii) the Effective Date shall have occurred and (iii) the time for any such payments as set forth in this Agreement has occurred.

## 5.6   Reserves for Payment

Bayer represents that the statements in (a) Bayer AG's 2010 Annual Report regarding special charges for intended settlement programs on page 69 and 72 and (b) Bayer AG's First Quarter of 2011 Report on page 18 relate to the payments contemplated under this Agreement.

## Article 6 –Claims Administrators/Arbitrator/Qualified Settlement Fund

### 6.1   Appointment and Replacement of Administrative Personnel

6.1.1   This Agreement is a private agreement.

6.1.2   At the request of Bayer and the NCC, BrownGreer PLC has agreed to preside over the Program as the Claims Administrator.

50

6.1.3   Bayer and the NCC shall select an "Arbitrator" (which may be more than one person or firm) within 45 days of the Execution Date. In the event any initial Arbitrator, or any replacement therefor, is not available at the time a Notice of Appeal is delivered in accordance with the terms of this Agreement, Bayer and the NCC shall endeavor in good faith to select a mutually acceptable replacement. In the event Bayer and the NCC cannot agree upon a replacement within one hundred twenty (120) days of the date of the relevant Notice of Appeal, (y) no later than one hundred thirty (130) days from such date each party shall submit to John Perry two (2) candidates, each of whom is ready, willing and able to serve as the Arbitrator and who is knowledgeable about agriculture and rice farming, and (z) within five (5) days thereafter John Perry shall select the replacement Arbitrator from the submitted candidates. Any Notice of Appeal delivered to the Claims Administrator under this Agreement shall promptly be delivered to the Arbitrator. If more than one natural person or firm has been selected as the Arbitrator, the Claims Administrator shall endeavor to submit Notices of Appeal to such natural persons or firms on a rotating basis, but may exercise its discretion to submit any Notice of Appeal to the natural person or firm that then has the lightest docket of appeals brought under this Agreement or the GMB Settlement Agreement, as applicable.

6.1.4   Bayer shall pay all fees and costs of the Claims Administrator, except as otherwise expressly set forth herein.

6.1.5   Bayer also shall pay all fees and costs of the Arbitrator, except as otherwise expressly set forth herein.

**6.2   Certain General Authority of the Claims Administrator**

6.2.1   The Claims Administrator shall have the authority to perform all actions, to the extent not expressly prohibited by, or otherwise inconsistent with, any provision of this Agreement, deemed by the Claims Administrator to be reasonably necessary for the efficient and timely administration of this Agreement. For the avoidance of doubt, the Claims Administrator shall not serve as the QSF Administrator under the terms of the Qualified Settlement Fund Agreement attached hereto as Exhibit F.

6.2.2   The Claims Administrator may create administrative procedures, supplementary to (and not inconsistent with) those specified herein or in the Exhibits hereto, that provide further specific details about how the Program is to be administered, and/or other aspects of the Program; provided, however, that such procedures comply, or otherwise are not in conflict, with the terms of this Agreement.

6.2.3   Without limitation of the foregoing, the Claims Administrator shall have the authority to modify and/or supplement the form of Enrollment and

51

Claims Form, Cheniere/CL-131 Claims Form and/or Other Losses Claims Form provided for herein to provide for more efficient administration of the Program, provided that (i) such changes may not materially alter the substance of such form or increase the burden of preparing such form without the consent of Bayer and the NCC and (ii) no change shall be made in the form of Release or form of Stipulation of Dismissal without Bayer's and the NCC's prior written consent.

6.2.4   Each of Bayer and the NCC shall appoint one or two individuals (such number to be determined in each of their respective discretion) to act as a liaison with the Claims Administrator, including answering any questions that the Claims Administrator may have with respect to the interpretation of any provision of this Agreement.

**6.3   Liability of Administrative Personnel**

6.4   No Claims Administrator, or employee or agent of any Claims Administrator, shall be liable to any Claimant or any Enrolling Counsel for his acts or omissions, or those of any agent or employee of any Administrator, in connection with the Program except, with respect to each such Person, for such Person's own gross negligence or willful misconduct. Nothing in this Section 6.3 confers on any Program Claimant or Enrolling Counsel any privity of contract with, or other right to institute any action against, any Claims Administrator. In the event that the Claims Administrator must comply with any discovery obligations related to its work under this Agreement, the requesting party bears the cost of complying with such discovery obligation and such work and costs are expressly excluded from this Agreement.

6.4.1   Within 30 days of the Execution Date of this Agreement, the NCC shall file with the Honorable Catherine Perry of the United States District Court for the Eastern District of Missouri (the "Court") a motion, requesting that the Court issue an order in the form attached hereto as Exhibit G (the "Order") approving the establishment of the Qualified Settlement Fund.

6.4.2   The NCC is solely responsible for the identification of a Person to serve as QSF Administrator of the Qualified Settlement Fund and to secure such Person's execution and delivery of the Qualified Settlement Fund Agreement attached hereto as Exhibit F.

6.4.3   For the avoidance of doubt, Bayer shall in no way be responsible for the expenses of the QSF Administrator. Further, Bayer shall in no way be associated with the administration of the Qualified Settlement Fund or be liable in respect of any dispute between or among any Enrolled Claimants and their respective Counsel in respect of any costs, expenses, legal fees or litigation costs to be deducted from the Qualified Settlement Fund.

52

6.4.4   The NCC makes no representation or warranties of any kind that the QSF Agreement provides any tax or other benefits to Bayer.

### Article 7 – Certain Litigation Matters

**7.1   Use of Stipulations of Dismissal and Releases Prior to Certain Events**

Except as otherwise provided in this Agreement, the Claims Administrator shall retain control of the Release(s) and Stipulation of Dismissal of any particular Enrolled Claimant until such time as the initial Market Losses Payment is made to such Enrolled Claimant hereunder, at which time each such Release and each such Stipulation of Dismissal shall be delivered to Bayer (and, without limitation, Bayer shall be free to file or cause to be filed such Stipulation of Dismissal and/or Release in any relevant action or proceeding).

**7.2   Pursuit of Certain Claims**

7.2.1   From and after the date on which an Enrollment and Claims Form is submitted in relation to a particular Eligible Claimant until the earlier of (i) the date on which such Eligible Claimant's Release(s) and Stipulation of Dismissal, if any, is delivered to Bayer pursuant hereto or (ii) if applicable, the date such Enrollment and Claims Form is finally rejected by the Claims Administrator or Bayer in relation to such Eligible Claimant pursuant to the terms hereof or such Eligible Claimant exits the Program under circumstances such that his Release(s) and Stipulation of Dismissal, if any, is returned to him, such Eligible Claimant shall:

7.2.1.1   Be prohibited from, and refrain from, taking any action (including any legal action) to initiate, pursue or maintain, or otherwise attempt to execute upon, collect or otherwise enforce any actual or alleged Released Claims against Bayer or any other Bayer Released Party (other than to the extent inherent in making and pursuing a Program Claim in accordance with the terms of this Agreement);

7.2.1.2   Without limitation of Section 7.2.1.1, (i) cooperate in all reasonable respects with Bayer to seek to stay, and to continue in effect any then outstanding stay with respect to, any pending legal proceedings instituted by such Eligible Claimant against Bayer or any other Released Party and (ii) refrain from instituting any new legal action against any Released Party; and

7.2.1.3   Without limitation of Section 7.2.1.1 or 7.2.1.2, be prohibited from, and refrain from, attempting to execute or collect on, or otherwise enforce, any judgment that may be entered against Bayer or any other Released Party in any legal action described in Section 7.2.1.2.

53

Further, if such Eligible Claimant exits the Program under circumstances such that his Release(s) remain(s) in effect, in furtherance and not in limitation of such Release(s), any judgment referred to in Section 7.2.1.3 automatically shall be deemed to have been released by such Eligible Claimant, and such Eligible Claimant shall execute such instruments, and take such other actions, as Bayer reasonably may request in order to further evidence or implement the same.

7.2.2   Without limitation of Section 7.2.1 (and in addition to and without limitation of the terms of his Release(s)), each Eligible Claimant shall indemnify and hold harmless Bayer and each other Bayer Released Party from and against (i) any and all Released Claims made or asserted (prior to, on or after the date of such Eligible Claimant's Program Claim) against Bayer or any other Released Party by any Settling Claimant Releasing Party described in such Eligible Claimant's Release(s) for contribution, indemnity (contractual or non-contractual) or otherwise made at any time by such Settling Claimant Releasing Party; and (ii) any and all damages, losses, costs expenses (including legal fees and expenses) and/or Liabilities incurred or suffered by, or imposed on, any Bayer Released Party in connection with, arising out of or resulting from (x) any Released Claim described in clause (i) (including any amount paid or required to be paid in satisfaction of any such Released Claim), (y) any judgment suffered by any Bayer Released Party in any legal action described in Section 7.2.1.2 (including any amount paid or required to be paid in satisfaction of such judgment) arising out of any Released Claim described in clause (i) and/or (z) any violation by such Eligible Claimant of Section 7.2.1. This Section 7.2.2 shall become null and void in the event that such Eligible Claimant exits the Program under circumstances such that his Release(s) is/are returned to him. Bayer may set off all or any portion of any amount payable to any Bayer Released Party pursuant to this Section 7.2.2 by an Eligible Claimant against an equal amount of any Funding Payment obligation hereunder in respect of any Settlement Payment from time to time payable under this Agreement to such Eligible Claimant (and such setoff shall be deemed to satisfy, to the extent of the amount of such setoff, both such Funding Payment obligation and the relevant Settlement Payment Obligation to such Eligible Claimant).

## 7.3   Trial Claimants

7.3.1   Within thirty (30) days of the Effective Date, or upon receipt of necessary tax documentation from the Included Trial Claimants, whichever occurs later, Bayer shall pay, or cause to be paid, the judgments directly to such claimants and/or their counsel, including any interest reflected in the judgment through the Effective Date but excluding any costs, then standing and remaining unpaid, rendered in favor of the following

54

Included Trial Claimants, more specifically identified in Exhibit I attached hereto:

1. The MDL Missouri Trial Plaintiffs
2. The First MDL Arkansas & Mississippi Trial Plaintiffs
3. The MDL Louisiana Trial Plaintiffs

7.3.2 As and when corresponding Settlement Payments are transferred to the Qualified Settlement Fund in accordance with this Agreement, Bayer shall pay, or cause to be paid, to the Included Trial Claimants identified below and more specifically in Exhibit I attached hereto such sums as will, when added to the settlements already paid to them, equal the Settlement Payments that would have been paid to such Persons had they been participants in the Program:

1. The Second MDL Mississippi Trial Plaintiffs
2. The MDL Texas Trial Plaintiffs

7.3.3 Prior to the Enrollment and Claims Deadline, Included Trial Claimants shall submit to the Claims Administrator FSA Forms 578 for 2006 through 2009 and the parties shall jointly provide to the Claims Administrator the amounts paid.

### Article 8 – Attorneys' Fees and Litigation Costs

**8.1    Individual Counsel Attorneys' Fees and Common Benefit Fund**

8.1.1 Neither Bayer nor any other Bayer Released Party shall have any responsibility whatsoever for the payment of any Enrolled Claimant's attorneys' fees or costs. All payments to Enrolled Claimants, Included Trial Claimants (except for the Spain Claimants) and Additional Trial Claimants (except for the Briggs and Underwood Claimants) under this Settlement Agreement shall be made as if Judge Perry's February 24, 2010 Common Benefit Fund Order applied to those claims, including the direction that 8% of all payments to Enrolled Claimants and Included Trial Claimants (except for the Spain Claimants) be directed to the common benefit trust fund for attorneys' fees and 3% of all payments to Enrolled Claimants, Included Trial Claimants (except for the Spain Claimants), and Additional Trial Claimants (except for the Briggs and Underwood Claimants) be directed to the common benefit trust fund for costs and expenses incurred by attorneys providing a common benefit. The NCC and the Enrolled Claimants acknowledge and agree that any Funding Payments that otherwise would be transferred to the Qualified Settlement Fund hereunder shall be reduced by an amount equal to the payment that Bayer makes into the common benefit fund. All reductions for payments to common benefit funds shall have no effect on any Cap under this

Agreement; the Cap shall be calculated before any such reduction takes place.

8.1.2    The NCC and each Enrolled Claimant understands and agrees that any Award determined by the Claims Administrator as being payable to an Enrolled Claimant may be subject to deduction for attorneys' fees, common benefit fees or reimbursement of litigation costs, that if required pursuant to a court order, Bayer may direct the Claims Administrator to direct the QSF Administrator to make Settlement Payments only after deduction for such fees and/or costs, and that the QSF Administrator shall make all Settlement Payments owed in relation to any particular Program Claim pursuant to this Agreement in accordance with the terms of this Agreement, the terms of the Qualified Settlement Agreement and any associated court order.

8.1.3    Intentionally Omitted.

### Article 9 – Quality Control and Audit Procedures

**9.1    Prevention and Detection of Fraud – General**

9.1.1    Bayer and the Claims Administrator shall have the authority, but not the obligation, to institute claim-auditing procedures and other procedures designed to detect and prevent the payment of fraudulent Program Claims, at Bayer's sole cost and expense. To the extent that Enrollment and Claims Packages from certain Enrolling Counsel exhibit unusual levels of potential fraud, Bayer expressly has the authority in its sole discretion to audit all Enrollment and Claims Packages from such Enrolling Counsel.

9.1.2    Bayer shall notify the Claims Administrator and the NCC, as well any as any implicated Enrolled Claimant and his Counsel, of any indicia of deception, dishonesty or fraud of which it becomes aware relating to any Program Claim or in any way relating to the Program; Bayer shall have no Liability for defamation in respect of any such contention. The Eligible or Enrolled Claimant and/or his Counsel shall have the right to contest such suggestion of misconduct to the Arbitrator by requesting a hearing within ten (10) days of receiving such notice. The Arbitrator may promulgate and revise rules for reviewing and resolving allegations of deception, dishonesty or fraud. Any resulting resolution of such allegations shall be final, binding and Non-Appealable.

9.1.3    No Settlement Payment may be paid in respect of a Program Claim while that Program Claim is the subject of an audit by Bayer for good cause, subject to the resolution of any arbitration instituted pursuant to the terms of Section 9.1.2 above.

56

**9.2     Consequences of Fraud; Failure to Detect Fraud**

Anything to the contrary set forth in this Agreement notwithstanding, no Enrolled Claimant shall have any claim against Bayer, the Claims Administrator or Arbitrator in respect of any fraudulent Program Claim, whether or not detected pursuant to the terms of this Article 9, and no Enrolled Claimant shall have any claim against Bayer, the Claims Administrator or Arbitrator in the event of any failure to detect a fraudulent Program Claim. Enrolled Claimants who submit fraudulent claims as determined under Section 9.1.2 forfeit any benefit they or any Affiliated Claimant receive or may receive under this Agreement and their Releases remain valid and enforceable. In addition, Bayer expressly retains all remedies against Enrolled Claimants and/or his Counsel for fraudulent submissions.

## Article 10 – Liens

10.1     Intentionally Omitted.

10.2     Prior to receiving any Settlement Payment, each Enrolled Claimant shall represent and warrant that any and all Liens with respect to any and all Settlement Payments (and/or the right to receive any and all such Settlement Payments) have been satisfied and discharged.

10.3     In any event and any term of this Agreement to the contrary notwithstanding, satisfaction and discharge of any and all Liens, whether past, present or future, whether known or unknown or asserted or unasserted, with respect to any Settlement Payment (and/or the right to receive any Settlement Payment) are the sole responsibility of the relevant Enrolled Claimant. In relation to any particular Enrolled Claimant, satisfaction and discharge of any and all Liens must be established to the satisfaction of the Claims Administrator and Bayer before any Settlement Payment can be disbursed to such Enrolled Claimant (and before Bayer shall be required to make any Funding Payment in respect of any such Settlement Payment). Upon request to the Claims Administrator, Bayer shall be entitled to proof of satisfaction and discharge of any or all such Liens in relation to any particular Enrolled Claimant.

10.4     The foregoing provisions of this Article 10 are solely for the several benefit of Bayer and the Claims Administrators. No Enrolled Claimant or his Counsel shall have any rights or defenses based upon or arising out of any act or omission of Bayer or any Claims Administrator with respect to this Article 10.

10.5     In addition to and without limitation of any of the foregoing provisions of this Article 10, each Enrolled Claimant shall indemnify, defend and hold harmless Bayer from and against (i) any and all claims made or asserted at any time against Bayer, by any Person at any time holding or asserting any Lien in relation to, or any other Person at any time claiming by, through or under, such Enrolled Claimant with respect to any Funding Payment or Settlement Payment paid or to be paid on account of such Enrolled Claimant's participation in the Program (or the right to receive any such Settlement Payment) and (ii) any and all damages,

57

losses, costs, expenses (including reasonable and documented fees and disbursements of counsel and other professionals and including the costs of enforcing this Section 10.5) or Liabilities incurred or suffered by, or imposed on, Bayer in connection with, arising out of or resulting from any claim described in clause (i) (including any amount paid or required to be paid in satisfaction of any such claim).

10.6   Intentionally Omitted

**10.7   Lien Reporting Obligations**

Barbara Wright of the Division of Medicare Debt Management on May 24, 2011 provided the parties with a statement that these "settlements are not required to be reported pursuant to 42 USC 1395y(b)(8)." In reliance on this statement, the parties are not reporting these payments under the Medicare Secondary Payer Act or the Medicare, Medicaid and SCHIP Extension Act of 2007. If, for whatever reason, this statement by Ms. Wright ceases to be valid o Bayer has reasonable concern regarding its validity, the NCC agree to cooperate with Bayer to promptly institute procedures for complying with the reporting requirements of these Acts.

### Article 11 – Compromise of Claims

**11.1   Compromise of Claims**

11.1.1  This Agreement is an effort to compromise the claims made by Claimants which were disputed as to validity and/or amount and this Agreement may not be used by anyone as evidence of negligence or liability of any kind by Bayer, provided, however, that nothing in this Agreement shall be construed to prevent Bayer from pleading or otherwise proving its status as a joint tortfeasor for the purpose of seeking contribution from any Additional Released Party.

11.1.2  No party, no Enrolling Counsel and no Eligible or Enrolled Claimant shall seek to introduce and/or offer the terms of this Agreement, any statement, transaction or proceeding in connection with the negotiation, execution or implementation of this Agreement, or any statements in any documents delivered in connection with this Agreement, or otherwise rely on the terms of this Agreement, in any judicial or arbitral proceeding, except (1) Bayer may use this Agreement to seek contribution from any of the Additional Released Parties for payments made under this Agreement and (2) insofar as it is necessary to enforce the terms of this Agreement (or in connection with the determination of any income tax Liability of a party) or any instrument executed and delivered pursuant to this Agreement (including any Claims Form and any attachments or exhibits thereto). If a Person seeks to introduce and/or offer any of the materials described herein in any proceeding against Bayer or any Bayer Released Party, Bayer and any such Bayer Released Party may seek to enforce the terms of this Section 11.1.2 against such Person and the restrictions of this

Section 11.1.2 shall not be applicable to Bayer or any such Bayer Released Party with respect to that Person.

11.1.3  Nothing in this Article 11 applies to (i) any action to submit into evidence in any legal proceeding (past, present or future), or otherwise to file or enforce in any manner, or (ii) any other action by Bayer in relation to, any Release or any Stipulation of Dismissal that is released or provided to Bayer in accordance with the terms of this Agreement.

### Article 12 – Public Statements; Confidentiality

### 12.1  Claimant Information

The amount of any individual payment or Award made to an Enrolled Claimant under this Agreement (such amount information, "<u>Award Information</u>"), shall be kept confidential by Bayer, the Claims Administrator and the QSF Administrator and shall not be disclosed except (i) to appropriate Persons to the extent necessary to process Program Claims or provide benefits under this Agreement, (ii) as otherwise expressly provided in this Agreement, (iii) as may be required by law, lawful compulsory order or listing agreements, (iv) as may be reasonably necessary in order to enforce, or exercise Bayer's rights under, or with respect to, such Enrolled Claimant's Claims Form(s), Release(s), Stipulation(s) of Dismissal or (with respect to such Enrolled Claimant or his Counsel, as applicable) this Agreement or (v) in any action brought by Bayer for contribution against any Additional Released Party, provided that such Award Information shall be protected by the highest level of confidentiality available under the protective order in such case. All Enrolled Claimants shall be deemed to have consented to the disclosure of the Award Information for these purposes.

### 12.2  Accurate Public Statement

Before the time that notice has been provided to all parties that the last signature has occurred by any party to the NCC or GMB Agreement, no party shall issue any release or make any public statement regarding the Agreement. The GMB Settlement Agreement shall have the same restriction on issuing any release or making any public statement regarding the Agreement. With the exception of Section 12.1, nothing herein limits any Party's ability to provide accurate information in response to questions or inquiries about the Program.

### Article 13 – Intentionally Omitted

### Article 14 – Miscellaneous

### 14.1  Notice by Parties

14.1.1  Any notice, request, instruction or other document to be delivered pursuant to this Agreement shall be sent to the appropriate party as

follows, or as otherwise instructed by a notice delivered to the other Party pursuant to this Section 14.1.1. Notice may be provided by: (i) U.S. first class, certified mail, return receipt requested; (ii) to the extent specified hereunder, electronic mail (provided evidence of delivery is provided to the sender); (iii) facsimile, with a confirming copy sent within one day by regular U.S. mail; (iv) prepaid courier; (v) Federal Express; or (iv) personal delivery:

14.1.1.1     If to Bayer:

John Galvin – jgalvin@foxgalvin.com

14.1.1.2     If to any Enrolled Claimant represented by Counsel:

To such Enrolled Claimant's Counsel as reflected on such Enrolled Claimant's Enrollment and Claims Form.

14.1.1.3     If to the NCC:

Don Downing – ddowning@grgpc.com

Adam Levitt – levitt@whafh.com

14.1.1.4     If to an Enrolled Claimant who is not represented by Counsel:

To such address as is reflected on such Enrolled Claimant's Enrollment and Claims Form.

14.1.2   Bayer may for all purposes of this Agreement treat the counsel specified in accordance with Section 2.3 as such Enrolled Claimant's Counsel, unless and until otherwise advised by both such Enrolled Claimant and such counsel.

14.1.3   Any notice, request, instruction or other document to be given by any party or any Claims Administrator to any Enrolled Claimant or his Counsel hereunder, shall be in writing and delivered in accordance with the terms of Section 14.1.1 above, and such party or Claims Administrator may rely on the contact information last provided by the Enrolled Claimant or his Counsel to such party or Claims Administrator, as applicable, and no party nor any Claims Administrator shall have any obligation to (but in its sole and absolute discretion may) take other steps to locate Enrolled Claimants or Counsel as to whom notices, requests, instructions or other documents have been returned as undelivered or undeliverable. Each Enrolled Claimant and (if applicable) his Counsel shall have the responsibility to keep the Claims Administrator informed of

the correct contact information for both such Enrolled Claimant and such Counsel.

14.1.4 Any such notice, request, instruction or other document shall be deemed to have been given as of the date so transmitted by facsimile or electronic mail, on the next Business Day when sent by Federal Express, or five Business Days after the date so mailed, provided that if any such date on which any such notice or other communication shall be deemed to have been given is not a Business Day, then such notice or other communication shall be deemed to have been given as of the next following Business Day and, provided, further, that delivery otherwise shall be deemed to occur upon tender and rejection by the intended recipient.

## 14.2 Receipt of Documentation

Anything to the contrary set forth in Section 14.1 above notwithstanding, any form or other documentation required to be served or submitted under this Agreement shall be deemed timely (i) if delivered by mail (and not required to be delivered in some other fashion), if postmarked (or, in the absence of a postmark or if such postmark is illegible, if received) on or before the date by which it is required to be submitted under this Agreement or (ii) if delivered (and expressly permitted or required to be delivered) by electronic mail, when sent (provided that the sender can produce reasonable evidence of the same).

## 14.3 Governing Law

This Agreement shall be governed by and construed in accordance with the law of the State of Arkansas without regard to any choice-of-law rules that would require the application of the law of another jurisdiction.

## 14.4 Waiver of Inconsistent Provisions of Law; Severability

14.4.1 To the fullest extent permitted by applicable law, each party, each Eligible Claimant and each Enrolled Claimant waives any provision of law (including the common law), which renders any provision of this Agreement invalid, illegal or unenforceable in any respect.

14.4.2 Any provision of this Agreement which is prohibited or unenforceable to any extent or in any particular context shall be ineffective, but such ineffectiveness shall be limited as follows: (i) if such provision is prohibited or unenforceable only in or as it relates to a particular jurisdiction, such provision shall be ineffective only in or as it relates to (as the case may be) such jurisdiction and only to the extent of such prohibition or unenforceability, and such prohibition or unenforceability in or as it relates to (as the case may be) such jurisdiction shall not otherwise invalidate or render unenforceable such provision (in such or any other jurisdiction); (ii) if (without limitation of, and after giving effect to, clause

61

(i)) such provision is prohibited or unenforceable only in a particular context (including only as to a particular Person or Persons or under any particular circumstance or circumstances), such provision shall be ineffective, but only in such particular context; and (iii) without limitation of clauses (i) or (ii), such ineffectiveness shall not invalidate any other provision of this Agreement. In any event, upon any such determination that any term or other provision is invalid, illegal or unenforceable, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible to the fullest extent permitted by applicable law. Nothing in this Section 14.4.2 is intended to, or shall, limit (1) Section 14.4.1 or (2) the intended effect of Section 14.3.

### 14.5    Good Faith Negotiations

The parties recognize and acknowledge that each of the parties hereto is represented by counsel and that such party received independent legal advice with respect to the advisability of entering into this Agreement. Each of the parties acknowledges that: the negotiations leading up to this Agreement were conducted regularly and at arm's length; this Agreement is made and executed by and of each party's own free will; each party knows all of the relevant facts and its rights in connection therewith; and it has not been improperly influenced or induced to make this settlement as a result of any act or action on the part of any party or employee, agent, attorney or representative of any party. The parties further acknowledge that they entered into this Agreement because of their desire to avoid the further expense and inconvenience of litigation and other disputes and to compromise permanently and settle the claims between any Enrolled Claimant, on the one hand, and Bayer, on the other hand, settled by the execution of this Agreement.

### 14.6    Construction

With regard to each and every term and condition of this Agreement, the parties hereto understand and agree that the same have or has been mutually negotiated, prepared and drafted, and if at any time the parties thereto desire or are required to interpret or construe any such term or condition or any agreement or instrument subject hereto, no consideration shall be given to the issue of which party thereto actually prepared, drafted or requested any term or condition hereof.

### 14.7    Entire Agreement

This Agreement contains the entire agreement between the parties with respect to the subject matter hereof and supersedes and cancels all previous agreements, negotiations and commitments between the parties hereto (oral or otherwise) with respect to the subject matter hereof.

### 14.8    Headings; References

The headings of the sections, paragraphs and subsections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement. Any reference to an Exhibit shall be deemed to refer to the

applicable Exhibit attached hereto. The words "include" and "including" and words of similar import when used in this Agreement or any Exhibit hereto are not limiting and shall be construed to be followed by the words "without limitation," whether or not they are in fact followed by such words. The definitions contained in this Agreement or any Exhibit attached hereto are applicable to the singular as well as the plural forms of such terms. Words of any gender (masculine, feminine, neuter) mean and include correlative words of the other genders. As used herein or in any Exhibit hereto, the term "dollars" and the symbol "$", shall mean United States dollars. References herein to instruments or documents being submitted "by" any Person include (whether or not so specified) submission of the same on behalf of such Person by his Counsel whether or not so specified, provided that if any particular instrument or document is required herein to be executed by a particular Person, it must (unless otherwise expressly specified herein) be so executed by such Person. References herein to any particular Section (such as, for example, Section 4.2) shall be deemed to refer to all sub-Sections of such Section (such as, for example, Section 4.2.1, 4.2.2, etc.), all sub-sub-Sections of such sub-Sections, and so on; the corresponding principle applies to all references herein to any particular sub-Section, sub-sub-Section and so on. The words "this Agreement", "herein", "hereof", "hereby", "hereunder" and words of similar import refer to this Agreement as a whole (together with any Exhibits attached hereto) and not to any particular subdivision unless expressly so limited or the context requires otherwise. Any reference herein to this Agreement shall be deemed to include this Agreement as it may be modified, varied, amended or supplemented from time to time.

### 14.9   No Third Party Beneficiaries; Assignment

14.9.1  No provision of this Agreement or any Exhibit attached hereto is intended to create any third-party beneficiary hereto or thereto except as expressly set forth herein or therein. For the avoidance of doubt, nothing in this Section 14.9 limits or modifies the third-party beneficiary provisions of any Claims Form, Release or Stipulation of Dismissal. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns; provided, however, that neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by any of the NCC or any Enrolled Claimant who becomes a party hereto without the prior written consent of Bayer. Any assignment in violation of this Section 14.9.1 shall be null and void ab initio.

14.9.2  Without limitation of Section 14.9.1 but also without limitation of any NCC's right to enforce this Agreement, no Eligible Claimant or Enrolled Claimant shall have any right to institute any proceeding, judicial or otherwise, against any of Bayer, any NCC, any Claims Administrator or the Arbitrator to enforce, or otherwise with respect to, this Agreement.

### 14.10   Amendments; No Implied Waiver

This Agreement may be amended by (and only by) an instrument signed by Bayer, on the one hand, and by the NCC, on the other hand. Except where a specific period for action or inaction is provided herein, no failure on the part of a party to exercise, and no delay on the part

of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof; nor shall any waiver on the part of any party of any such right, power or privilege, or any single or partial exercise of any such right, power or privilege, preclude any other or further exercise thereof or the exercise of any other right, power or privilege; nor shall any waiver on the part of any party, on any particular occasion or in any particular instance, of any particular right, power or privilege operate as a waiver of such right, power or privilege on any other occasion or in any other instance.

### 14.11  Counterparts; Facsimile Signature

This Agreement may be executed in any number of counterparts, each of which shall be an original and all of which shall together constitute one and the same instrument. It shall not be necessary for any counterpart to bear the signature of all parties hereto. This Agreement and any amendments hereto, to the extent signed and delivered by means of a facsimile machine or electronic scan (including in the form of an Adobe Acrobat PDF file format), shall be treated in all manner and respects as an original agreement and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

### 14.12  Tax Matters

The parties agree to characterize the monies comprised of Market Losses, the Chenicre/CL-131 Fund and Other Losses Fund for federal, state and local income tax purposes in such manner as is reasonably determined by Bayer, including without limitation as a "qualified settlement fund" within the meaning of Treasury Regulation Section 1.468B-1 or as a grantor trust pursuant to an election under Treasury Regulation Section 1.468B-1(k) or otherwise. Bayer shall timely provide the QSF Administrator, and the NCC shall cause the QSF Administrator to provide Bayer, with such material and relevant information as and to the extent reasonably requested by Bayer or the QSF Administrator, as applicable, in connection with any tax filing or the payment of any taxes or any private letter ruling regarding the tax status of the funds.

### 14.13  Further Assurances

From time to time following the Execution Date, (i) each party shall take such reasonable actions consistent with the terms of this Agreement as may reasonably be requested by any other party, and otherwise reasonably cooperate with each other party in a manner consistent with the terms of this Agreement as reasonably requested by each such other party, and (ii) each Enrolled Claimant and his Enrolling Counsel shall take such reasonable actions consistent with the terms of this Agreement as may reasonably be requested by Bayer or by the NCC, and otherwise reasonably cooperate with Bayer and the NCC in a manner consistent with the terms of this Agreement as reasonably requested by Bayer or the NCC, in the case of each of (i) and (ii) as may be reasonably necessary in order further to effectuate the intent and purposes of this Agreement and to carry out the terms hereof. To the extent such actions shall be made by counsel, such actions shall be consistent with their duties to their clients who are parties to this Agreement.

### 14.14  Specific Performance

It is understood and agreed by the parties that money damages would not be a sufficient remedy for any breach of this Agreement by any party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach in addition to any other remedy available at law or in equity, without the necessity of demonstrating the inadequacy of money damages.

### 14.15   Additional Released Parties

Bayer may seek contribution from any Additional Released Party. This Agreement and the Release extinguish any and all Liability on behalf of the Additional Released Parties to the Enrolled Claimants in any way growing or arising out of the detection in the United States rice supply of Bayer GM Rice Seed. As a condition of participating in this Agreement, Claimants waive any opportunity or right to intervene or voluntarily participate, and agree not to intervene or voluntarily participate, in any lawsuit brought by any Bayer entity seeking contribution, or recovery in any form, for funds paid under this Agreement against any of the Additional Released Parties, even if such lawsuit adversely affects Claimant's interest in any such party. Anything to the contrary in this Section 14.15 notwithstanding, no Claimant shall be required to act, or refrain from acting, in such a way as to violate a fiduciary duty owed to any Additional Released Party. For the avoidance of doubt, each Claimant agrees that no such fiduciary duty arises from membership or stock ownership of any Additional Released Party.

### 14.16   Computing Dates

For all deadlines under this Agreement, to compute deadlines (a) exclude the day of the event that triggers the period; (b) count every day, including intermediate Saturdays, Sundays and legal holidays and (c) include the last day of the period, but if the last day is a Saturday, Sunday or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday or legal holiday.

### 14.17   Further Judicial Rulings

Notwithstanding any rulings or decisions by the U.S. Court of Appeals for the Eighth Circuit, the Circuit Court of Arkansas County, Arkansas, the Eastern District of Missouri or any other court that does not address this Agreement, this settlement will proceed pursuant to the terms and conditions set forth above.

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the Execution Date.

**Bayer**

_____

[INSERT NAME/TITLE]
On Behalf of each of the Persons identified
within the definition of the term "Bayer"
July__, 2011

**Negotiating Claimant's Counsel**

_____
Don Downing
July _l_, 2011

_____
Adam Levitt
July __, 2011

_____
Richard Arsenault
July __, 2011

_____
William Chaney
July __, 2011

_____
Scott Powell
July __, 2011

66

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the Execution Date.

**Bayer**

_Gary D. McConnell_

Gary D. McConnell, Vice President and Associate General Counsel
On Behalf of each of the Persons identified
within the definition of the term "Bayer"
July 1, 2011

**Negotiating Claimant's Counsel**

_____
Don Downing
July ___, 2011

_____
Adam Levitt
July ___, 2011

_____
Richard Arsenault
July ___, 2011

_____
William Chaney
July ___, 2011

_____
Scott Powell
July ___, 2011

66

**Exhibit A-1**
**Enrollment and Claims Form**
**(For Eligible Claimants Represented by Counsel)**

[Insert Brown Greer form here]

**Exhibit A-1**
**Enrollment and Claims Form**
**(For Eligible Claimants Not Represented by Counsel)**

**Brown Greer Form Here**

**Exhibit A-2**
**Cheniere/CL-131 Claims Form**

**Brown Greer Form Here**


**Exhibit A-3**
**Other Losses Claims Form**

**Brown Greer Form Here**

**Exhibit B**
**Enrolling Counsel Declaration**
**Brown Greer Form Here**

**Exhibit C**
[intentionally omitted]

Exhibit D
Release

**Brown Greer Version here, tracked changes below to see changes**

**<u>GENERAL RELEASE OF ALL CLAIMS</u>**

<u> </u>

*[Print Name of Eligible Claimant, Affiliated Claimant or Landlord here.]*

The undersigned, being of lawful age, for the consideration of the right of the Settling Claimant (as defined herein) to receive Settlement Payments subject to and in accordance with the terms of that certain Settlement Agreement, entered into by and among Bayer and the NCC (the "<u>Settlement Agreement</u>"), receipt of which is hereby acknowledged, does hereby execute and deliver this General Release of all Claims (this "<u>Release</u>") on behalf of the Person first identified above ("<u>Settling Claimant</u>").  If the undersigned is not the Settling Claimant (e.g., if the Settling Claimant is not a natural person or if the Settling Claimant is deceased or incompetent), the undersigned represents and warrants that he is a duly authorized representative of the Settling Claimant and has actual and express authority to execute and deliver this Release on behalf of the Settling Claimant and, in any event, the undersigned represents and warrants that this Release constitutes, or will constitute, when executed and delivered, a valid and binding agreement of the Settling Claimant, enforceable in accordance with its terms.

By the signature appearing below:

Settling Claimant, to the full extent permitted by law, (i) if a natural person: for himself and his assigns, and for his and their current and former heirs, executors, administrators, attorneys and representatives and (ii) if other than a natural person: for itself and its current and former parents, subsidiaries and affiliates, the current and former agents (actual or apparent), servants, employees,

officers, directors, members, managers, partners, owners, attorneys, and representatives of any

such Person and their respective heirs, executors, administrators, predecessors, successors and

assigns (each a "Settling Claimant Releasing Party" and, collectively, the "Settling Claimant

Releasing Parties"), hereby releases, acquits and forever discharges (i) Bayer CropScience LP

(formerly known as Aventis CropScience USA LP), Bayer CropScience Holding Inc., Bayer

CropScience Inc., Bayer CropScience LLC, Stoneville Pedigreed Seed Company, Bayer

Corporation, Bayer AG, Bayer CropScience AG, Bayer BioScience NV, Bayer CropScience

Holding SA, Bayer CropScience SA, and StarLink Logistics Inc.; their respective current and

former parents, subsidiaries and affiliates; the current and former agents (actual or apparent),

servants, employees, officers, directors, members, managers, partners, owners, attorneys, and

representatives of any such Person and their respective heirs, executors, administrators,

predecessors, successors and assigns (each a "Bayer Released Party" and, collectively, the "Bayer

Released Parties"); (ii) each of Riceland Foods, Inc., Producers Rice Mill, Inc., BASF

Agrochemical Products B.V., BASF Corporation, BASF Plant Science Company GmbH, BASF

Plant Science LP, Horizon Ag. LLC, and Louisiana State University as well as the current and

former parents, subsidiaries and affiliates of each of them; the current and former agents (actual or

apparent), servants, employees, officers, directors, members, managers, partners, owners,

attorneys, and representatives of any such Person; and their respective heirs, executors,

administrators, predecessors, successors and assigns, and (iii) any other Person (the Persons

referenced in the foregoing clauses (ii) and (iii) being collectively referred to herein as the

"Additional Released Parties") of and from any and all claims, demands, causes of action,

liabilities, sums of money, damages (including, but not limited to, punitive damages), loss of

service, expenses, compensation, costs and losses, of any type, kind, nature, description or

character whatsoever, whether based on tort, contract or other theory of recovery and including claims for contribution and indemnity, whether known or unknown, suspected or unsuspected, whether liquidated or unliquidated, which the Settling Claimant Releasing Parties, or any of them, now has or which may hereafter accrue on account of or in any way growing or arising out of the presence in the United States rice supply of Bayer GM Rice Seed, against any Bayer Released Party or any Additional Released Party (collectively, the "Settling Claimant Released Claims"). However, if, and only if, the undersigned is a landlord who is seeking recovery (y) directly as an Enrolled Claimant for some claims and indirectly as an Affiliated Claimant for other claims or (z) as an Affiliated Claimant for different claims with more than one Enrolled Claimant this Release specifically permits the undersigned to participate in the program in both such capacities for those different claims but in all other respects is fully operative and binding on the undersigned.

Settling Claimant, on Settling Claimant's behalf and all other Settling Claimant Releasing Parties, covenants and agrees that except to the extent provided herein Settling Claimant will not sue or bring any action or cause of action, including, without limitation, by way of third party claim, cross-claim or counterclaim, against any Bayer Released Party and/or any Additional Released Party in respect of any Settling Claimant Released Claim.

Settling Claimant warrants and represents that such Person is the sole and lawful owner of all rights, title and interest in and to the matters released and settled by such Person herein, or otherwise has, to the fullest extent permitted by applicable law, the requisite power and authority to release and settle such matters on behalf of Settling Claimant and all Settling Claimant Releasing Parties, and that neither Settling Claimant nor any Settling Claimant Releasing Party has assigned, transferred, pledged, hypothecated or subrogated any Settling Claimant Released Claim or any part or portion of any Settling Claimant Released Claim.

Upon receipt of any Settlement Payment by Settling Claimant under the Settlement Agreement, subject to its receipt of this Release (executed by Settling Claimant) and, as applicable, a General Release of All Claims duly executed by any Affiliated Claimant to the Settling Claimant, Bayer releases Settling Claimant and any such Affiliated Claimant from any claim related to the presence of Bayer GM Rice Seed in the United States rice supply. The foregoing release specifically excludes, and Bayer is not prohibited or limited in any way by such release from bringing, the following claims:

- Any claim arising out of any commercial transaction between the Settling Claimant or any such Affiliated Claimant and Bayer or any Person that sells or distributes any Bayer product.

- Any claim against any other Person that may affect anticipated payments from any Additional Released Party or may affect the ownership or property interest of the Settling Claimant or any such Affiliated Claimant, directly or indirectly, in any Additional Released Party. The foregoing release only covers claims made directly against the Settling Claimant or applicable Affiliated Claimant.

- Any claim against the Settling Claimant or any such Affiliated Claimant related to fraudulent or deceptive information submitted to the Claims Administrator under the Agreement or to enforce an obligation of an Enrolled Claimant or Affiliated Claimant under this Agreement.

Each Bayer Released Party and each Additional Released Party may plead this Release as a complete defense and bar to any Settling Claimant Released Claim brought in contravention

hereof and, in the event any Settling Claimant Releasing Party brings a Settling Claimant Released Claim, the Settling Claimant shall indemnify, defend and hold each Bayer Released Party and each Additional Released Party harmless from and against any and all costs, fees, liabilities, expenses, damages, judgment, interest, debts, or losses suffered or incurred in connection therewith, whether directly or indirectly, including the reasonable fees and disbursements of counsel and other professionals and court costs incurred in connection with enforcing the terms of this paragraph.

Settling Claimant represents and warrants, as to any Settling Claimant Released Claim, that no Settling Claimant Releasing Party has, as applicable, heretofore assigned or transferred, or purported to assign or to transfer, to any person or entity any Settling Claimant Released Claim released hereunder, or, any portion thereof or interest therein; and the Settling Claimant agrees to indemnify, defend and hold each Bayer Released Party and each Additional Released Party harmless from and against any and all claims and liabilities based on or arising out of any such assignment or transfer or purported assignment or transfer, including the reasonable fees and disbursements of counsel and other professionals and court costs incurred in connection with enforcing the terms of this paragraph.

Any Settlement Payments to be made to Settling Claimant shall be made to such Person subject to and in accordance with the terms of the Settlement Agreement and the Qualified Settlement Fund Agreement. Settling Claimant acknowledges and agrees that by participating in the Program Settling Claimant waives the right to receive any punitive or emotional damages in respect of any Eligible Claim and Settling Claimant understands and agrees that no Settlement

Payment paid under the terms of the Settlement Agreement is, or shall be deemed to be, attributable to punitive or emotional damages.

Settling Claimant will bear its own costs related hereto and to the claims released hereby.

This Release shall also release the Bayer Released Parties and their attorneys from any and all claims, demands, causes of action, liabilities. sums of money, damages, loss of service, expenses, compensation, costs and losses, of any type, kind, nature, description or character whatsoever, including claims for contribution and indemnity, whether known or unknown, suspected or unsuspected, whether liquidated or unliquidated, related to the conduct of the Bayer Released Parties and/or their attorneys in the prosecution or defense of any claim being released hereby. This Release does not release any obligations created by the Settlement Agreement.

With regard to medical bills, liens and other potential rights for reimbursement, Settling Claimant agrees as follows:

1.  Responsibility for Satisfaction of All Medical Expenses. Costs and Liens. Settling Claimant represents and warrants that (a) Medical Expenses and Costs were not alleged as injuries and/or damages in this matter because no such Medical Expenses and Costs exist; and/or (b) if any past, present and/or future medical bills, costs or liens in fact are discovered to result from or arise out of Settling Claimant's alleged injuries and/or damages Settling Claimant represents and warrants that they have been paid or will be paid by Settling Claimant and are Settling Claimant's responsibility to pay.

2.  No Governmental Benefits. Settling Claimant represents and warrants that Settling Claimant has not received any federal or other government medical assistance, vocational rehabilitation services, or other medical benefits of any type arising out of or related to Settling Claimant's alleged injuries.

3.  Attorney Liens. Settling Claimant represents and warrants that all legal expenses, bills, costs, or contingency fee agreements resulting from or arising out of

representation of Settling Claimant by Settling Claimant's retained attorney in relation to Settling Claimant's claims have been paid or will be paid out of the proceeds of the settlement and are Settling Claimant's responsibility to pay, and that any liens based on any legal expenses, bills, costs, or contingency fee agreements incurred by Settling Claimant's retained attorney as a result of Settling Claimant's alleged injuries will be satisfied by Settling Claimant.

4.   No Subrogation Claims or Liens. Settling Claimant further represents and warrants that Settling Claimant is aware of no subrogation claims, liens, or claims by Medicare and/or other Governmental Entities for payment of any type or character by reason of any medical condition or injuries arising out of Settling Claimant's alleged injuries.

5.   Landlord Claims. Settling Claimant represents and warrants that any claim to recovery relating to the presence of Bayer GM Rice Seed in the U.S. rice supply by any Affiliated Claimant have been paid or will be paid out of the proceeds of the settlement and are Settling Claimant's responsibility to pay, and that any claims by any such parties will be satisfied by Settling Claimant.

6.   It is understood and agreed that this settlement is the compromise of a disputed claim and that this Release, the Settlement Agreement, and any payment made pursuant to the Settlement Agreement may not be used by anyone as evidence of negligence or liability of any kind by Bayer, provided, however, that nothing in this Release shall be construed to prevent Bayer from pleading or otherwise proving its status as a joint tortfeasor for the purpose of seeking contribution from any Additional Released Party. This Release was entered into in good faith based upon arms-length negotiation between Settling Claimant, Bayer and their respective counsel.

To procure the payment of the Settlement Payment(s) to be made pursuant to the terms of the Settlement Agreement, the Settling Claimant hereby declares that no representations about the nature and extent of any injuries or damages made by any physician, attorney, or agent(s) of Bayer has induced Settling Claimant to execute this Release and that in determining the said sum there has been taken into consideration not only the ascertained damages, but also the possibility that the injuries or damages sustained may be permanent and progressive and recovery therefrom uncertain and indefinite and that other damage may become apparent at some future time, so that consequences not now anticipated may result from said incident, casualty, or event.

Except for the warranties, representations, covenants, terms and conditions specifically set forth herein, in executing this Release, the Settling Claimant has not received nor relied upon any oral or written representation of any Bayer Released Party regarding any fact, circumstance, condition, legal effect or promise of future action and, specifically, no representations have been made by any attorney or agent of any Bayer Released Party about the nature or extent of any damages.

Capitalized terms used and not otherwise defined in this Release carry the meanings ascribed to them in the Settlement Agreement.

Nothing in this Release, express or implied, is intended or shall be construed to confer upon, or to give to, any Person other than the Bayer Released Parties, the Additional Released Parties and their respective successors and permitted assigns, any right, remedy or claim under or by reason of this Release or any covenant, condition or stipulation thereof; and the covenants, stipulations and agreements contained in this Release are and shall be for the sole and exclusive benefit of the Bayer Released Parties, the Additional Released Parties and their respective successors and permitted assigns.

The Settlement Agreement is an effort to compromise the claims made by Claimants which were disputed as to validity and/or amount and the Settlement Agreement may not be used by anyone as evidence of negligence or liability of any kind by Bayer, provided, however, that nothing in this Release shall be construed to prevent Bayer from pleading or otherwise proving its status as a joint tortfeasor for the purpose of seeking contribution from any Additional Released Party.  This Agreement and the Release extinguish any and all Liability on behalf of the Additional Released Parties to the Enrolled Claimants in any way growing or arising out of

the detection in the United States rice supply of Bayer GM Rice Seed. As a condition of participating in the Agreement, Claimants waive any opportunity or right to intervene or voluntarily participate in support of any of the Additional Released Parties, and agree not to intervene or voluntarily participate in support of any of the Additional Released Parties, in any lawsuit brought by any Bayer entity seeking contribution, or recovery in any form, for funds paid under the Settlement Agreement against any of the Additional Released Parties, even if such lawsuit adversely affects Claimant's interest in any such party. Anything to the contrary in this paragraph notwithstanding, Settling Claimant shall not be required to act, or refrain from acting, in such a way as to violate a fiduciary duty owed to any Additional Released Party. For the avoidance of doubt, Settling Claimant agrees that no such fiduciary duty arises from membership or stock ownership of any Additional Released Party.

This Release, together with the Settlement Agreement (including any and all Exhibits attached thereto), constitutes the entire agreement between Settling Claimant and Bayer, and no other understandings or agreements, written or oral, shall be used to interpret this Release.

The Settling Claimant acknowledges that Settling Claimant has been advised to consult an attorney of Settling Claimant's choice regarding this Release. If represented, the Settling Claimant acknowledges that Settling Claimant's counsel may represent other rice farmers in connection with the Settlement Agreement and/or in connection with the GMB Settlement Agreement and consents to that representation and, to the extent that other representation may create a conflict of interest with the Settling Claimant, the Settling Claimant has given informed consent to Settling Claimant's counsel to such other representation in writing. If represented, the Settling Claimant further acknowledges that Settling Claimant's counsel has disclosed to Settling

Claimant any representation of other parties, other than rice farmers, who have made claims against Bayer related to the presence of Bayer GM Rice Seed in the United States rice supply and, to the extent that other representation may create a conflict of interest with the Settling Claimant, the Settling Claimant has given informed consent to Settling Claimant's counsel to such other representation in writing.   The Settling Claimant acknowledges that Settling Claimant fully understands this Release and, as applicable, the effect of becoming an Enrolled Claimant under the Settlement Agreement.

**CAUTION: READ BEFORE SIGNING:**

　　　　Signed this _____ day of _____, 2011.

If the Settling Claimant is a natural person:

_____
(Signature of Settling Claimant)

_____
(Print Name)

If the Settling Claimant is other than a natural person, or
if the Settling Claimant is deceased or incompetent:

_____
(Signature of Authorized Person)

_____
(Print Name)

_____
(Print Relationship to Settling Claimant)

　　　　　　　　　　　　　　Witness

I certify under the penalties of perjury that I witnessed _____ sign this Release in my presence at the following location on this date:


(Signature of Witness)

(Print Name)

Date:
Address of location where signed:

My Full Name:
My Current Address:
My Phone Number:

**Exhibit E**
**Stipulation of Dismissal**

**Exhibit F**
**Qualified Settlement Fund Agreement**

Exhibit G
Order

**Exhibit H**
**Excluded Trial Claimants**

1. Plaintiffs from Case No. CV-2008-107 in the Circuit Court of Woodruff County, Arkansas:
   Lenny Joe Kyle and Lenny Joe Kyle Farms.

2. Plaintiffs from Case No. CV-2006-413 in the Circuit Court of Lonoke County, Arkansas:
   Randy Schafer, End of the Road Farms, Inc., Schafer Planting Co., Wallace Farms, Robert E.
   Moery (individually and in his capacity as trustee of the Robert Moery trust), Kyle Moery,
   Carter Farms Partnership, Petrus Farms, Inc., Robert Petrus (individually and in his capacity
   as trustee of the Robert Petrus revocable trust), R & B Amaden Farms, Randall Snider, R & S
   Planting Company, Inc., S & R Farms, A.S. Kelly and Sons and Neil Daniels Farms.

3. Plaintiffs from Case No. CV-2009-119-3 in the Circuit Court of Desha County, Arkansas:
   Doyle Sims, Brad Sims, Doyle & Brad Sims Farms, Doyle Sims Farms, Inc., Bill Schwartz,
   Bill Schwartz Farms, Tony Wells, Wells Brothers Farms, Wells Brothers Partnership,
   Treasures Unlimited, Inc., T&H Farms, Inc., A&J Farms, Inc., Triple T Farms, Inc., Timothy
   Wells, Timothy Wells, Jr., Timothy Wells Farms, Wells Family Farms Partnership, Ricky
   Downen, Jodie Downen, Lauren Downen, Jonathan Oldner Farms, Amber Box Farms, R&J
   Farms Partnership, Robert Johnson, Mike Johnson, Robert Johnson Farms, Johnson Planting
   Co., Rob & Tam Farms, M&T, Inc., Mike & Tammy Johnson Farm, Alan Goodgame,
   Richard Goodgame, Richard Goodgame & Associates, Inc., Goodgame Farms, J.V.,
   Goodgame Farms Partnership and AG Farms, Inc.

4. Farmer plaintiffs from Case No. CV-2008-108 in the Circuit Court of Arkansas County,
   Arkansas:  Scott Meins, Dean Meins, S & D Farm Partnership, Raymond Meins, Inc., Robert
   H. Pond, Judy Pond, J. Kevin Pond, Ann Pond, Million Mallard Farms Partnership, Ponds
   Farm, Inc., Johnny Simpson, Elizabeth Simpson, Johnny & Elizabeth Simpson Partnership,
   David Simpson, Terry Simpson, David and Terry Simpson Partnership, Henrine Joyner,
   Hubert Joyner, Jane Wright Hubert, Josephine Seen, James Wesley Staton (individually and
   as executor of the estate of James L. Staton), Randy Staton, Jamie L. Martin, Betty Morris,
   Betty L. Morris Living Trust, Mark Simpson, Elaine Simpson, Mark and Elaine Simpson
   Farms, Jeff Simpson, Marcie Simpson, J&M Simpson Farms, Staton Family Farms, Kaal
   Farms, Inc., Paul D. Langston, Langston Properties, L.L.C., Jeff & Jodi Simpson Partnership
   and Betty Morris Farms.

**Exhibit I**
**Included Trial Claimants**

1.    The "Spain Claimants": Plaintiffs from Case No. CV-2009-309-2 in the Circuit Court of St. Francis County, Arkansas, which was settled prior to verdict: Keith Spain, John W. Spain, Lelia Spain, Lana Spain, John or Keith Spain Farms Partnership, John Spain Farms, Inc., J&K Spain Farms Trust, Spain Family Farms G.P., Two Spain Farms, Inc., Burt Russell, Glenda Phillips, Individually and as trustee of the Vernon Wood Trust, Gary Bryan, Dianna Bryan and Janice Sherman.

2.    The "MDL Missouri Trial Plaintiffs": Plaintiffs from the first federal court trial in Case No. 06-1811 in the Eastern District of Missouri:  Kenneth Bell and Zachary Bell as partners of Bell Planting Company, NEZ, Inc., Carolyn Bell, Charles Bell, Edwin Groves, Erin Bell, Nathan Bell, A.L. Blair, Bell AGCO LLC, Shawan Farms LLC, NAKE LLC and ZANA LLC as partners of Bottom Farms and JH Hunter Farms, LLC.

3.    The "First MDL Arkansas & Mississippi Trial Plaintiffs": Plaintiffs from the second federal court trial in Case No. 06-1811 in the Eastern District of Missouri: Jim Penn and Joe Penn, partners in Penn Brothers Partnership, Penn Brothers Landleveling, Inc., Denton Farms, Inc., Jerry Catt, Donna Catt, Black Dog Planting Company, Gary F. Goode, Trey Farms, Inc., MK Farms, Inc., Anna Farms, Inc. and 3G Farms, Inc.

4.    The "MDL Louisiana Trial Plaintiffs": Plaintiffs from the third federal court trial in Case No. 06-1811 in the Eastern District of Missouri:  Deshotels Farm Management.

5.    The "Second MDL Texas Trial Plaintiffs": Plaintiffs from the fourth federal court trial in Case No. 06-1811 in the Eastern District of Missouri, which was settled prior to verdict: Richard Lee Hafernick and Robbie Hafernick on behalf of Lee and Robbie Hafernick Farms, John F. Gaulding, Jr., on behalf of Gaulding Farm, John M. Donaho, James and Carol Gentz.

6.    The "MDL Mississippi Trial Plaintiffs": Plaintiffs from the fifth federal court trial in Case No. 06-1811 in the Eastern District of Missouri, which was settled prior to verdict: Phillip E. Rizzo, Phillip A. Rizzo, Paul R. Rizzo, John Michael Rizzo, Kimball Lake, Inc., Snake Creek, Inc., Bogue, Inc. members of Rizzo Farms Joint Venture, Gary Pongetti, Pongetti Farms, Inc., and EBP, Inc. partners of Pongetti Farms Partnership II, Peter H. Dulaney and Virginia V. Dulaney partners of Peter Dulaney Farms, Brian Byrd, Judy Byrd, Jarett Byrd and Jeremy Byrd partners of Byrd Farms Partnership.

**Exhibit J-1**
**Completed Enrollment and Claims Package Notice**
**Brown Greer Form Here**

Exhibit J-2
Completed Cheniere/CL-131 Claims Cheniere/CL-131 Claims Package Notice
Brown Greer Form Here

**Exhibit J-3**
**Completed Other Losses Claims Package Notice**
**Brown Greer Form Here**

**Exhibit K**
**Additional Trial Claimants**

1. The "Willman Claimants": Plaintiffs from Case No. CV-2007-169 in the Circuit Court of Lonoke County, Arkansas: William E. Willman, Floyd C. Willman, Elizabeth W. Thomas Trust 1997, Elizabeth W. Thomas Trust 2000, Willman & Willman Farms, LLC, W. Edgar Willman Trust 2000, Rodney Charles Spears d/b/a Chip Spears Farms, Spears Farm Central, Inc. and Gary Spears and Shawn Spears d/b/a Spears Farms.

2. The "Underwood Claimants": Plaintiffs from Case No. CV-2008-580 in the Circuit Court of Lonoke County, Arkansas: Martin Underwood, individually, Carla Underwood, individually, Martin Underwood Farms, Michael W. Morris, individually, Martha D. Morris, individually, Michael W. Morris Farms JV, Timmy Ables, individually, Meghan Ables, individually, Timmy & Meghan Ables Farms and Lewis Underwood

3. The "Briggs Claimants": Plaintiffs from Case No. CV-2009-173-5 in the Circuit Court of Jefferson County, Arkansas: Jesse Briggs, Briggs Bros. Farms Partnership, Jesse Briggs, Inc., John Briggs III, Inc., Old River Farms Partnership, Big Cut Farms, Inc., R.G. Farms, Inc., Raymond Glen Wright, Big Mo Farm Partnership, Amber Waves of Grain, Inc., Full Silo Farms, Inc., Briggs & Briggs, Inc., Highwater Planting Company, Inc., Henry Slew, Inc., Johnson Lake Planting Company, Inc., Hannaberry Planting Co., Inc., Witney Gully, Inc., Guy & Sue Kochel and Randy Briggs, Inc.

4. The "July MDL Claimants": Plaintiffs from the sixth federal court trial in Case No. 06-1811 in the Eastern District of Missouri: Frank Binkley, Lynn Gene, Inc., Eifling Investment Co., Sam Don, Inc., Rebecca Lynne, Inc., Clayton Lee, Inc., Don L. Eifling, Inc. and D. Lynn Eifling, Inc. as partners of Don Eifling & Son, Jeffrey Keeter, Robert J. Venable and Robbin V. Tuller, partners of RJR Farms; Keeter Farms, Inc.; and P&K, Inc., Dennis Brown, Sherry Brown, and Coty Brown, partners of Legacy Farms Partnership, Ronald Catt, Rudy Hufford and Cheryl Hufford, partners of Hufford Farms, Gary Richey and Jeremy Richey, R&R Farms Joint Venture, Mark Williams and Pamela G. Williams, Guy Brinkley and Aylene Williams.

5. The "January 2012 MDL Claimants": Plaintiffs from the seventh federal court trial in Case No. 06-1811 in the Eastern District of Missouri: David Haggard & Judith Haggard d/b/a Haggard Farms, Russ Hoggard and Russell D. Hoggard, partners of Hoggard Farms, B.W. & S.W. Farms, L.L.C., B.W. & D.W. Farms, L.L.C. & D.W. & S.W. Farms, L.L.C. (Wheeler entities), Kevin Cunningham, Scott E. Cunningham and Barbara K. Cunningham, William C. Hunter & Laura Collins, partners of Willow & Company, Samuel E. Hunter as trustee of Frances M. Hunter Insurance Trust; Trustee of William P. Hunter Marital Trust; W.P. Hunter Insurance Trust, Toppertown, Inc., Samuel E. Hunter and David B. Dalton, partners of D.P.S. Enterprises, Peter Rost, and Paul Rost d/b/a Peter Rost Farms, Peter Rost, Jr. d/b/a Peter Rost Jr. Farms, Peter Rost and Peter Rost, Jr., partners of Rost & Rost Farms, Johnny (Keith) Scott, Gordon (Lee) Wright, Christopher Lee Wright and Wright Farms of Butler Co., Inc.

**Exhibit X**
**Market Losses Payments**

Enrolled Claimants who have submitted Completed Enrollment and Claims Packages shall receive payments (collectively, "Market Losses Payments") for losses suffered in conjunction with their claims for reduced market prices for long-grain rice based on their acreage planted with long-grain rice from and after January 1, 2006 through and including December 31, 2010 (collectively, "Market Losses") in accordance with the following formula:

- $120 per acre, unless reduced by the Overall Cap, with an initial payment of $116.13 per acre, for each long-grain rice acre planted in 2006, as documented by an Eligible Claimant's FSA Form 578s;

- $80 per acre, unless reduced by the Overall Cap, with an initial payment of $77.42 per acre, for each long-grain rice acre planted in 2007, as documented by an Eligible Claimant's FSA Form 578s;

- $60 per acre, unless reduced by the Overall Cap, with an initial payment of $58.06 per acre, for each long-grain rice acre planted in 2008, as documented by an Eligible Claimant's FSA Form 578s;

- $40 per acre, unless reduced by the Overall Cap, with an initial payment of $38.71 per acre, for each long-grain rice acre planted in 2009, as documented by an Eligible Claimant's FSA Form 578s; and

- $10 per acre, unless reduced by the Overall Cap, with an initial payment of $9.68 per acre, for each long-grain rice acre planted in 2010, as documented by an Eligible Claimant's FSA Form 578s.

The aggregate amount of the initial payments identified above is referred to herein as the "Minimum Amount Due."

Any balance due with respect to Market Losses following payment of the Minimum Amount Due in accordance with the terms of this Exhibit X shall be payable in accordance with the terms of Section 5.5.2 of the Agreement.

As to any long-grain rice acre in which more than one Enrolled Claimant has an Interest, the Settlement Payment for corresponding Market Losses shall be divided proportionately among such Enrolled Claimants according to the Interests set forth in FSA Form 578s.

These Market Loss Payments shall be the only payments made regarding any claim of reduced market price for long-grain rice arising out of the presence of Bayer GM Rice Seed in the supply of rice in the United States, except that claims related to the loss of any premium for Cheniere or CL-131 rice grown for sale as seed shall be permitted as Other Losses as set forth in Exhibit Z.

**Exhibit Y**
**Cheniere/CL-131 Losses**

Y.1    Enrolled Claimants who planted the Cheniere rice variety and/or CL-131 rice variety in 2006 may apply for a payment for losses attributable to the presence of Bayer GM Rice Seed in and/or the withdrawal of these varieties from the market under this category. Those Enrolled Claimants who elect to participate in this category may not apply or participate in the Other Losses Fund. Enrolled Claimants who solely had an Interest as a landlord may not make a claim under this provision.

Y.2    To apply for a payment relating to the planting of Cheniere or CL-131 rice varieties in 2006 an Enrolled Claimant shall submit the following documentation to the Claims Administrator:

    Y.2.1    A completed declaration in the form of the attached Cheniere/CL-131 Losses Declaration.

    Y.2.2    Any of the following:

        Y.2.2.1    Contemporaneous documentation from a seed dealer documenting purchase of Cheniere and/or CL-131 rice varieties for the 2006 crop year for use by the Enrolled Claimant. Later-printed documentation based on records created contemporaneously will be considered contemporaneous documentation for these purposes. This documentation must include the date and quantity of such seed purchased and the quantity of such seed returned, if any; or;

Y.2.2.2 Provided that Enrolled Claimant does not have and cannot secure with reasonable effort the documentation described in Section Y.2.2.1 above (as evidenced pursuant to the terms of the Cheniere/CL-131 Losses declaration attached hereto):

(a) Settlement or delivery sheets from delivery of long-grain rice to a mill or other buyer that reflect, on a load-by-load basis, the amount of Cheniere and/or CL-131 rice delivered. Documentation that just reflects Clearfield or CL rice will not be accepted unless it is accompanied by additional, contemporaneous documentation identifying CL-131 as the variety actually grown;

(b) Contemporaneous documentation from a Person engaged in the business of cleaning seed of Cheniere having been cleaned for use as seed during the period from August 1, 2005 through April 1, 2006. If such documentation does not list the variety being cleaned, the variety may be established by supporting seed purchase documentation from 2005 of Cheniere. The lower of the 2005 Cheniere seed purchased or the 2006 seed cleaned shall be used to determine quantity of Cheniere seed used in 2006;

(c) Contemporaneous documentation created by the Enrolled Claimant or Affiliated Claimant (or their employee) demonstrating the number of acres of Cheniere or CL-131

95

planted in 2006 if (i) it was the regular practice of the Enrolled Claimant or Affiliated Claimant to keep such records and (ii) records for at least two other years from 2004 to 2007 are provided demonstrating the regular practice to keep such records; or

(d) Other contemporaneous documentation from an independent third party, such as a crop consultant, showing the amount of Cheniere or CL-131 acres planted or seed purchased in 2006.

Y.2.3   As to any documentation submitted in accordance with the terms of Section Y.2.2 above, if the documentation does not show purchase by, delivery to, cleaning for or consulting received by the Enrolled Claimant or Affiliated Claimant (as applicable), it must show purchase by, delivery to, cleaning for or consulting received by an owner, partner, employee or agent of the Enrolled Claimant or Affiliated Claimant and be accompanied by a declaration stating (i) the relationship between the recipient of seed on the documentation and the Enrolled Claimant or Affiliated Claimant, (ii) how the seed was allocated among Persons, if applicable, and (iii) that the Enrolled Claimant or Affiliated Claimant is not aware of any other claim being made for Cheniere/CL-131 Losses in respect of the seed described in the relevant documentation.

Y.2.4   Conversions:

(a)     A yield of 148.64 bushels per acre shall be used to determine

acreage planted with respect to Cheniere/CL-131 Losses for

claimants submitting settlement or delivery sheets as proof of loss.

(b)     A planting rate of 1.46 bushels per acre for Cheniere and 1.36

bushels per acre for CL-131 will be used to calculate the acres

planted for those claimants submitting seed purchase receipts or

seed cleaning documentation as proof of loss.

(c)     One (1) bushel is equivalent to forty-five (45) pounds of rice.

(d)     One (1) hundredweight (cwt) is equivalent to one hundred (100)

pounds (or 2.22 bushels).

(e)     One (1) barrel is equivalent to one hundred sixty two (162) pounds

of rice (or 3.6 bushels).

Y.2.5   If an Enrolled Claimant submits overlapping forms of documentation that

result in different calculations of the acreage grown in Cheniere or CL-131

in 2006, the Claims Administrator shall use the lowest calculation in

determining payment under this provision, provided, however, that if an

Enrolled Claimant submits contemporaneous documentation from a seed

dealer documenting purchase of Cheniere and/or CL-131 rice varieties for

the 2006 crop year and also submits documentation described in Section

Y.2.2.2.2 above the Claims Administrator shall consider only

contemporaneous documentation from a seed dealer documenting

purchase of Cheniere and/or CL-131 rice varieties for the 2006 crop year

in processing a claim for Cheniere/CL-131 Losses and shall consider no

97

other documentation otherwise permitted pursuant to the terms of this Exhibit Y.

Y.3    Claimants who satisfy the criteria set forth in Exhibit Y shall be entitled to receive payments in accordance with the following formula, calculated as set forth in the attached Declaration:

    Y.3.1    $100 per acre for each acre such Enrolled Claimant planted in the Cheniere rice variety in 2006; and

    Y.3.2    $100 per acre for each acre such Enrolled Claimant planted in the CL-131 rice variety in 2006.

Cheniere/CL-131 Losses Declaration

Brown Greer Form Here

**Exhibit Z – Other Losses**

The term "Other Losses" means the following losses, other than Market Losses, established pursuant to the terms of Section 5.4 of the Agreement:

Z.1     Alternative Variety/Crop – lost revenue due to change in variety crop.

Z.2     Seed Rice Producers – lost revenue relating to the loss of any premium for Cheniere or CL-131 rice grown for sale as seed.

Z.3     Milling Lost Revenue – revenue losses for milling operations (excluding such losses suffered by Riceland Foods, Inc. and Producers Rice Mill, Inc.)

Z.4     Miscellaneous – other extraordinary losses relating to the presence of Bayer GM Rice Seed in the U.S. rice supply as affecting a particular farm operation.

Claims for reduced market prices for long-grain rice, emotional damages of any kind, punitive damages, expenses of counsel and losses occurring after any final determination made by the Arbitrator under the Agreement are excluded from consideration under the Other Losses Fund process. Participation in the Other Losses Fund is limited to those Eligible Claimants who actually farmed the land. In the event that a landlord is not an Affiliated Claimant, any payments to an Eligible Claimant for lost revenue will be reduced by the percentage of Interest of that landlord's share for that land. If all landlords are Affiliated Claimants then no reduction in payment will occur.

Those Enrolled Claimants who elect to participate in this category may not apply or participate in the Cheniere/CL-131 Losses Fund. Farming operations differ significantly and the amounts paid in Cheniere/CL-131 Losses Fund do not establish a guideline, minimum or maximum for any payments under the Other Losses Fund.

There is no presumption of impact or damage for any participant in the Other Losses fund. All claims must be documented and farmers who participate in the Other Losses fund and do not document their damages will not receive any payments.

To apply for a payment relating to Other Losses an Enrolled Claimant shall submit to the Claims Administrator a completed declaration in the form of the attached Other Losses Declaration.

**Other Losses Declaration**
**Brown Greer Form Here**

## RELEASE OF ALL CLAIMS

| CLAIMANT | | | |
|---|---|---|---|
| ☐ Eligible Claimant | | ☐ Affiliated Claimant | |
| **Name** | | | |
| **Address** | Street | | |
| | City | State | Zip |
| **Social Security Number or EIN** | | | |

| REPRESENTATIVE CLAIMANT (If none, check here:  ☐) | | | |
|---|---|---|---|
| Note:  These fields should be completed only if the Settling Claimant is deceased or incapacitated. | | | |
| **Name** | | | |
| **Address** | Street | | |
| | City | State | Zip |
| **Social Security Number or EIN** | | | |
| **Representative Capacity:** | | | |

| CLAIMANT'S COUNSEL (If none, check here:  ☐) | |
|---|---|
| **Name** | |
| **Firm** | |

Eligible Claimant:

**EXHIBIT**

tabbies

B

## GENERAL RELEASE OF ALL CLAIMS

The undersigned, being of lawful age, for the consideration of the right of the Settling Claimant (as defined herein) to receive Settlement Payments subject to and in accordance with the terms of that certain Settlement Agreement, entered into by and among Bayer and the NCC (the "Settlement Agreement"), receipt of which is hereby acknowledged, does hereby execute and deliver this General Release of all Claims (this "Release") on behalf of the Person first identified above ("Settling Claimant").   If the undersigned is not the Settling Claimant (e.g., if the Settling Claimant is not a natural person or if the Settling Claimant is deceased or incompetent), the undersigned represents and warrants that he is a duly authorized representative of the Settling Claimant and has actual and express authority to execute and deliver this Release on behalf of the Settling Claimant and, in any event, the undersigned represents and warrants that this Release constitutes, or will constitute, when executed and delivered, a valid and binding agreement of the Settling Claimant, enforceable in accordance with its terms.

By the signature appearing below:

Settling Claimant, to the full extent permitted by law, (i) if a natural person: for himself and his assigns, and for his and their current and former heirs, executors, administrators, attorneys and representatives and (ii) if other than a natural person: for itself and its current and former parents, subsidiaries and affiliates, the current and former agents (actual or apparent), servants, employees, officers, directors, members, managers, partners, owners, attorneys, and representatives of any such Person and their respective heirs, executors, administrators, predecessors, successors and  assigns (each a "Settling Claimant Releasing Party" and,

Eligible Claimant:

collectively, the "Settling Claimant Releasing Parties"), hereby releases, acquits and forever

discharges (i) Bayer CropScience LP (formerly known as Aventis CropScience USA LP), Bayer

CropScience Holding Inc., Bayer CropScience Inc., Bayer CropScience LLC, Stoneville

Pedigreed Seed Company, Bayer Corporation, Bayer AG, Bayer CropScience AG, Bayer

BioScience NV, Bayer CropScience Holding SA, Bayer CropScience SA, and StarLink Logistics

Inc.; their respective current and former parents, subsidiaries and affiliates; the current and

former agents (actual or apparent), servants, employees, officers, directors, members, managers,

partners, owners, attorneys,  and representatives of any such Person and their respective heirs,

executors, administrators, predecessors, successors and assigns (each a "Bayer Released Party"

and, collectively, the "Bayer Released Parties"); (ii) each of Riceland Foods, Inc., Producers

Rice Mill, Inc., BASF Agrochemical Products B.V., BASF Corporation, BASF Plant Science

Company GmbH, BASF Plant Science LP, Horizon Ag, LLC, and Louisiana State University as

well as the current and former parents, subsidiaries and affiliates of each of them; the current

and former agents (actual or apparent), servants, employees, officers, directors, members,

managers, partners, owners, attorneys,  and representatives of any such Person; and their

respective heirs, executors, administrators, predecessors, successors and assigns, and (iii) any

other Person (the Persons referenced in the foregoing clauses (ii) and (iii) being collectively

referred to herein as the "Additional Released Parties") of and from any and all claims, demands,

causes of action, liabilities, sums of money, damages (including, but not limited to, punitive

damages), loss of service, expenses, compensation, costs and losses, of any type, kind, nature,

description or character whatsoever, whether based on tort, contract or other theory of recovery

and including claims for contribution and indemnity, whether known or unknown, suspected or

unsuspected, whether liquidated or unliquidated, which the Settling Claimant Releasing Parties,

or any of them, now has or which may hereafter accrue on account of or in any way growing or

arising out of the presence in the United States rice supply of Bayer GM Rice Seed, against any

Bayer Released Party or any Additional Released Party (collectively, the "Settling Claimant

Released Claims").  However, if, and only if, the undersigned is a landlord who is seeking

recovery (y) directly as an Enrolled Claimant for some claims and indirectly as an Affiliated

Claimant for other claims or (z)  as an Affiliated Claimant for different claims with more than

one Enrolled Claimant this Release specifically permits the undersigned to participate in the

program in both such capacities for those different claims but in all other respects is fully

operative and binding on the undersigned.

Settling Claimant, on Settling Claimant's behalf and all other Settling Claimant

Releasing Parties, covenants and agrees that except to the extent provided herein Settling

Claimant will not sue or bring any action or cause of action, including, without limitation, by

way of third party claim, cross-claim or counterclaim, against any Bayer Released Party and/or

any Additional Released Party in respect of any Settling Claimant Released Claim.

Settling Claimant warrants and represents that such Person is the sole and lawful owner

of all rights, title and interest in and to the matters released and settled by such Person herein, or

otherwise has, to the fullest extent permitted by applicable law, the requisite power and authority

to release and settle such matters on behalf of Settling Claimant and all Settling Claimant

Releasing Parties, and that neither Settling Claimant nor any Settling Claimant Releasing Party

has assigned, transferred, pledged, hypothecated or subrogated any Settling Claimant Released

Claim or any part or portion of any Settling Claimant Released Claim.

Upon receipt of any Settlement Payment by Settling Claimant under the Settlement

Eligible Claimant:

Agreement, subject to its receipt of this Release (executed by Settling Claimant) and, as

applicable, a General Release of All Claims duly executed by any Affiliated Claimant to the

Settling Claimant, Bayer releases Settling Claimant and any such Affiliated Claimant from any

claim related to the presence of Bayer GM Rice Seed in the United States rice supply.  The

foregoing release specifically excludes, and Bayer is not prohibited or limited in any way by

such release from bringing, the following claims:

- Any claim arising out of any commercial transaction between the Settling

  Claimant or any such Affiliated Claimant and Bayer or any Person that

  sells or distributes any Bayer product.

- Any claim against any other Person that may affect anticipated payments

  from any Additional Released Party or may affect the ownership or

  property interest of the Settling Claimant or any such Affiliated Claimant,

  directly or indirectly, in any Additional Released Party.  The foregoing

  release only covers claims made directly against the Settling Claimant or

  applicable Affiliated Claimant.

- Any claim against the Settling Claimant or any such Affiliated Claimant

  related to fraudulent or deceptive information submitted to the Claims

  Administrator under the Agreement or to enforce an obligation of an

  Enrolled Claimant or Affiliated Claimant under this Agreement.

Each Bayer Released Party and each Additional Released Party may plead this Release as

a complete defense and bar to any Settling Claimant Released Claim brought in contravention

hereof and, in the event any Settling Claimant Releasing Party brings a Settling Claimant

Released Claim, the Settling Claimant shall indemnify, defend and hold each Bayer Released Party and each Additional Released Party harmless from and against any and all costs, fees, liabilities, expenses, damages, judgment, interest, debts, or losses suffered or incurred in connection therewith, whether directly or indirectly, including the reasonable fees and disbursements of counsel and other professionals and court costs incurred in connection with enforcing the terms of this paragraph.

Settling Claimant represents and warrants, as to any Settling Claimant Released Claim, that no Settling Claimant Releasing Party has, as applicable, heretofore assigned or transferred, or purported to assign or to transfer, to any person or entity any Settling Claimant Released Claim released hereunder, or, any portion thereof or interest therein; and the Settling Claimant agrees to indemnify, defend and hold each Bayer Released Party and each Additional Released Party harmless from and against any and all claims and liabilities based on or arising out of any such assignment or transfer or purported assignment or transfer, including the reasonable fees and disbursements of counsel and other professionals and court costs incurred in connection with enforcing the terms of this paragraph.

Any Settlement Payments to be made to Settling Claimant shall be made to such Person subject to and in accordance with the terms of the Settlement Agreement and the Qualified Settlement Fund Agreement. Settling Claimant acknowledges and agrees that by participating in the Program Settling Claimant waives the right to receive any punitive or emotional damages in respect of any Eligible Claim and Settling Claimant understands and agrees that no Settlement Payment paid under the terms of the Settlement Agreement is, or shall be deemed to be, attributable to punitive or emotional damages.

Eligible Claimant:

Settling Claimant will bear its own costs related hereto and to the claims released hereby.

This Release shall also release the Bayer Released Parties and their attorneys from any and all claims, demands, causes of action, liabilities, sums of money, damages, loss of service, expenses, compensation, costs and losses, of any type, kind, nature, description or character whatsoever, including claims for contribution and indemnity, whether known or unknown, suspected or unsuspected, whether liquidated or unliquidated, related to the conduct of the Bayer Released Parties and/or their attorneys in the prosecution or defense of any claim being released hereby. This Release does not release any obligations created by the Settlement Agreement.

With regard to medical bills, liens and other potential rights for reimbursement, Settling Claimant agrees as follows:

1.     Responsibility for Satisfaction of All Medical Expenses, Costs and Liens. Settling Claimant represents and warrants that (a) Medical Expenses and Costs were not alleged as injuries and/or damages in this matter because no such Medical Expenses and Costs exist; and/or (b) if any past, present and/or future medical bills, costs or liens in fact are discovered to result from or arise out of Settling Claimant's alleged injuries and/or damages Settling Claimant represents and warrants that they have been paid or will be paid by Settling Claimant and are Settling Claimant's responsibility to pay.

2.     No Governmental Benefits. Settling Claimant represents and warrants that Settling Claimant has not received any federal or other government medical assistance, vocational rehabilitation services, or other medical benefits of any type arising out of or related to Settling Claimant's alleged injuries.

3.     Attorney Liens. Settling Claimant represents and warrants that all legal expenses, bills, costs, or contingency fee agreements resulting from or arising out of representation of Settling Claimant by Settling Claimant's retained attorney in relation to Settling Claimant's claims have been paid or will be paid out of the proceeds of the settlement and are Settling Claimant's responsibility to pay, and that any liens based on any legal expenses, bills, costs, or contingency fee agreements incurred by Settling Claimant's retained attorney as a result of Settling Claimant's alleged injuries will be satisfied by Settling Claimant.

4.      No Subrogation Claims or Liens. Settling Claimant further represents and warrants that Settling Claimant is aware of no subrogation claims, liens, or claims by Medicare and/or other Governmental Entities for payment of any type or character by reason of any medical condition or injuries arising out of Settling Claimant's alleged injuries.

5.      Landlord Claims. Settling Claimant represents and warrants that any claim to recovery relating to the presence of Bayer GM Rice Seed in the U.S. rice supply by any Affiliated Claimant have been paid or will be paid out of the proceeds of the settlement and are Settling Claimant's responsibility to pay, and that any claims by any such parties will be satisfied by Settling Claimant.

6.      It is understood and agreed that this settlement is the compromise of a disputed claim and that this Release, the Settlement Agreement, and any payment made pursuant to the Settlement Agreement may not be used by anyone as evidence of negligence or liability of any kind by Bayer, provided, however, that nothing in this Release shall be construed to prevent Bayer from pleading or otherwise proving its status as a joint tortfeasor for the purpose of seeking contribution from any Additional Released Party. This Release was entered into in good faith based upon arms-length negotiation between Settling Claimant, Bayer and their respective counsel.

To procure the payment of the Settlement Payment(s) to be made pursuant to the terms of the Settlement Agreement, the Settling Claimant hereby declares that no representations about the nature and extent of any injuries or damages made by any physician, attorney, or agent(s) of Bayer has induced Settling Claimant to execute this Release and that in determining the said sum there has been taken into consideration not only the ascertained damages, but also the possibility that the injuries or damages sustained may be permanent and progressive and recovery therefrom uncertain and indefinite and that other damage may become apparent at some future time, so that consequences not now anticipated may result from said incident, casualty, or event.

Except for the warranties, representations, covenants, terms and conditions specifically set forth herein, in executing this Release, the Settling Claimant has not received nor relied upon any oral or written representation of any Bayer Released Party regarding any fact, circumstance, condition, legal effect or promise of future action and, specifically, no representations have been

made by any attorney or agent of any Bayer Released Party about the nature or extent of any damages.

Capitalized terms used and not otherwise defined in this Release carry the meanings ascribed to them in the Settlement Agreement.

Nothing in this Release, express or implied, is intended or shall be construed to confer upon, or to give to, any Person other than the Bayer Released Parties, the Additional Released Parties and their respective successors and permitted assigns, any right, remedy or claim under or by reason of this Release or any covenant, condition or stipulation thereof; and the covenants, stipulations and agreements contained in this Release are and shall be for the sole and exclusive benefit of the Bayer Released Parties, the Additional Released Parties and their respective successors and permitted assigns.

The Settlement Agreement is an effort to compromise the claims made by Claimants which were disputed as to validity and/or amount and the Settlement Agreement may not be used by anyone as evidence of negligence or liability of any kind by Bayer, provided, however, that nothing in this Release shall be construed to prevent Bayer from pleading or otherwise proving its status as a joint tortfeasor for the purpose of seeking contribution from any Additional Released Party. This Agreement and the Release extinguish any and all Liability on behalf of the Additional Released Parties to the Enrolled Claimants in any way growing or arising out of the detection in the United States rice supply of Bayer GM Rice Seed. As a condition of participating in the Agreement, Claimants waive any opportunity or right to intervene or voluntarily participate in support of any of the Additional Released Parties, and agree not to intervene or voluntarily participate in support of any of the Additional Released Parties, in any lawsuit brought by any

Eligible Claimant:

Bayer entity seeking contribution, or recovery in any form, for funds paid under the Settlement Agreement against any of the Additional Released Parties, even if such lawsuit adversely affects Claimant's interest in any such party.  Anything to the contrary in this paragraph notwithstanding, Settling Claimant shall not be required to act, or refrain from acting, in such a way as to violate a fiduciary duty owed to any Additional Released Party.  For the avoidance of doubt, Settling Claimant agrees that no such fiduciary duty arises from membership or stock ownership of any Additional Released Party.

This Release, together with the Settlement Agreement (including any and all Exhibits attached thereto), constitutes the entire agreement between Settling Claimant and Bayer, and no other understandings or agreements, written or oral, shall be used to interpret this Release. The Settling Claimant acknowledges that Settling Claimant has been advised to consult an attorney of Settling Claimant's choice regarding this Release.  If represented, the Settling Claimant acknowledges that Settling Claimant's counsel may represent other rice farmers in connection with the Settlement Agreement and/or in connection with the GMB Settlement Agreement and consents to that representation and, to the extent that other representation may create a conflict of interest with the Settling Claimant, the Settling Claimant has given informed consent to Settling Claimant's counsel to such other representation in writing.  If represented, the Settling Claimant further acknowledges that Settling Claimant's counsel has disclosed to Settling Claimant any representation of other parties, other than rice farmers, who have made claims against Bayer related to the presence of Bayer GM Rice Seed in the United States rice supply and, to the extent that other representation may create a conflict of interest with the Settling Claimant, the Settling Claimant has given informed consent to Settling Claimant's counsel to such other representation in writing.  The Settling Claimant acknowledges that Settling Claimant

fully understands this Release and, as applicable, the effect of becoming an Enrolled Claimant

under the Settlement Agreement.

**CAUTION: READ BEFORE SIGNING:**

**IN WITNESS WHEREOF,** Claimant, Claimant's Representative (if any) and Claimant's

Counsel (if any) have each executed this Release, as of the dates set forth below.

| SIGNATURE BY SETTLING CLAIMANT (if Settling Claimant is Natural Person) | |
| --- | --- |
| Signature by Settling Claimant: | |
| Print Name: | |
| Date of Signature: | ___ / ___ / ___ <br> (Month/Day/Year) |
| **SIGNATURE BY SETTLING CLAIMANT (if Settling Claimant is other than a Natural Person, or if the Settling Claimant is Deceased or Incompetent)** | |
| Signature of Authorized Person: | |
| Print Name: | |
| Relationship to Settling Claimant: | |
| Date of Signature: | ___ / ___ / ___ <br> (Month/Day/Year) |
| **WITNESS SIGNATURE** | |
| I certify under penalties of perjury that I witnessed _____ sign this Release in my presence at the following location on this date. | |
| Signature of Witness: | |
| Print Name: | |
| Date of Signature: | ___ / ___ / ___ <br> (Month/Day/Year) |
| Address of Location Where Signed: | Street |
| | City                State                Zip |
| My Full Name: | Last                First                Middle |
| My Current Address: | Street |
| | City                State                Zip |

| SIGNATURE BY CLAIMANT'S COUNSEL | |
|---|---|
| Signature by Claimant's Counsel: | |
| Date of Signature: | _ / _ / __<br>(Month/Day/Year) |